

# Disclosure Statement
# for
# Solicitation of Acceptances of a
# Prepackaged Plan of Reorganization

THE VOTING DEADLINE TO ACCEPT OR REJECT THE PREPACKAGED PLAN IS 5:00 P.M. (PREVAILING EASTERN TIME) ON AUGUST 13, 2012 UNLESS EXTENDED BY THE COMPANY (THE "UNDERLINE VOTING DEADLINE").   TO BE COUNTED, BALLOTS MUST BE RECEIVED BY THE VOTING AGENT (AS DEFINED HEREIN) ON OR BEFORE THE VOTING DEADLINE.

THIS SOLICITATION IS BEING CONDUCTED TO OBTAIN SUFFICIENT ACCEPTANCES OF A PREPACKAGED PLAN OF REORGANIZATION PRIOR TO THE FILING OF VOLUNTARY REORGANIZATION CASES UNDER CHAPTER 11 OF TITLE 11 OF THE UNITED STATES CODE.  NO CHAPTER 11 CASES HAVE YET BEEN COMMENCED.  AS NO CHAPTER 11 CASES HAVE YET BEEN COMMENCED, THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT AS CONTAINING "ADEQUATE INFORMATION" WITHIN THE MEANING OF SECTION 1125(a) OF THE BANKRUPTCY CODE.  IF VOLUNTARY REORGANIZATION CASES ARE FILED, IMMEDIATELY FOLLOWING SUCH FILING, BROADVIEW NETWORKS HOLDINGS, INC. AND EACH OF ITS DIRECT AND INDIRECT SUBSIDIARIES EXPECT TO SEEK AN ORDER OF THE BANKRUPTCY COURT APPROVING THIS DISCLOSURE STATEMENT AS CONTAINING ADEQUATE INFORMATION, AND THE SOLICITATION OF VOTES FOR AND CONFIRMING, THE PREPACKAGED PLAN OF REORGANIZATION DESCRIBED HEREIN.

Broadview Networks Holdings, Inc. ("**Broadview**") and its direct and indirect subsidiaries (collectively, the "**Company**" or, on and after a bankruptcy filing, the "**Debtors**," as applicable)[1] hereby transmit this disclosure statement (as may be amended, supplemented or

---

[1]    The last four digits of the taxpayer identification numbers of Broadview and its subsidiaries follow in parentheses: (i) Broadview Networks Holdings, Inc. (0798); (ii) A.R.C. Networks, Inc. (0814); (iii) ARC Networks, Inc. (4934); (iv) ATX Communications, Inc. (2245); (v) ATX Licensing, Inc. (9838); (vi) ATX Telecommunication Services of Virginia, LLC (3888); (vii) BridgeCom Holdings, Inc. (2965); (viii) BridgeCom International, Inc. (3985); (ix) BridgeCom Solutions Group, Inc. (3989); (x) Broadview Networks, Inc. (1082); (xi) Broadview Networks of Massachusetts, Inc. (8054); (xii) Broadview Networks of Virginia, Inc. (6404); (xiii) Broadview NP Acquisition Corp. (2734); (xiv) BV-BC Acquisition Corp. (7846); (xv) CoreComm – ATX, Inc. (0529); (xvi) CoreComm Communications, LLC (2077); (xvii) Digicom, Inc. (7176); (xviii) Eureka Broadband Corporation (6004); (xiv) Eureka Holdings, LLC (1318); (xx) Eureka Networks, LLC (1244); (xxi) Eureka Telecom, Inc. (3720); (xxii) Eureka Telecom of VA, Inc. (5508); (xxiii) InfoHighway Communications Corporation (0551); (xxiv) Info-Highway International, Inc. (8543); (xxv) InfoHighway of Virginia, Inc. (1600); (xxvi) Nex-i-.com, Inc. (3240);

otherwise modified from time to time, the "**Disclosure Statement**") pursuant to section 1126(b) of title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as amended (the "**Bankruptcy Code**"), in connection with the Company's solicitation of votes (the "**Solicitation**") to confirm the Joint Prepackaged Plan of Reorganization for Broadview Networks Holdings, Inc. and Its Affiliated Debtors (as may be amended, supplemented or otherwise modified from time to time, the "**Prepackaged Plan**").  All capitalized terms in this Disclosure Statement not otherwise defined herein have the meanings given to them in the Prepackaged Plan attached hereto as Exhibit 1.  The purpose of this Disclosure Statement is to provide holders of Claims and Interests that are entitled to vote on the Prepackaged Plan (i.e., holders of Class 2 Claims and Class 8 Interests under the Prepackaged Plan) (the "**Voting Classes**") with sufficient information to allow them to make an informed decision on whether to accept or reject the Prepackaged Plan.

The overall purpose of the Prepackaged Plan is to enable the Company to de-lever its balance sheet and better position the Company to compete in the telecommunications and information technology industry, and to provide a solution for the impending maturity of its Senior Secured Notes on September 1, 2012.  Generally, the Prepackaged Plan provides that:

- holders of the Senior Secured Notes shall receive their pro rata share of (i) 97.5% of the common stock (the "**New Common Stock**"), of Broadview following the financial restructuring contemplated herein ("**Reorganized Broadview**"), subject to dilution by shares of New Common Stock issued pursuant to the Management Equity Plan or upon exercise of the New Warrants (each as defined herein), and (ii) $150 million of new 10.5% senior secured notes due 2017 (the "**New Senior Secured Notes**");

- a New ABL Facility that will provide total borrowing commitment upon consummation of the Prepackaged Plan of no less than $25 million;

- the repayment in full and termination of the Company's obligations under the ABL Facility;

- the issuance of (i) 2.5% of the New Common Stock, subject to dilution by shares of New Common Stock issued pursuant to the Management Equity Plan or upon exercise of the New Warrants (each, as defined herein), and (ii) two series of 8-year warrants to purchase up to (A) 11% of the fully diluted New Common Stock, subject to dilution by the 4% Warrants (defined below) (the "**11% Warrants**") and (B) 4% of the fully diluted New Common Stock (the "**4% Warrants**," collectively, the "**New Warrants**"), in each case, subject to dilution by the Management Equity Plan, as further described in Section 6.4(e) of this Disclosure Statement, to be issued on a pro rata basis to holders of the Company's outstanding

---

(xxvii) Open Support Systems LLC (9972); and (xxviii) TruCom Corporation (0714).  The Debtors' executive headquarters' address is 800 Westchester Avenue, Rye Brook, NY 10573.

Existing Preferred Interests in exchange for the cancellation of such Existing Preferred Interests;

- the cancellation of all of the Other Existing Equity Interests; and

- the retirement of the Senior Secured Notes.

**YOU HAVE RECEIVED THIS DISCLOSURE STATEMENT, THE BALLOT AND THE ENCLOSED MATERIALS BECAUSE YOU ARE ENTITLED TO VOTE ON THE PREPACKAGED PLAN.**

INFORMATION CONTAINED HEREIN IS SUBJECT TO COMPLETION OR AMENDMENT. THIS DISCLOSURE STATEMENT SHALL NOT CONSTITUTE AN OFFER TO SELL OR THE SOLICITATION OF AN OFFER TO BUY NOR WILL THERE BE ANY DISTRIBUTION OF THE SECURITIES DESCRIBED HEREIN UNTIL THE EFFECTIVE DATE OF THE PREPACKAGED PLAN.

ALL CAPITALIZED TERMS IN THIS DISCLOSURE STATEMENT NOT OTHERWISE DEFINED HEREIN HAVE THE MEANINGS GIVEN TO THEM IN THE PREPACKAGED PLAN, ATTACHED TO THIS DISCLOSURE STATEMENT AS EXHIBIT 1.

THE COMPANY HAS ENTERED INTO A RESTRUCTURING SUPPORT AGREEMENT WITH THE HOLDERS OF APPROXIMATELY TWO-THIRDS OF THE AGGREGATE PRINCIPAL AMOUNT OF THE OUTSTANDING SENIOR SECURED NOTES (SUCH HOLDERS, THE "**CONSENTING NOTEHOLDERS**") AND THE HOLDERS OF APPROXIMATELY 70% OF THE EXISTING PREFERRED INTERESTS (SUCH HOLDERS, THE "**CONSENTING EQUITY HOLDERS**"). PURSUANT TO THE RESTRUCTURING SUPPORT AGREEMENT, THE CONSENTING NOTEHOLDERS AND CONSENTING EQUITY HOLDERS, AS APPLICABLE, HAVE AGREED TO, AMONG OTHER THINGS, VOTE ALL OF THEIR SENIOR SECURED NOTES AND EXISTING PREFERRED INTERESTS IN FAVOR OF THE PREPACKAGED PLAN.

THE CONFIRMATION AND EFFECTIVENESS OF THE PREPACKAGED PLAN ARE SUBJECT TO MATERIAL CONDITIONS PRECEDENT. THERE IS NO ASSURANCE THAT THESE CONDITIONS WILL BE SATISFIED OR WAIVED.

HOLDERS OF CLAIMS AGAINST, AND HOLDERS OF INTERESTS IN, THE COMPANY ARE ENCOURAGED TO READ AND CAREFULLY CONSIDER THE MATTERS DESCRIBED IN THIS DISCLOSURE STATEMENT.

IF THE PREPACKAGED PLAN IS CONFIRMED BY THE BANKRUPTCY COURT AND THE EFFECTIVE DATE OCCURS, ALL HOLDERS OF CLAIMS AGAINST, AND HOLDERS OF INTERESTS IN, THE COMPANY (INCLUDING, WITHOUT LIMITATION, THOSE HOLDERS OF CLAIMS OR INTERESTS WHO DO NOT SUBMIT BALLOTS TO ACCEPT OR REJECT THE PREPACKAGED PLAN OR WHO ARE NOT ENTITLED TO VOTE ON THE PREPACKAGED PLAN) WILL BE BOUND BY THE TERMS OF THE PREPACKAGED PLAN AND THE TRANSACTIONS CONTEMPLATED THEREBY.

NONE OF THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION (THE "**SEC**"), ANY OTHER SECURITIES COMMISSION OR ANY OTHER REGULATORY AUTHORITY OR ANY COURT HAS APPROVED OR DISAPPROVED THE PREPACKAGED PLAN, THE NEW COMMON STOCK OR THE NEW SENIOR SECURED NOTES, NOR HAVE ANY OF THE FOREGOING AUTHORITIES PASSED UPON OR ENDORSED THE MERITS OF THE PREPACKAGED PLAN OR THE ACCURACY OR ADEQUACY OF THIS DISCLOSURE STATEMENT.  ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.  THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE AN OFFER OR SOLICITATION IN ANY STATE OR OTHER JURISDICTION IN WHICH SUCH OFFER OR SOLICITATION IS NOT AUTHORIZED.

THE COMPANY BELIEVES THAT THE ISSUANCE OF THE SECURITIES UNDER THE PREPACKAGED PLAN WILL BE EXEMPT FROM REGISTRATION UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "**SECURITIES ACT**"), AND RELATED STATE STATUTES BY REASON OF THE APPLICABILITY OF SECTIONS 1145(a)(1) AND (2) OF THE BANKRUPTCY CODE OR OTHER APPLICABLE EXEMPTIONS.

EXCEPT AS OTHERWISE SET FORTH HEREIN, THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE BY THE COMPANY AS OF THE DATE HEREOF, AND THE DELIVERY OF THIS DISCLOSURE STATEMENT WILL NOT, UNDER ANY CIRCUMSTANCES, CREATE ANY IMPLICATION THAT THE INFORMATION CONTAINED HEREIN IS CORRECT AT ANY TIME SUBSEQUENT TO THE DATE HEREOF.

NO PERSON HAS BEEN AUTHORIZED BY THE COMPANY IN CONNECTION WITH THE PREPACKAGED PLAN OR THE SOLICITATION TO GIVE ANY INFORMATION OR TO MAKE ANY REPRESENTATION OTHER THAN AS CONTAINED IN THIS DISCLOSURE STATEMENT, THE PREPACKAGED PLAN AND THE EXHIBITS AND SCHEDULES ATTACHED TO OR INCORPORATED BY REFERENCE OR REFERRED TO IN THE DISCLOSURE STATEMENT AND/OR PREPACKAGED PLAN, AND, IF GIVEN OR MADE, SUCH INFORMATION OR REPRESENTATION MAY NOT BE RELIED UPON AS HAVING BEEN AUTHORIZED BY THE COMPANY.

FOR THE CONVENIENCE OF HOLDERS OF CLAIMS AND INTERESTS, THIS DISCLOSURE STATEMENT SUMMARIZES THE TERMS OF THE PREPACKAGED PLAN AND CERTAIN OF THE PLAN DOCUMENTS.  IF ANY INCONSISTENCY EXISTS BETWEEN THE PREPACKAGED PLAN OR THE APPLICABLE PLAN DOCUMENTS AND THIS DISCLOSURE STATEMENT, THE TERMS OF THE PREPACKAGED PLAN OR THE APPLICABLE PLAN DOCUMENTS ARE CONTROLLING.  THE SUMMARIES OF THE PREPACKAGED PLAN AND THE PLAN DOCUMENTS IN THIS DISCLOSURE STATEMENT DO NOT PURPORT TO BE COMPLETE AND ARE SUBJECT TO, AND ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO, THE FULL TEXT OF THE PREPACKAGED PLAN AND THE APPLICABLE PLAN DOCUMENTS.  ALL HOLDERS OF CLAIMS AND INTERESTS ARE ENCOURAGED TO REVIEW THE FULL TEXT OF THE PREPACKAGED PLAN AND THE PLAN DOCUMENTS, AND TO READ CAREFULLY THIS ENTIRE DISCLOSURE STATEMENT, INCLUDING ALL EXHIBITS HERETO.

iv

THIS DISCLOSURE STATEMENT MAY NOT BE RELIED ON FOR ANY PURPOSE OTHER THAN TO DETERMINE WHETHER TO VOTE TO ACCEPT OR REJECT THE PREPACKAGED PLAN, AND NOTHING STATED HEREIN SHALL CONSTITUTE AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PERSON, OR BE ADMISSIBLE IN ANY PROCEEDING INVOLVING THE COMPANY OR ANY OTHER PERSON, OR BE DEEMED CONCLUSIVE EVIDENCE OF THE TAX OR OTHER LEGAL EFFECTS OF THE PREPACKAGED PLAN ON THE COMPANY OR HOLDERS OF CLAIMS OR INTERESTS.

HOLDERS OF CLAIMS OR INTERESTS SHOULD NOT CONSTRUE THE CONTENTS OF THIS DISCLOSURE STATEMENT AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL OR TAX ADVICE.  EACH HOLDER SHOULD CONSULT WITH ITS OWN LEGAL, BUSINESS, FINANCIAL AND TAX ADVISORS WITH RESPECT TO ANY SUCH MATTERS CONCERNING THIS DISCLOSURE STATEMENT, THE SOLICITATION OF VOTES TO ACCEPT THE PREPACKAGED PLAN, THE PREPACKAGED PLAN, THE PLAN DOCUMENTS AND THE TRANSACTIONS CONTEMPLATED HEREBY AND THEREBY.

**CAUTIONARY STATEMENT REGARDING FORWARD-LOOKING STATEMENTS**

THIS DISCLOSURE STATEMENT CONTAINS BOTH HISTORICAL AND FORWARD-LOOKING STATEMENTS.  ALL STATEMENTS OTHER THAN STATEMENTS OF HISTORICAL FACT INCLUDED IN THIS DISCLOSURE STATEMENT THAT ADDRESS ACTIVITIES, EVENTS OR DEVELOPMENTS THAT THE COMPANY EXPECTS, BELIEVES OR ANTICIPATES WILL OR MAY OCCUR IN THE FUTURE ARE FORWARD-LOOKING STATEMENTS INCLUDING, WITHOUT LIMITATION, THE STATEMENTS ABOUT THE COMPANY'S PLANS, OBJECTIVES, STRATEGIES AND PROSPECTS REGARDING, AMONG OTHER THINGS, THE COMPANY'S FINANCIAL CONDITION, RESULTS OF OPERATIONS AND BUSINESS.  THE COMPANY HAS IDENTIFIED SOME OF THESE FORWARD-LOOKING STATEMENTS WITH WORDS LIKE "BELIEVE," "MAY," "WILL," "SHOULD," "EXPECT," "INTEND," "PLAN," "PREDICT," "ANTICIPATE," "ESTIMATE" OR "CONTINUE" AND OTHER WORDS AND TERMS OF SIMILAR MEANING.  THESE FORWARD-LOOKING STATEMENTS ARE CONTAINED THROUGHOUT THIS DISCLOSURE STATEMENT, ARE BASED ON CURRENT EXPECTATIONS ABOUT FUTURE EVENTS AFFECTING THE COMPANY AND ARE SUBJECT TO UNCERTAINTIES AND FACTORS RELATING TO THE COMPANY'S OPERATIONS, BUSINESS ENVIRONMENT, AND DISCUSSIONS WITH CREDITORS.  ALL SUCH MATTERS ARE DIFFICULT TO PREDICT AND MANY ARE BEYOND THE COMPANY'S CONTROL AND COULD CAUSE THE COMPANY'S ACTUAL RESULTS TO DIFFER MATERIALLY FROM THOSE MATTERS EXPRESSED OR IMPLIED BY FORWARD-LOOKING STATEMENTS.  MANY FACTORS MENTIONED IN THE COMPANY'S DISCUSSION IN THIS DISCLOSURE STATEMENT WILL BE IMPORTANT IN DETERMINING FUTURE RESULTS.  ALTHOUGH THE COMPANY BELIEVES THAT THE EXPECTATIONS REFLECTED IN THESE FORWARD-LOOKING STATEMENTS ARE REASONABLE, THE COMPANY CANNOT GUARANTEE FUTURE RESULTS, LEVELS OF ACTIVITY, PERFORMANCE OR ACHIEVEMENTS.  THE COMPANY'S PLANS AND OBJECTIVES ARE BASED, IN PART, ON ASSUMPTIONS INVOLVING THE COMPANY CONTINUING AS A GOING CONCERN AND EXECUTING

THE COMPANY'S STATED BUSINESS PLAN AND OBJECTIVES. FORWARD-LOOKING STATEMENTS (INCLUDING ORAL REPRESENTATIONS) ARE ONLY PREDICATIONS OR STATEMENTS OF CURRENT PLANS, WHICH THE COMPANY REVIEWS CONTINUOUSLY. THEY CAN BE AFFECTED BY INACCURATE ASSUMPTIONS THE COMPANY MIGHT MAKE OR BY KNOWN OR UNKNOWN RISKS AND UNCERTAINTIES, INCLUDING, AMONG OTHER THINGS, RISKS ASSOCIATED WITH:

- servicing and refinancing the Company's substantial indebtedness;
- the Company's history of net losses;
- the elimination or relaxation of certain regulatory rights and protections;
- billing and other disputes with vendors;
- failure to maintain interconnection and service agreements with incumbent local exchange and other carriers;
- the loss of customers in an adverse economic environment;
- regulatory uncertainties in the communications industry;
- system disruptions or the failure of the Company's information systems to perform as expected;
- the failure to anticipate and keep up with technological changes;
- inability to provide services and systems at competitive prices;
- difficulties associated with collecting payment from incumbent local exchange carriers, Interexchange Carriers ("**IXCs**") and wholesale customers;
- the highly competitive nature of the communications market in which the Company operates including competition from incumbents, cable operators and other new market entrants, and declining prices for communications services;
- continued industry consolidation;
- restrictions in connection with the New Senior Secured Notes Indenture and the New ABL Agreement;
- government regulation;
- increased regulation of Internet-protocol-based service providers;
- vendor bills related to past periods;
- the ability to maintain certain real estate leases and agreements;
- interruptions in the business operations of third-party service providers;
- limits on the Company's ability to seek indemnification for losses from individuals and entities from whom the debtors have acquired assets and operations;
- the financial difficulties faced by others in the Company's industry;
- the failure to retain and attract management and key personnel;
- the failure to manage and expand operations effectively;
- the failure to successfully integrate in any future acquisitions;
- misappropriation of the Company's intellectual property and proprietary rights;

- the possibility of incurring liability for information disseminated through the Company's network;

- service network disruptions due to software or hardware bugs of the network equipment;

- fraudulent usage of the Company's network and services;

- the satisfaction of the conditions to consummate the Prepackaged Plan and the Company's ability to consummate the Prepackaged Plan;

- the impact of the Prepackaged Plan, if effected, on the Company's operations, credibility and valued relationships;

- the uncertainty surrounding the Prepackaged Plan, including the Company's ability to retain employees, agents, customers and vendors; and

- the amount of the costs, fees, expenses and charges related to the transactions contemplated by the prepackaged plan.

BECAUSE THE COMPANY'S ACTUAL RESULTS, PERFORMANCE OR ACHIEVEMENTS COULD DIFFER MATERIALLY FROM THOSE EXPRESSED IN, OR IMPLIED BY, THESE FORWARD-LOOKING STATEMENTS, THE COMPANY CANNOT GIVE ANY ASSURANCE THAT ANY OF THE EVENTS ANTICIPATED BY THESE FORWARD-LOOKING STATEMENTS WILL OCCUR OR, IF ANY OF THEM DO, WHAT IMPACT THEY WILL HAVE ON THE COMPANY'S BUSINESS, RESULTS OF OPERATIONS AND FINANCIAL CONDITION.  YOU ARE CAUTIONED NOT TO PLACE UNDUE RELIANCE ON THESE FORWARD-LOOKING STATEMENTS, WHICH SPEAK ONLY AS OF THE DATE OF THIS DISCLOSURE STATEMENT.  THE COMPANY DOES NOT UNDERTAKE ANY OBLIGATION TO UPDATE THESE FORWARD-LOOKING STATEMENTS TO REFLECT NEW INFORMATION, FUTURE EVENTS OR OTHERWISE, EXCEPT AS MAY BE REQUIRED UNDER APPLICABLE LAW.

**THE COMPANY SUPPORTS CONFIRMATION OF THE PREPACKAGED PLAN. THE COMPANY URGES ALL HOLDERS OF CLAIMS AND INTERESTS WHOSE VOTES ARE BEING SOLICITED TO ACCEPT THE PREPACKAGED PLAN.**

**IF THE REORGANIZATION CASES ARE FILED, THE COMPANY INTENDS TO CONTINUE OPERATING ITS BUSINESS IN CHAPTER 11 IN THE ORDINARY COURSE AND TO OBTAIN THE NECESSARY RELIEF FROM THE BANKRUPTCY COURT TO PAY ITS EMPLOYEES, AGENTS, TRADE AND CERTAIN OTHER CREDITORS IN FULL AND ON TIME IN ACCORDANCE WITH EXISTING BUSINESS TERMS.  THE COMPANY AND THE CONSENTING NOTEHOLDERS BELIEVE THAT IT IS IN THE BEST INTERESTS OF THE COMPANY FOR THE COMPANY TO CONTINUE TO PAY SUCH CREDITORS IN FULL AND ON TIME, BECAUSE: (I) DOING SO WILL MINIMIZE THE RISK OF DISRUPTION TO THE COMPANY'S BUSINESS; (II) THE PREPACKAGED PLAN PROVIDES FOR THE UNIMPAIRMENT OF GENERAL UNSECURED CLAIMS; AND (III) THE REORGANIZATION CASES ARE EXPECTED TO BE BRIEF IN DURATION DUE TO THEIR PREPACKAGED NATURE.**

**TABLE OF CONTENTS**

**Page**

ARTICLE I. INTRODUCTION ...........................................................................................1
    1.1     General. .............................................................................................1
    1.2     The Confirmation Hearing. ...............................................................2
    1.3     Classification of Claims and Interests. ..............................................3
    1.4     Voting; Holders of Claims Entitled to Vote. ......................................4
    1.5     Important Matters. .............................................................................5

ARTICLE II. SUMMARY OF PREPACKAGED PLAN AND CLASSIFICATION AND
          TREATMENT OF CLAIMS AND INTERESTS THEREUNDER ..................6

ARTICLE III. BUSINESS DESCRIPTION AND CIRCUMSTANCES THAT LED TO
          THE SOLICITATION .................................................................11
    3.1     General. ...........................................................................................11
    3.2     Industry Overview. ..........................................................................12
    3.3     Products and Services. .....................................................................12
    3.4     Service Agreements with Carriers. ..................................................14
    3.5     Facilities. .........................................................................................14
    3.6     Employees. ......................................................................................14
    3.7     Regulation. ......................................................................................14
    3.8     The Company's Capital Structure. ...................................................15

ARTICLE IV. EVENTS LEADING TO THE SOLICITATION ..............................................16
    4.1     Events Leading to the Solicitation. ..................................................16
    4.2     The Restructuring Support Agreement. ............................................17

ARTICLE V. REASONS FOR THE SOLICITATION .........................................................18

ARTICLE VI. THE PREPACKAGED PLAN ......................................................................19
    6.1     Anticipated Events in a Chapter 11 Case. ........................................19
    6.2     Summary of Distributions under the Prepackaged Plan. ...................20
    6.3     Settlement. .......................................................................................25
    6.4     Post-Confirmation Capital Structure of the Reorganized Debtors. ...25
    6.5     Means for Implementation. ...............................................................27
    6.6     Discharge. ........................................................................................31
    6.7     Vesting and Retention of Causes of Action. .....................................32
    6.8     Survival of Certain Indemnification Obligations. .............................33
    6.9     Release, Injunction and Related Provisions. .....................................33
    6.10    Objections to Claims and Interest. ...................................................39
    6.11    Executory Contracts. .......................................................................39
    6.12    Conditions Precedent to Confirmation and Consummation of the
           Prepackaged Plan. ...........................................................................40
    6.13    Retention of Jurisdiction. .................................................................42
    6.14    Amendments. ...................................................................................42

ARTICLE VII. CONFIRMATION OF THE PREPACKAGED PLAN .....................................43
    7.1     Confirmation Hearing. .....................................................................43

7.2     Confirmation. ...........................................................................................43
7.3     Classification of Claims and Interests.....................................................49
7.4     Consummation. ........................................................................................50

ARTICLE VIII. ALTERNATIVES TO CONFIRMATION AND  CONSUMMATION
OF THE PREPACKAGED PLAN ........................................................50
8.1     Alternative Plan(s) of Reorganization. ...................................................50
8.2     Liquidation Under the Bankruptcy Code. ...............................................51
8.3     Inaction/Maintenance of Status Quo. ......................................................51

ARTICLE IX. SUMMARY OF VOTING PROCEDURES ..........................................51
9.1     The Solicitation Package...........................................................................51
9.2     Voting Deadline. .......................................................................................52
9.3     Voting and Revocation Instructions..........................................................52
9.4     Note to Holders of Claims or Interests in the Voting Classes. ............55
9.5     Voting Tabulation. ....................................................................................56

ARTICLE X. THE REORGANIZATION CASES..........................................................57
10.1    Continuation of Business After the Petition Date.....................................57
10.2    First Day Relief. ........................................................................................57
10.3    Case Administration...................................................................................58

ARTICLE XI. CERTAIN RISK FACTORS TO BE CONSIDERED ...........................59
11.1    Certain Bankruptcy Considerations. ........................................................59
11.2    Risks Relating to the New Credit Agreement, the New Common Stock
and the New Notes. ...................................................................................66
11.3    Risks Associated with the Business. ........................................................70

ARTICLE XII. SECURITIES LAW MATTERS.............................................................84
12.1    General. .....................................................................................................84
12.2    Issuance and Resale of the New Senior Secured Notes and the New
Common Stock Under the Prepackaged Plan. ..........................................84
12.3    Where You Can Find More Information. ...................................................84

ARTICLE XIII. CERTAIN FEDERAL INCOME TAX  CONSEQUENCES OF THE
PREPACKAGED PLAN .......................................................................85
13.1    Introduction................................................................................................85
13.2    Federal Income Tax Consequences to the Company..................................86
13.3    Federal Income Tax Consequences to Holders of Certain Claims. ..................90

ARTICLE XIV. CONCLUSION.......................................................................................95

Annexed as Exhibits to this Disclosure Statement are copies of the following documents:

- Prepackaged Plan (Exhibit 1);

- Restructuring Support Agreement (Exhibit 2);

- Prepetition Organizational Chart (Exhibit 3);

- Audited Consolidated Financial Statements for the Company for the fiscal year ended December 31, 2011 (Exhibit 4);

- Liquidation Analysis (Exhibit 5);

- Reorganized Company's Projected Financial Information (Exhibit 6);

- New Senior Secured Notes Indenture (Exhibit 7); and

- Valuation Analysis (Exhibit 8).

x

## ARTICLE I.

## INTRODUCTION

### 1.1 *General.*

The Company hereby transmits this Disclosure Statement pursuant to section 1126(b) of the Bankruptcy Code, in connection with the Solicitation of votes with respect to the Prepackaged Plan. All capitalized terms in this Disclosure Statement not otherwise defined herein have the meanings given to them in the Prepackaged Plan attached hereto as Exhibit 1.

The purpose of this Disclosure Statement is to provide holders of Claims and Interests that are entitled to vote on the Prepackaged Plan (i.e., holders of Class 2 Claims and Class 8 Interests under the Prepackaged Plan) with sufficient information to allow them to make an informed decision on whether to accept or reject the Prepackaged Plan. The overall purpose of the Prepackaged Plan is to de-lever the Company's balance sheet and better position the Company to compete in the telecommunications and information technology industry. If the Company obtains the requisite votes accepting the Prepackaged Plan (which the Company believes it will in light of the fact that, as set forth herein, the Consenting Noteholders who hold approximately two-thirds of the aggregate principal amount of the outstanding Senior Secured Notes, and the Consenting Equity Holders, who hold approximately 70% of the Existing Preferred Interests, have agreed to vote for, support and not object to the Prepackaged Plan), the Company anticipates commencing the Reorganization Cases and seeking approval of this Disclosure Statement and the Prepackaged Plan from the Bankruptcy Court within 30 to 45 days of the filing of the Reorganization Cases. As set forth more fully herein and in the Prepackaged Plan, the Company believes that the provisions of section 1145(a)(1) and (2) of the Bankruptcy Code render the initial offer and distribution of the New Senior Secured Notes, the New Common Stock and the New Warrants on the Effective Date under the Prepackaged Plan exempt from federal and state securities registration.

**The Company has not commenced cases under chapter 11 of the Bankruptcy Code at this time.**

The Company has fixed **5:00 P.M. (prevailing Eastern Time) on July 11, 2012** as the voting record date (the "**Voting Record Date**"). Accordingly, only holders of record of Claims and Interests as of the Voting Record Date that are entitled to vote on the Prepackaged Plan will receive a Ballot and may vote on the Prepackaged Plan. In addition, a Ballot for voting to accept or reject the Prepackaged Plan is enclosed with this Disclosure Statement for the holders of Claims and Interests that are entitled to vote to accept or reject the Prepackaged Plan. If you are a holder of a Claim or Interest entitled to vote on the Prepackaged Plan and did not receive a Ballot, received a damaged Ballot or lost your Ballot, or if you have any questions concerning the procedures for voting on the Prepackaged Plan, please contact the Voting Agent: Kurtzman Carson Consultants ("**KCC**") at either **(866) 927-708** (for beneficial owners of Senior Secured Notes) or **(877) 833–4150** (for beneficial owners of Existing Preferred Interests and nominees of beneficial owners of Senior Secured Notes), via e-mail to **BroadviewInfo@kccllc.com** or send your written inquiry to:

**Kurtzman Carson Consultants**
**599 Lexington Avenue, 39th Floor**
**New York, NY 10022**
**Attn: Broadview Networks Holdings Ballot Processing**

**Although the solicitation of votes on the Prepackaged Plan relates to the Reorganization Cases and voluntary petitions for relief under chapter 11 of the Bankruptcy Code, no filing has yet occurred. The Company expressly reserves the right to extend the Voting Deadline by oral or written notice to the Voting Agent.**

Each holder of a Claim or Interest entitled to vote on the Prepackaged Plan should read this Disclosure Statement and the Exhibits hereto, including the Prepackaged Plan, as well as the instructions accompanying the Ballot in their entirety before voting on the Prepackaged Plan. These documents contain important information concerning the classification of Claims and Interests for voting purposes and the tabulation of votes. No solicitation of votes may be made except pursuant to this Disclosure Statement and section 1126(b) of the Bankruptcy Code. In voting on the Prepackaged Plan, holders of Claims and Interests entitled to vote should not rely on any information relating to the Company and its business other than the information contained in this Disclosure Statement, the Prepackaged Plan and all Exhibits hereto and thereto.

Additional copies of this Disclosure Statement (including the Exhibits hereto) are available upon request made to the office of the Company's counsel, Willkie Farr & Gallagher LLP, 787 Seventh Avenue, New York, New York 10019, Attention: Rachel C. Strickland, Esq., and Jennifer J. Hardy, Esq. (212) 728-8000 (phone) or (212) 728-8111 (facsimile). Additional copies of this Disclosure Statement (including the Exhibits hereto) can also be accessed free of charge from the following website: **http://www.kccllc.net/broadview**.

### 1.2    *The Confirmation Hearing.*

If the Company receives the requisite votes in favor of the Prepackaged Plan (which the Company believes it will in light of the fact that, as set forth above, the Consenting Noteholders who hold approximately two-thirds of the aggregate principal amount of the outstanding Senior Secured Notes, and the Consenting Equity Holders, who hold approximately 70% of the Existing Preferred Interests, have agreed to vote for, support and not object to the Prepackaged Plan), then the Company intends to file voluntary petitions for relief under chapter 11 of the Bankruptcy Code. Upon the commencement of the Reorganization Cases, the Company intends to request that the Bankruptcy Court schedule, as promptly as practicable, a hearing to approve this Disclosure Statement as containing adequate information within the meaning of section 1125(a) of the Bankruptcy Code and the solicitation of votes on the Prepackaged Plan as being in compliance with section 1126(b) of the Bankruptcy Code, and to confirm the Prepackaged Plan. Even if the Company does not receive the requisite votes in favor of the Prepackaged Plan prior to filing its petitions, the Company may decide to file for chapter 11 relief and seek confirmation of the Prepackaged Plan or a modified plan.

Section 1128(a) of the Bankruptcy Code requires that the Bankruptcy Court, after notice, hold a hearing to confirm a plan. Section 1128(b) provides that a party-in-interest may object to confirmation of a plan. Objections to confirmation must be filed with the Bankruptcy

Court and served on the Debtors as well as the other parties set forth in the notice of the Confirmation Hearing (the "**Notice of Confirmation Hearing**") by the objection deadline, as will be set forth therein.  The Notice of Confirmation Hearing shall be provided, among others, to holders of Claims and Interests entitled to vote on the Prepackaged Plan, or their representatives, as set forth in an order of the Bankruptcy Court and governed by the Bankruptcy Rules and local rules of the Bankruptcy Court.  At the Confirmation Hearing, the Bankruptcy Court will:

- determine whether the solicitation of votes on the Prepackaged Plan was in compliance with section 1126 of the Bankruptcy Code;

- determine whether the Prepackaged Plan has been accepted by a sufficient number and amount of Class 2 Claims and Class 8 Interests;

- determine whether this Disclosure Statement contains adequate information with the meaning of section 1125(a) of the Bankruptcy Code;

- hear and determine objections, if any, to the Prepackaged Plan and to confirmation of the Prepackaged Plan that have not been previously disposed of;

- determine whether the Prepackaged Plan meets the confirmation requirements of the Bankruptcy Code; and

- determine whether to confirm the Prepackaged Plan.

**1.3**     *Classification of Claims and Interests.*

The following table designates the Classes of Claims against and Interests in the Company, and specifies which Classes are (a) impaired or unimpaired by the Prepackaged Plan, (b) entitled to vote to accept or reject the Prepackaged Plan in accordance with section 1126 of the Bankruptcy Code, or (c) deemed to accept or reject the Prepackaged Plan.

| Class | Designation | Impairment | Entitled to Vote |
|-------|-------------|------------|------------------|
| Class 1 | ABL Facility Claims | No | No (Deemed to accept) |
| Class 2 | Senior Secured Notes Claims | Yes | Yes |
| Class 3 | Other Secured Claims | No | No (Deemed to accept) |
| Class 4 | Other Priority Claims | No | No (Deemed to accept) |
| Class 5 | General Unsecured Claims | No | No (Deemed to accept) |
| Class 6 | Intercompany Claims | No | No (Deemed to accept) |
| Class 7 | Intercompany Interests | No | No (Deemed to accept) |
| Class 8 | Existing Preferred Interests | Yes | Yes |
| Class 9 | Other Existing Equity Interests | Yes | No (Deemed to reject) |
| Class 10 | Subordinated Securities Claims | Yes | No (Deemed to reject) |

**1.4**     *Voting; Holders of Claims Entitled to Vote.*

Pursuant to the provisions of the Bankruptcy Code, only holders of allowed claims or equity interests in classes of claims or equity interests that are impaired and that are not deemed to have rejected a plan of reorganization are entitled to vote to accept or reject such proposed plan.  Generally, a claim or interest is impaired under a plan if the holder's legal, equitable or contractual rights are altered under such plan.  Classes of claims or equity interests under a chapter 11 plan in which the holders of claims or equity interests are unimpaired are conclusively presumed to have accepted such plan and are not entitled to vote to accept or reject the proposed plan.  In addition, classes of claims or equity interests in which the holders of claims or equity interests will not receive or retain any property on account of their claims or equity interests are deemed to have rejected the plan and are not entitled to vote to accept or reject the plan.

In connection with the Prepackaged Plan:

- Claims and Interests in **Classes 2** and **8** are impaired and the holders of such Claims and Interests will receive distributions under the Prepackaged Plan.  As a result, holders of Claims and Interests in **Classes 2** and **8** are entitled to vote to accept or reject the Prepackaged Plan;

- Claims and Interests in **Classes 1, 3, 4, 5, 6** and **7** are unimpaired.  As a result, holders of Claims and Interests in those Classes are deemed to have accepted the Prepackaged Plan and are not entitled to vote to accept or reject the Prepackaged Plan;

- Claims and Interests in **Classes 9** and **10** are impaired and the holders of such Claims and Interests will not receive any distribution on account of such Claims and Interests.  As a result, the holders of Claims and Interests in those Classes are deemed to have rejected the Prepackaged Plan and are not entitled to vote to accept or reject the Prepackaged Plan.

**Your vote on the Prepackaged Plan is important.**  The Bankruptcy Code requires as a condition to confirmation of a plan of reorganization that each class that is impaired under a plan vote to accept such plan, unless the provisions of section 1129(b) of the Bankruptcy Code are met.  For a class of impaired claims to accept the Prepackaged Plan, section 1126 of the Bankruptcy Code requires acceptance by holders of claims that hold at least two-thirds in amount and more than one-half in number of holders of claims of such class who vote on the Prepackaged Plan.  An impaired class of interests is deemed to accept a plan of reorganization if holders of at least two-thirds in amount of the allowed interests in such class who actually cast Ballots vote to accept the plan.

If a Class of Claims or Interests entitled to vote on the Prepackaged Plan rejects the Prepackaged Plan, the Company reserves the right to amend the Prepackaged Plan and/or to request confirmation of the Prepackaged Plan pursuant to section 1129(b) of the Bankruptcy Code.  Section 1129(b) of the Bankruptcy Code permits the confirmation of a plan of reorganization notwithstanding the non-acceptance of a plan by one or more impaired classes of

claims or equity interests, so long as at least one impaired class of claims or interests votes to accept the plan. Under that section, a plan may be confirmed by a bankruptcy court if it does not "discriminate unfairly" and is "fair and equitable" with respect to each non-accepting class.

If you are entitled to vote to accept or reject the Prepackaged Plan, a Ballot is enclosed for the purpose of voting on the Prepackaged Plan. This Disclosure Statement, the Exhibits attached hereto, the Prepackaged Plan and the related documents are the only materials the Company is providing to creditors for their use in determining whether to vote to accept or reject the Prepackaged Plan, and such materials may not be relied upon or used for any purpose other than to vote to accept or reject the Prepackaged Plan.

If you are the holder of a Class 2 Claim or Class 8 Interest, please complete, execute and return your Ballot(s) to the Voting Agent on or before the Voting Deadline. All correspondence in connection with voting on the Prepackaged Plan should be directed to the Voting Agent at the following address:

**Kurtzman Carson Consultants**
**599 Lexington Avenue, 39th Floor**
**New York, NY 10022**
**Attn: Broadview Networks Holdings Ballot Processing**

TO BE COUNTED, YOUR ORIGINAL BALLOT INDICATING ACCEPTANCE OR REJECTION OF THE PLAN MUST BE ACTUALLY RECEIVED BY THE VOTING AGENT NO LATER THAN **5:00 P.M., PREVAILING EASTERN TIME, ON AUGUST 13, 2012,** UNLESS EXTENDED BY THE COMPANY. YOUR BALLOT MAY BE SENT VIA MAIL, OVERNIGHT COURIER OR MESSENGER. ALL BALLOTS MUST BE SIGNED.

The Ballots have been specifically designed for the purpose of soliciting votes on the Prepackaged Plan from the Classes entitled to vote with respect thereto. Accordingly, in voting on the Prepackaged Plan, please use only the Ballots sent to you with this Disclosure Statement or provided by the Voting Agent. Only holders of record of Claims and Interests as of the Voting Record Date that are entitled to vote on the Prepackaged Plan will receive a Ballot and may vote on the Prepackaged Plan.

All properly completed Ballots received prior to the Voting Deadline will be counted for purposes of determining whether a voting Class of impaired Claims or Interests has accepted the Prepackaged Plan. The Voting Agent will prepare and file with the Bankruptcy Court a certification of the results of the balloting with respect to the Classes entitled to vote.

### 1.5    *Important Matters.*

This Disclosure Statement contains projected financial information and certain other forward-looking statements, all of which are based on various estimates and assumptions and will not be updated to reflect events occurring after the date hereof. Such information and statements are subject to inherent uncertainties and to a wide variety of significant business, economic and competitive risks, including, among others, those described herein. Consequently, actual events, circumstances, effects and results may vary significantly from those included in or

contemplated by such projected financial information and such other forward-looking statements. The projected financial information contained herein and in the Exhibits annexed hereto is, therefore, not necessarily indicative of the future financial condition or results of operations of the Company, which in each case may vary significantly from those set forth in such projected financial information. Consequently, the projected financial information and other forward-looking statements contained herein should not be regarded as representations by the Company, its advisors, or any other person that the projected financial conditions or results of operations can or will be achieved.

## ARTICLE II.

## SUMMARY OF PREPACKAGED PLAN AND CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS THEREUNDER

The overall purpose of the Prepackaged Plan is to enable the Company to de-lever its balance sheet and better position the Company to compete in the telecommunications and information technology industry, and to provide a solution for the impending maturity of its Senior Secured Notes on September 1, 2012. Generally, the Prepackaged Plan provides that:

- holders of the Senior Secured Notes shall receive their pro rata share of (i) 97.5% of the New Common Stock of Reorganized Broadview subject to dilution by shares of New Common Stock issued pursuant to the Management Equity Plan (as defined herein) or upon exercise of the New Warrants (also subject to dilution as described herein) and (ii) $150 million of the 10.5% New Senior Secured Notes due 2017;

- a New ABL Facility that will provide total borrowing commitment upon consummation of the Prepackaged Plan of no less than $25 million;

- the repayment in full and termination of the Company's obligations under the ABL Facility;

- the issuance of (i) 2.5% of the New Common Stock subject to dilution by shares of New Common Stock issued pursuant to the Management Equity Plan (as defined herein) or upon exercise of the New Warrants and (ii) the New Warrants, on the terms described in Section 6.4(e) of this Disclosure Statement, also subject to dilution as described herein, in each case to be issued on a pro rata basis to holders of the Company's outstanding Existing Preferred Interests in exchange for the cancellation of such Existing Preferred Interests;

- the cancellation of all of the Other Existing Equity Interests; and

- the retirement of the Senior Secured Notes.

The following table briefly summarizes the classification and treatment of Claims and Interests under the Prepackaged Plan. The summaries in this table are qualified in their

- 6 -

entirety by the description of the treatment of such Claims in Articles IV and V of the Prepackaged Plan. In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims, U.S. Trustee Fees, Fee Claims, and Priority Tax Claims have not been classified.

| Class | Claims and Interests | Treatment | Status | Voting Rights | Estimated Allowed Amount | Projected Recovery |
|---|---|---|---|---|---|---|
| Class 1 | ABL Facility Claims | In full and final satisfaction of each Allowed ABL Facility Claim, each holder thereof shall be paid in Cash in full on account of such holder's Allowed ABL Facility Claim. | Not Impaired | Not Entitled to Vote (Deemed to Accept) | $0 – $14 million[2] | 100% |
| Class 2 | Senior Secured Notes Claims | The Senior Secured Notes Claims shall be deemed Allowed Claims in the approximate amount of $317.1 million. On the Effective Date, each holder of an Allowed Senior Secured Notes Claim shall receive, in full and final satisfaction of its Allowed Senior Secured Notes Claims, its Pro Rata share of: (i) the New Senior Secured Notes issued pursuant to the New Senior Secured Notes Indenture; and (ii) the Senior Secured Notes Equity Distribution. | Impaired | Entitled to Vote | $317.1 million | 100% |

[2] The Company intends to request permission from the Bankruptcy Court to pay all ABL Facility Claims shortly after the commencement of the Reorganization Cases pursuant to the DIP Facility, and therefore expects that there will be no outstanding ABL Facility Claims as of the Confirmation Date.

| Class | Claims and Interests | Treatment | Status | Voting Rights | Estimated Allowed Amount | Projected Recovery |
|---|---|---|---|---|---|---|
| Class 3 | Other Secured Claims | Subject to the provisions of sections 502(b)(3) and 506(d) of the Bankruptcy Code, each holder of an Allowed Other Secured Claim shall receive, at the Reorganized Debtors' option:  (i) the Reinstatement of such Claim; (ii) payment in full in Cash of the Allowed amount of such Other Secured Claim; (iii) the delivery of the collateral securing any such Other Secured Claim and payment of any interest required under section 506(b) of the Bankruptcy Code; (iv) such other treatment rendering such Other Secured Claim Unimpaired; or (v) such other, less favorable treatment as may be agreed between such holder and the Reorganized Debtors. | Not Impaired | Not Entitled to Vote (Deemed to Accept) | $3.7 million | 100% |
| Class 4 | Other Priority Claims | In satisfaction of each Allowed Other Priority Claim, each holder thereof shall receive the following, at the option of the Reorganized Debtors: (i) payment in full in Cash; (ii) other treatment rendering such Other Priority Claim Unimpaired; or | Not Impaired | Not Entitled to Vote (Deemed to Accept) | $7 – $10 million | 100% |

| Class | Claims and Interests | Treatment | Status | Voting Rights | Estimated Allowed Amount | Projected Recovery |
|---|---|---|---|---|---|---|
| | | (iii) such other, less favorable treatment as may be agreed between such holder and the Reorganized Debtors. | | | | |
| Class 5 | General Unsecured Claims | Each Allowed General Unsecured Claim shall, at the discretion of the Reorganized Debtors, be: (i) Reinstated as of the Effective Date as an obligation of the Reorganized Debtors, and paid in accordance with the ordinary course terms for such Claim; (ii) paid in full in Cash on the relevant Distribution Date; or (iii) receive such other treatment as may be agreed between such holder and the Reorganized Debtors. | Not Impaired | Not Entitled to Vote (Deemed to Accept) | $25 – $27 million[3] | 100% |
| Class 6 | Intercompany Claims | Each Intercompany Claim shall either be Reinstated or cancelled in the Reorganized Debtors' discretion. | Not Impaired | Not Entitled to Vote (Deemed to Accept) | $0 | 100% |

---

[3]   This number reflects the estimated amount of General Unsecured Claims which will be outstanding as of the projected Petition Date.  However, the Company intends to seek Bankruptcy Court approval shortly after the commencement of the Reorganization Cases to pay certain of the General Unsecured Claims in the ordinary course of business, including the undisputed General Unsecured Claims of suppliers, vendors and independent sales agents which are unimpaired under the Prepackaged Plan.  If the Company receives Bankruptcy Court approval to pay such claims, the Company believes that the amount of General Unsecured Claims as of the Effective Date will be substantially less than the amount expressed herein.

| Class | Claims and Interests | Treatment | Status | Voting Rights | Estimated Allowed Amount | Projected Recovery |
|---|---|---|---|---|---|---|
| Class 7 | Intercompany Interests | Intercompany Interests shall either be Reinstated or cancelled in the Reorganized Debtors' discretion. | Not Impaired | Not Entitled to Vote (Deemed to Accept) | N/A | 100% |
| Class 8 | Existing Preferred Interests | On the Effective Date, all Existing Preferred Interests shall be cancelled, and each holder of an Allowed Existing Preferred Interest shall receive, in full and final satisfaction of its Allowed Existing Preferred Interest, its Pro Rata share of: (i) the Existing Interest Equity Distribution; and (ii) the New Warrants. | Impaired | Entitled to Vote | N/A | $14.6 million[4] |
| Class 9 | Other Existing Equity Interests | On the Effective Date, all Other Existing Equity Interests shall be cancelled, and holders of Other Existing Equity Interests shall receive no distribution on account of such Interests. | Impaired | Not Entitled to Vote (Deemed to Reject) | N/A | $0 |

---

[4] The New Warrant component of the estimated recovery to holders of Existing Preferred Interests was calculated using the Black-Scholes model with a 35% volatility assumption.

| Class | Claims and Interests | Treatment | Status | Voting Rights | Estimated Allowed Amount | Projected Recovery |
|---|---|---|---|---|---|---|
| Class 10 | Subordinated Securities Claims | All Subordinated Securities Claims shall be cancelled, and holders of Subordinated Securities Claims shall receive no distribution on account of such Claims. | Impaired | Not Entitled to Vote (Deemed to Reject) | $0 | $0 |

The recoveries set forth above are estimates and are contingent upon approval of the Prepackaged Plan as proposed.

## ARTICLE III.

## BUSINESS DESCRIPTION AND CIRCUMSTANCES THAT LED TO THE SOLICITATION

**3.1**    *General.*

The Company is a leading provider of communications and information technology solutions to business customers nationwide.  Historically, the Company has focused on markets across ten states throughout the Northeast and Mid-Atlantic United States, including the major metropolitan markets of New York, Boston, Philadelphia, Baltimore and Washington, D.C.  For the three months ended March 31, 2012, approximately 88% of the Company's total revenue was generated from retail end users in a wide array of industries, including professional services, health care, education, manufacturing, real estate, retail, automotive, non-profit groups and others.  For the same period, approximately 12% of total revenue was generated from wholesale, carrier access and other market channels.  As of March 31, 2012, the Company provided services to approximately 36,000 business customers.

The Company offers a comprehensive product portfolio based on providing bundled packages that include both network connectivity and end user software, with a focus on addressing the needs of end users operating within complex telecommunications infrastructures. The Company benefits from a strong traditional network infrastructure, software development expertise and proprietary technology.  This allows the Company to offer its customers more than just network access, but additionally a product line that includes advanced, converged communications services, including cloud-based services, on a cost effective basis.  The Company offers a full suite of voice, data, internet and cloud-based systems (as described below) and services to customers located within the Company's traditional network infrastructure, which is deployed throughout the Northeast and Mid-Atlantic regional markets.  In addition, the Company offers cloud-based systems and services to customers nationwide.

To provide comprehensive network connectivity to its nationwide customers, the Company both utilizes its own network of telecommunications switches, data routers, application servers and related equipment located in its switching locations and data centers, as well as connectivity to other networks that the Company purchases from other carriers for resale to its customers.  The Company purchases this additional connectivity through various resale arrangements with such carriers and various other commercial agreements.

For the twelve months ending December 31, 2011, the Company recorded gross revenue of approximately $378,154,000 and incurred net losses of approximately $11,855,000.

## 3.2   *Industry Overview.*

The market for communications services, particularly local voice, has been historically dominated by the incumbent local exchange carriers ("**ILECs**") in the United States, including Verizon Communications Inc. ("**Verizon**"), AT&T Inc. ("**AT&T**"), CenturyLink Inc., Frontier Communications Corporation, FairPoint Communications, Inc. ("**FairPoint**") and Windstream Corporation ("**Windstream**").  While the ILECs own substantially all of the local exchange networks providing basic network access in their respective operating regions, competitive communications providers, such as the Company, hold significant market share.  In recent years, the number of competitive communications providers in the United States has been reduced due to industry consolidation and the fact that leading cable companies have entered the residential and business communications markets, thereby reducing the market share held by ILECs.

Increased complexity in delivering communications and IT services, together with what has been a challenging economic climate has driven business customers to evaluate alternative approaches, including cloud-based applications and services.  As competitive pressures have commoditized more access services, cloud-based services represent growth opportunities for competitive providers who are successful in tailoring cloud-based applications to individual business needs.

## 3.3   *Products and Services.*

The Company's array of communications and IT services include cloud-based services, voice and data communications services and value-added products and services.  The Company's products and services are offered with a range of alternatives and customized packages, allowing the Company to meet the specific requirements and objectives of a large number of potential business customers.  The Company's sales and marketing initiatives focus on bundling products and services into a single, tailored and competitively priced package for each customer.

### (a)   **Cloud Services.**

Cloud computing is the delivery of computing and storage capacity to end users from a remote location.  More than just connectivity, cloud-based services allow the actual storage space and software applications to be stored off-site, or "in the cloud," and accessed through a network connection.  Because the software and/or infrastructure is located remotely, it is accessible from anywhere, at anytime.

- 12 -

OfficeSuite® is the Company's cloud-based voice-over-IP ("**VoIP**") communications solution, and is one of the Company's fastest growing product lines. VoIP technology allows for the delivery of voice communications and multimedia sessions over networks such as the Internet. OfficeSuite® packages business-grade VoIP with advanced telephone equipment and managed network security into a unified communications package. The OfficeSuite® package's features include unlimited local and long distance calls, online updates, secure multi-site data networking and high-speed internet access. OfficeSuite® leverages advanced functionality and the ability to transport data traffic, while covering all the service, equipment and management needs of the Company's customers. Customers can choose from a range of different connectivity options at various price points.

In 2011, the Company introduced OfficeSuite® ACD, a full-featured cloud-based application integrated with OfficeSuite® that provides robust call center capabilities for business customers, including advanced call routing, queuing, call recording, easy-to-use reporting and functionality. OfficeSuite® ACD delivers to business customers the advanced call center features of other internal telephone connection systems without the need to invest capital in on-site equipment or intensive IT support. It provides a suite of highly flexible capabilities that enable quick and easy prioritization and distribution of incoming business calls, customized hold treatments and advanced call routing options that factor in a number of customer-specified parameters.

Along with network connectivity, the Company's cloud-based computing packages also include bundled packages of subscription-based software and infrastructure services. Thus, by connecting to the "cloud," customers are additionally able to remotely access not only the most popular productivity software, (e.g., Microsoft Office and Microsoft Exchange) but also thousands of other business applications. By providing these cloud-based software and infrastructure services to its customers, the Company is able to provide greater customer value as compared to solely providing network access, thereby increasing its share of the customer's overall communications and IT operational expenditures and at the same time increasing the Company's monthly recurring revenue.

### (b)   T-1 Based & Traditional Offerings.

The Company also offers integrated voice and data packages. These integrated offerings result in performance and cost efficiencies compared to purchasing discrete services from separate competing carriers.

The Company provides customized packages of voice services that include features such as call forwarding, call waiting, call transfer, calling number identification/calling name identification, voicemail and direct inward dialing. The Company uses its own network elements and those procured pursuant to contracts with Verizon, AT&T and FairPoint to service its customers. In addition to the local service portfolio, the Company offers a range of dedicated long distance services.

The Company also offers ancillary long distance services such as operator assistance, calling cards and conference calling. In instances where a customer may have locations outside the Company's network footprint, the Company resells the long distance

services of other communications carriers through agreements with those carriers. The Company generally sells or offers its long distance services as part of a bundle that includes one or more other service offerings. In addition, through arrangements with national network providers, the Company offers certain services on a nationwide basis to business customers who have locations outside of the Company's network footprint.

### (c)  Other Value-Added Products and Services.

The Company gives its customers the option to outsource necessary management and maintenance services. Packaged solutions of day-to-day management and ongoing maintenance include managed e-mail security, content filtering and online data backup and recovery.

### 3.4  *Service Agreements with Carriers.*

In order to provide certain services to its customers, the Company resells telecommunication services that it purchases from ILECs. Specifically, pursuant to Federal Communication Commission ("**FCC**") rules, the Company negotiates interconnection agreements with ILECs to obtain access to unbound network elements for resale to its own customers. These agreements with ILECs typically have three-year terms. The Company has interconnection agreements in effect with Verizon, FairPoint and AT&T, and is currently negotiating agreements with other ILECs to support its nationwide service offering.

### 3.5  *Facilities.*

The Company is headquartered in Rye Brook, New York. The Company does not own any of its facilities, but leases fifteen material facilities in New York, Pennsylvania, New Jersey and Massachusetts consisting of seven offices and eight switch locations. In addition, FCC rules generally require ILECs to permit competitors, such as the Company, to colocate equipment used for interconnection and/or access to the ILECs' unbundled network elements. The Company maintains approximately 260 of these colocations with Verizon and FairPoint within the Northeast and Mid-Atlantic regions.

### 3.6  *Employees.*

As of March 31, 2012, the Company employed approximately 850 employees and contracted with approximately 300 agent channel partners who each market the Company's products.

### 3.7  *Regulation.*

The Company is subject to federal, state, local and foreign laws, regulations, and orders affecting the rates, terms, and conditions of certain of its service offerings, operations and relations with other service providers. The FCC has jurisdiction over the Company's facilities and services to the extent they are used in the provision of interstate or international communications services.

State regulatory public utility commissions generally have jurisdiction over the Company's facilities and services to the extent they are used in the provision of intrastate services.  In addition, local governments may regulate aspects of the Company's business through zoning requirements, permit or right-of-way procedures, and franchise fees.  Foreign laws and regulations apply to communications that originate or terminate in a foreign country.

**3.8**     *The Company's Capital Structure.*

### (a)     ABL Facility.

Broadview and certain of its affiliates are borrowers under a $25 million five-year revolving credit facility (the "**ABL Facility**") governed by that certain Credit Agreement, dated as of August 23, 2006 and amended as of July 27, 2007, November 23, 2010, December 8, 2011, and May 31, 2012, by and among the borrowers, The CIT Group/Business Credit, Inc. as administrative agent and lender.

Indebtedness under the ABL Facility is guaranteed by all of Broadview's direct and indirect subsidiaries (other than certain immaterial subsidiaries) that are not borrowers thereunder and is secured by a first priority security interest in, accounts, inventory, deposit accounts and all cash, thereto, lock boxes and capital stock of each subsidiary grantor, among other assets, and a second priority security interest in substantially all of the remainder of the Company's assets.  As of the date hereof, the Company has approximately $14 million of outstanding borrowings under the ABL Facility.  On May 31, 2012, the ABL Facility was amended to extend the term through August 1, 2012.

### (b)     Senior Secured Notes.

On August 23, 2006, Broadview completed an offering of $210 million aggregate principal amount of senior secured notes due 2012 (the "**2006 Notes**"), and on May 14, 2007, Broadview completed an additional offering of $90 million aggregate principal amount of senior secured notes due 2012 (together with the 2006 Notes, the "**Original Notes**") issued pursuant to that certain Indenture for 11 3/8% Senior Secured Notes due 2012, dated as of August 23, 2006, and supplemented as of September 29, 2006, May 14, 2007 and May 31, 2007 among Broadview Networks Holdings, Inc., as Issuer, certain other direct and indirect subsidiaries, as Guarantors, and The Bank of New York, as Trustee and Collateral Agent.

On November 14, 2007, Broadview exchanged $300 million of the Original Notes, representing 100% of the outstanding aggregate principal amount, for an equal principal amount of a new issue of substantially identical debt securities that were registered under the Securities Act of 1933, as amended (the "**Senior Secured Notes**").  Broadview is required to pay cash interest on the principal amount of the Senior Secured Notes at a rate of 11.375% per annum, which is due semi-annually on March 1 and September 1 of each year.  The Senior Secured Notes mature on September 1, 2012.

The obligations under the Senior Secured Notes are guaranteed on a senior secured basis, jointly and severally, by each of Broadview's existing and future domestic restricted subsidiaries.  The Senior Secured Notes are secured by a lien on substantially all of the Company's assets, provided, however, that pursuant to the terms of the that certain Intercreditor

Agreement, dated as of August 23, 2006 and amended as of May 10, 2007, the security interest in the Company's receivables, inventory, deposit accounts, securities accounts and certain other assets that secure the Senior Secured Notes are contractually subordinated to the lien that secures the ABL Facility.

        **(c)**     **Capital Stock.**

Broadview's outstanding capital stock consists of authorized common stock and preferred stock. There is no established public trading market for Broadview's outstanding capital stock. There are: 87,254 outstanding shares of Broadview's Series A Preferred Stock; 100,702 outstanding shares of Broadview's Series A-1 Preferred Stock; 91,187 outstanding shares of Broadview's Series B Preferred Stock; 62,756 outstanding shares of Broadview's Series B-1 Preferred Stock; and 14,402 outstanding shares of Broadview's Series C Preferred Stock. Broadview also has 9,286,759 outstanding shares of Class A Common Stock and 360,050 shares of Class B Common Stock.

## ARTICLE IV.

## EVENTS LEADING TO THE SOLICITATION

**4.1**    **Events Leading to the Solicitation.**

During the last 18 months the Company and its management team diligently explored potential transactions including mergers and acquisitions, refinancing and restructuring in an effort to have sufficient capital leading up to September 1, 2012, the maturity date for the Company's $300 million in Senior Secured Notes. In October 2010, the Company retained Jefferies & Company, Inc. ("**Jefferies**") as its investment banker to market the Company, and in December 2011, the Company retained Evercore Group, L.L.C. ("**Evercore**") as its financial advisor to assist the Company with respect to a refinancing or restructuring transaction and other strategic alternatives.

As part of their engagements, the Company's financial advisors worked with the Board of Directors of Broadview and the Company's management to pursue strategic alternatives, including an investment in the Company, a sale of all or substantially all of the assets of the Company, or a sale of certain operations or discrete assets of the Company. In connection with such efforts, certain parties expressed preliminary interest in various transactions with respect to the Company's assets. For a variety of reasons, such transactions did not develop. The Company also explored other strategic options, such as a refinancing, including through a notes offering launched in June 2011 which did not garner enough interest to be consummated.

During this time, the Company also sought to negotiate with its largest bondholders, and, in the second quarter of 2012, certain of the Company's largest bondholders retained legal and financial restructuring advisors to work with the Company to pursue a potential balance sheet restructuring, while the Company was simultaneously continuing to explore other opportunities. Due to macro-economic trends, including trends specific to the

- 16 -

Company's industry, the Company was unable to obtain new financing or to achieve a sale transaction with sufficient value to pay the Senior Secured Notes in full prior to maturity.

Therefore, it became clear that a consensual balance sheet restructuring with holders of the Senior Secured Notes was the Company's best option to maximize value for the Company's stakeholders.  Upon the execution of customary confidentiality agreements, the Company provided certain bondholders with information regarding its operations, projections and business plan to facilitate their ability to negotiate and assess a potential restructuring plan with the Company.  After good-faith, arm's-length negotiations, on July 13, 2012, the Company reached an agreement (as may be amended or modified, the "**Restructuring Support Agreement**") with the Required Consenting Noteholders, who hold approximately two-thirds of the aggregate principal amount of the outstanding Senior Secured Notes, and the Consenting Equity Holders, who hold approximately 70% of the Existing Preferred Interests.

**4.2**     *The Restructuring Support Agreement.*

Pursuant to the Restructuring Support Agreement, the Consenting Noteholders and Consenting Equity Holders, as applicable, have agreed to, among other things, vote all of their Senior Secured Notes and Existing Preferred Interests in favor of the Prepackaged Plan, provided, however, that the Prepackaged Plan is consummated prior to a date that is 95 days after the Petition Date, which will be automatically extended for an additional sixty days if the Company has not obtained certain necessary regulatory approvals, as may be further extended by the parties thereto (the "**Termination Date**").  Each of the parties to the Restructuring Support Agreement agreed to support the terms of the Prepackaged Plan and to take all reasonable actions necessary and appropriate to consummate the Prepackaged Plan in a timely manner, so long as certain restructuring milestones set forth in the Restructuring Support Agreement are met.

(a)     **Additional Agreements.**

Each of the parties to the Restructuring Support Agreement has agreed that, unless the Restructuring Support Agreement is terminated in accordance with the terms thereof, it will not take any action that is inconsistent with, or that would materially delay or impede approval, confirmation or consummation of the Prepackaged Plan, and not directly or indirectly propose, support, solicit, encourage or participate in the formulation of any restructuring for the Company other than the Prepackaged Plan.

(b)     **Fiduciary Duties.**

Nothing in the Restructuring Support Agreement shall require the Company or its board of directors to breach any fiduciary obligations it has under applicable law, and to the extent that such fiduciary obligations require the Company or its board of directors to terminate its obligations under the Restructuring Support Agreement, it may do so without incurring any liability to the Consenting Noteholders or the Consenting Equity Holders.

## ARTICLE V.

## REASONS FOR THE SOLICITATION

The Company is pursuing a restructuring through solicitation and confirmation of the Prepackaged Plan to de-lever its balance sheet and better position the Company to compete in the telecommunications and information technology industry, and to resolve the imminent maturity of the obligations under the Senior Secured Notes, which mature on September 1, 2012. Upon maturity, the Company does not expect, and cannot provide assurance, that it will have, or have access to, sufficient liquidity to meet its debt repayment obligations under the Senior Secured Notes. As of March 31, 2012, the Company had an estimated $320.7 million of indebtedness outstanding. As of March 31, 2012, it had $25.1 million of cash on hand.

The Company expects that the Prepackaged Plan, if successfully confirmed, will de-lever its balance sheet by reducing the Company's indebtedness to an estimated $167 million at consummation of the Prepackaged Plan, consisting of an estimated $14 million in borrowings under the New ABL Facility and $150 million in principal amount of New Senior Secured Notes. Following the consummation of the Prepackaged Plan, the Company projects that it will have approximately $18 million in cash on its balance sheet, with additional liquidity under the New ABL Facility. However, there can be no assurance actual results will comport materially with the Company's projections.

Chapter 11 of the Bankruptcy Code provides that unless the terms of section 1129(b) of the Bankruptcy Code are satisfied, for the Bankruptcy Court to confirm the Prepackaged Plan as a consensual plan, the holders of impaired Claims against, and Interests in, the Company in each Class of impaired Claims and Interests must accept the Prepackaged Plan by the requisite majorities set forth in the Bankruptcy Code. For a class of impaired claims to accept the Prepackaged Plan, section 1126 of the Bankruptcy Code requires acceptance by holders of claims that hold at least two-thirds in amount and more than one-half in number of holders of claims of such class who vote on the Prepackaged Plan. An impaired class of interests is deemed to accept a plan of reorganization if holders of at least two-thirds in amount of the allowed interests in such class who actually cast ballots vote to accept the plan.

In the event that the Prepackaged Plan does not receive sufficient votes for confirmation, the Company would likely commence chapter 11 cases on terms other than as contemplated by the Prepackaged Plan. If the Company commences such a bankruptcy filing, holders of the Senior Secured Notes and Existing Preferred Interests may receive consideration that is substantially less than what is being offered under the Prepackaged Plan.

The Company believes that a bankruptcy (other than pursuant to the Prepackaged Plan) could result in recoveries to its creditors and equity holders substantially below those expected to result from the Prepackaged Plan, and could materially adversely affect its business and prospects. As a result, the Company is pursuing solicitation of the Prepackaged Plan because it believes that the Prepackaged Plan is superior to any existing alternative. For all of these reasons, the Company's board of directors supports the Prepackaged Plan and urges the Holders of Claims and Interests entitled to vote on the Prepackaged Plan to accept and support it.

## ARTICLE VI.

## THE PREPACKAGED PLAN

**6.1**     *Anticipated Events in a Chapter 11 Case.*

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code.  Pursuant to chapter 11, a debtor may remain in possession of its assets, continue to manage its business and attempt to reorganize its business for the benefit of the debtor, its creditors and other parties-in-interest.  The commencement of a chapter 11 case creates an estate comprising all the legal and equitable interests of a debtor in its property as of the date the petition is filed.  Sections 1107 and 1108 of the Bankruptcy Code provide that a debtor may continue to operate its business and remain in possession of its property as a "debtor in possession," unless the Bankruptcy Court orders the appointment of a trustee.  The commencement of a chapter 11 case also triggers the automatic stay provisions of the Bankruptcy Code.  Section 362 of the Bankruptcy Code provides, among other things, for an automatic stay of all attempts to collect prepetition claims from the debtor or otherwise interfere with its property or business.  Except as otherwise ordered by the Bankruptcy Court, the automatic stay generally remains in full force and effect until confirmation of a plan of reorganization.

Pursuant to section 1102 of the Bankruptcy Code, upon the commencement of a chapter 11 case, the Office of the United States Trustee (the "**U.S. Trustee**") is required to appoint a committee of creditors holding unsecured claims and may appoint additional committees of creditors or of equity security holders as the U.S. Trustee deems appropriate.  However, it is not uncommon for the U.S. Trustee to not appoint a creditors' committee in cases where solicitation of a prepackaged plan has been conducted before the Petition Date and holders of unsecured claims are unimpaired.

Pursuant to section 1103 of the Bankruptcy Code, a committee appointed under section 1102 of the Bankruptcy Code may:

- consult with the trustee or debtor in possession concerning the administration of the chapter 11 case;

- investigate the acts, conduct, assets, liabilities and financial condition of the debtor, the operation of the debtor's business and the desirability of the continuance of such business and any other matter relevant to the case or to the formulation of a plan;

- participate in the formulation of a plan, advise those represented by such committee of such committee's determinations as to any plan formulated and collect and file with the court acceptances or rejections of a plan;

- request the appointment of a trustee or examiner under section 1104 of the Bankruptcy Code; and

- perform such other services as are in the interest of those represented by the committee.

Furthermore, pursuant to section 1109(b) of the Bankruptcy Code, upon the commencement of the chapter 11 case, any party-in-interest, including the debtor, a creditors' committee, an equity security holders' committee, a creditor, an equity security holder or any indenture trustee may raise and may appear and be heard on any issue in the chapter 11 case.

**6.2**   ***Summary of Distributions under the Prepackaged Plan.***

If the Prepackaged Plan is confirmed by the Bankruptcy Court, each holder of an Allowed Claim or Allowed Interest in a particular Class will receive the same treatment as the other holders in the same Class of Claims or Interests, whether or not such holder voted to accept the Prepackaged Plan, unless such holder agrees to accept less favorable treatment by settlement or otherwise.  Moreover, upon confirmation, the Prepackaged Plan will be binding on all of the Debtors' creditors and equity holders regardless of whether such creditors or equity holders voted to accept the Prepackaged Plan.  Such treatment will be in full satisfaction, release and discharge of and in exchange for such holder's Claims against, or Interests in, the Debtors, except as otherwise provided in the Prepackaged Plan.

### (a)   Treatment of Unclassified Claims.

The Bankruptcy Code does not require classification of certain priority claims against a debtor.  In this case, these unclassified claims include DIP Claims, Administrative Claims, Priority Tax Claims and Fee Claims as set forth below.

### (1)   DIP Claims.

Under the Prepackaged Plan, the DIP Claims shall be deemed to be Allowed Claims and shall be satisfied in full, by the termination of all commitments under the DIP Facility, payment in full in Cash of all outstanding obligations and cash collateralization, and return or backstopping of all letters of credit issued thereunder.

### (2)   Administrative Claims.

Under the Prepackaged Plan, Administrative Claims include any Claim, other than a Fee Claim, a claim for payment of U.S. Trustee Fees or a DIP Claim, for payment of costs or expenses of administration, specified in sections 503(b) and 507(a)(1) of the Bankruptcy Code, including, without limitation, the actual and necessary costs and expenses incurred after the Petition Date of preserving the Estates and operating the business of the Debtors (such as wages, salaries, or commissions for services rendered).  Each holder of an Allowed Administrative Claim shall be paid 100% of the unpaid Allowed amount of such Claim in Cash on the Distribution Date.  Notwithstanding the immediately preceding sentence, Allowed Administrative Claims incurred in the ordinary course of business and on ordinary business terms unrelated to the administration of the Reorganization Cases (such as Allowed trade and vendor Claims) shall be paid, at the Debtors or the Reorganized Debtors' option, in accordance with ordinary business terms for payment of such Claims.  Notwithstanding the foregoing, the

holder of an Allowed Administrative Claim may receive such other, less favorable treatment as may be agreed upon by the claimant and the Debtors or the Reorganized Debtors.

### (3)     Priority Tax Claims.

Under the Prepackaged Plan, Priority Tax Claims include any Claim by a governmental unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.  Except to the extent that a holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, each holder of an Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code.

### (4)     Fee Claims.

Under the Prepackaged Plan, Fee Claims include any Claim by a Professional Person (other than an ordinary course professional retained pursuant to an order of the Bankruptcy Court) for compensation or reimbursement pursuant to section 327, 328, 330, 331, 503(b) or 1103(a) of the Bankruptcy Code in connection with the Reorganization Cases, and a claim by a member of the Creditors' Committee, if any, arising under section 503(b)(3)(F) of the Bankruptcy Code.

### (b)     Treatment of Classified Claims.

The following describes the Prepackaged Plan's classification of the Claims and Interests that are required to be classified under the Bankruptcy Code and the treatment each holder of Allowed Claims or Allowed Interests will receive for such Claims or Interests:

### (1)     Class 1—ABL Facility Claims.[5]

The Claims in Class 1 consist of any Claim derived from or based upon the ABL Facility.

Treatment:  In full and final satisfaction of each Allowed ABL Facility Claim, each holder thereof shall be paid in Cash in full on account of such holder's Allowed ABL Facility Claim.

Voting:  Class 1 is not Impaired by the Prepackaged Plan and each holder of a Class 1 ABL Facility Claim is conclusively presumed to have accepted the Prepackaged Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, holders of Class 1 ABL Facility Claims are not entitled to vote to accept or reject the Prepackaged Plan.

---

[5]     The Company intends to request permission from the Bankruptcy Court to pay all ABL Facility Claims shortly after the commencement of the Reorganization Cases pursuant to the DIP Facility, and therefore expects that there will be no outstanding ABL Facility Claims as of the Confirmation Date.

**(2)       Class 2—Senior Secured Notes Claims.**

Allowance:  The Claims in Class 2 consist of any Claim derived from or based upon the Senior Secured Notes.  The Senior Secured Notes Claims shall be deemed to be Allowed Claims in the approximate amount of $317.1 million.

Treatment:  On the Effective Date, each holder of an Allowed Senior Secured Notes Claim shall receive, in full and final satisfaction of its Senior Secured Notes Claims, its Pro Rata share of:  (i) the New Senior Secured Notes issued pursuant to the New Senior Secured Notes Indenture; and (ii) the Senior Secured Notes Equity Distribution.

Voting:  Class 2 is Impaired.  Therefore, holders of Class 2 Senior Secured Notes Claims are entitled to vote to accept or reject the Prepackaged Plan.

**(3)       Class 3—Other Secured Claims.**

The Claims in Class 3 consist of any Secured Claim other than a DIP Claim, an ABL Facility Claim, a Senior Secured Notes Claim or an Intercompany Claim.

Each Allowed Other Secured Claim in Class 3 shall be considered to be a separate subclass within Class 3, and each such subclass shall be deemed to be a separate Class for purposes of the Prepackaged Plan.

Treatment:  Subject to the provisions of sections 502(b)(3) and 506(d) of the Bankruptcy Code, each holder of an Allowed Other Secured Claim shall receive, at the Reorganized Debtors' option: (i) the Reinstatement of such Claim; (ii) payment in full in Cash of the Allowed amount of such Other Secured Claim; (iii) the delivery of the collateral securing any such Other Secured Claim and payment of any interest required under section 506(b) of the Bankruptcy Code; (iv) such other treatment rendering such Other Secured Claim Unimpaired; or (v) such other, less favorable treatment as may be agreed between such holder and the Reorganized Debtors.

Voting:  Class 3 is not Impaired by the Prepackaged Plan and each holder of a Class 3 Other Secured Claim is conclusively presumed to have accepted the Prepackaged Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, holders of Class 3 Other Secured Claims are not entitled to vote to accept or reject the Prepackaged Plan.

**(4)       Class 4—Other Priority Claims.**

The Claims in Class 4 consist of any Claim entitled to priority pursuant to section 507(a) of the Bankruptcy Code, other than: (i) an Administrative Claim; (ii) a Priority Tax Claim; (iii) a Fee Claim; (iv) a DIP Claim; or (v) any Claim for "adequate protection" of the security interests of the ABL Lenders or the holders of Senior Secured Notes authorized pursuant to the terms of the DIP Order.

Treatment:  In satisfaction of each Allowed Other Priority Claim, each holder thereof shall receive the following, at the option of the Reorganized Debtors: (i) payment in full

in Cash; (ii) other treatment rendering such Other Priority Claim Unimpaired; or (iii) such other, less favorable treatment as may be agreed between such holder and the Reorganized Debtors.

Voting:  Class 4 is not Impaired by the Prepackaged Plan and each holder of a Class 4 Other Priority Claim is conclusively presumed to have accepted the Prepackaged Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, holders of Class 4 Other Priority Claims are not entitled to vote to accept or reject the Prepackaged Plan.

**(5)     Class 5—General Unsecured Claims.**

The Claims in Class 5 consist of any Claim that is not: (i) an Administrative Claim; (ii) an Other Priority Claim; (iii) a Priority Tax Claim; (iv) a claim for U.S. Trustee Fees; (v) an Other Secured Claim; (vi) a DIP Claim; (vii) an ABL Facility Claim; (viii) a Fee Claim; (ix) a Senior Secured Notes Claim; (x) an Intercompany Claim; or (xi) a Subordinated Securities Claim.

Treatment:  Each Allowed General Unsecured Claim shall, at the discretion of the Reorganized Debtors, be: (i) Reinstated as of the Effective Date as an obligation of the Reorganized Debtors, and paid in accordance with the ordinary course terms for such Claim; (ii) paid in full in Cash on the relevant Distribution Date; or (iii) receive such other treatment as may be agreed between such holder and the Reorganized Debtors.

Voting:  Class 5 is not Impaired by the Prepackaged Plan and each holder of a Class 5 General Unsecured Claim is conclusively presumed to have accepted the Prepackaged Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, holders of Class 5 General Unsecured Claims are not entitled to vote to accept or reject the Prepackaged Plan.

**(6)     Class 6—Intercompany Claims.**

The Claims in Class 6 consist of any Claims (including an Administrative Claim), cause of action, or remedy held by a Debtor against another Debtor.

Treatment:  Each Intercompany Claim shall either be Reinstated or cancelled in the Reorganized Debtors' discretion.

Voting:  Class 6 is not Impaired by the Prepackaged Plan and each holder of a Class 6 Intercompany Claim is conclusively presumed to have accepted the Prepackaged Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, holders of Class 6 Intercompany Claims are not entitled to vote to accept or reject the Prepackaged Plan.

**(7)     Class 7—Intercompany Interests.**

Class 7 consists of all Interests, other than Existing Preferred Interests and Other Existing Equity Interests, in a Debtor held by another Debtor.

Treatment:  Intercompany Interests shall be either Reinstated or cancelled in the Reorganized Debtors' discretion.

Voting:  Class 7 is not Impaired by the Prepackaged Plan and each holder of a Class 7 Intercompany Interest is conclusively presumed to have accepted the Prepackaged Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, holders of Class 7 Intercompany Interests are not entitled to vote to accept or reject the Prepackaged Plan.

### (8)   Class 8—Existing Preferred Interests.

Class 8 consists of the shares of Series A Preferred Stock, Series A-1 Preferred Stock, Series B Preferred Stock, Series B-1 Preferred Stock, and Series C Preferred Stock of Broadview Networks Holdings, Inc., issued and outstanding immediately prior to the Effective Date.

Treatment:  On the Effective Date, all Existing Preferred Interests shall be cancelled, and each holder of an Allowed Existing Preferred Interest shall receive, in full and final satisfaction of its Allowed Existing Preferred Interest, its Pro Rata share of: (i) the Existing Interest Equity Distribution; and (ii) the New Warrants.

Voting:  Class 8 is Impaired by the Prepackaged Plan.  Therefore, holders of Class 8 Existing Preferred Interests are entitled to vote to accept or reject the Prepackaged Plan.

### (9)   Class 9—Other Existing Equity Interests.

Class 9 consists of all Interests in a Debtor other than an Existing Preferred Interest or an Intercompany Interest, including, without limitation, the shares of Class A Common Stock and Class B Common Stock of Broadview Networks Holdings, Inc. issued and outstanding immediately prior to the Effective Date.

Treatment:  On the Effective Date, all Other Existing Equity Interests shall be cancelled, and holders of Other Existing Equity Interests shall receive no distribution on account of such Interests.

Voting:  Class 9 is Impaired by the Prepackaged Plan and holders of Other Existing Equity Interests are conclusively presumed to have rejected the Prepackaged Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, holders of Class 9 Other Existing Equity Interests are not entitled to vote to accept or reject the Prepackaged Plan.

### (10)   Class 10—Subordinated Securities Claims.

Class 10 consists of all Claims of the type described in, and subject to subordination pursuant to section 510(b) of the Bankruptcy Code, if any, which Claim is related to an Interest in a Debtor.

Treatment:  On the Effective Date, all Subordinated Securities Claims shall be cancelled, and holders of Subordinated Securities Claims shall receive no distribution on account of such Interests.

Voting:  Class 10 is Impaired by the Prepackaged Plan and holders of Subordinated Securities Claims are conclusively presumed to have rejected the Prepackaged Plan

pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, holders of Class 10 Subordinated Securities Claims are not entitled to vote to accept or reject the Prepackaged Plan.

**6.3**     *Settlement.*

Pursuant to Bankruptcy Rule 9019, and in consideration for the classification, distribution and other benefits provided under the Prepackaged Plan, the provisions of the Prepackaged Plan shall constitute a good faith compromise and settlement of all Claims and controversies resolved pursuant to the Prepackaged Plan, including, without limitation, all Claims arising prior to the Petition Date, whether known or unknown, foreseen or unforeseen, asserted or unasserted, by or against any Released Party, or holders of Claims, arising out of, relating to or in connection with the business or affairs of or transactions with the Debtors.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of each of the foregoing compromises or settlements, and all other compromises and settlements provided for in the Prepackaged Plan, and the Bankruptcy Court's findings shall constitute its determination that such compromises and settlements are in the best interests of the Debtors, the Estates, creditors and other parties-in-interest, and are fair, equitable and within the range of reasonableness.  The provisions of the Prepackaged Plan, including, without limitation, its release, injunction, exculpation and compromise provisions, are mutually dependent and non-severable.

**6.4**     *Post-Confirmation Capital Structure of the Reorganized Debtors.*

The following section summarizes the capital structure of the Reorganized Debtors, including the post-Effective Date arrangements the Reorganized Debtors expect to enter into to fund their obligations under the Prepackaged Plan and provide for their post-Effective Date working capital needs.  The summary of the Reorganized Debtors' capital structure is qualified in its entirety by reference to the Prepackaged Plan.

**(a)     The New ABL Facility.**

The New ABL Facility in a drawable principal amount of at least $25 million shall be used by the Reorganized Debtors to (a) fund post-Effective Date general corporate purposes of the Reorganized Debtors in the ordinary course of business (including working capital requirements) and (b) make any payments required under the Prepackaged Plan.  Obligations incurred under the New ABL Agreement shall, *inter alia*, be secured by liens which are substantially similar to the liens securing the ABL Facility, or as otherwise agreed among the lenders under the New ABL Facility and the Required Consenting Noteholders.

**(b)     The New Senior Secured Notes.**

On the Effective Date, the Debtors will issue the New Senior Secured Notes in the amount of $150 million.  Obligations incurred under the New Senior Secured Notes Indenture shall, *inter alia*, (x) have an interest rate of 10.5%, (y) be secured by liens on a collateral package which is substantially similar to the collateral package for the Senior Secured Notes; and (z) have a final maturity date of five years from the Effective Date.

**(c)**     **Authorization and Issuance of New Common Stock.**

As of the Effective Date, Reorganized Broadview shall authorize and issue one class of equity securities consisting of the New Common Stock, which shall be distributed in accordance with Sections 5.1 and 5.2 and other relevant provisions of the Prepackaged Plan to effectuate the Restructuring Transaction.  In addition, as of the Effective Date, Reorganized Broadview shall authorize such shares of New Common Stock as may be required for the Management Equity Plan and the New Warrant Agreement, in accordance with Sections 5.2, 6.3 and 7.5 of the Prepackaged Plan.

**(d)**     **New Stockholders Agreement and New Registration Rights Agreement.**

On and as of the Effective Date, Reorganized Broadview shall enter into and deliver the New Stockholders Agreement to each entity that is intended to be a party thereto and such agreement shall be deemed to be valid, binding and enforceable in accordance with its terms, and each party thereto shall be bound thereby, in each case without the need for execution by any party thereto other than Reorganized Broadview.

The New Stockholders Agreement shall provide each Required Consenting Noteholder with: (i) drag-along and tag-along rights with respect to its New Common Stock, (ii) rights of first refusal with respect to transfers of New Common Stock by other Required Consenting Noteholders, and (iii) preemptive rights with respect to the purchase of its pro rata share of any additional equity securities (other than the New Common Stock issued upon exercise of the New Warrants or pursuant to the Management Equity Plan) or issued or sold by Reorganized Broadview (together with a pro rata portion of any securities that are unsubscribed for by any other Required Consenting Noteholder).  The New Stockholders Agreement shall terminate upon the closing of an initial public offering.

Holders of the New Senior Secured Notes shall be entitled to registration rights pursuant to the New Registration Rights Agreement in form and substance satisfactory to the Required Consenting Noteholders.  On and as of the Effective Date, Reorganized Broadview shall enter into and deliver the New Registration Rights Agreement to each entity that is intended to be a party thereto and such agreement shall be deemed to be valid, binding and enforceable in accordance with its terms, and each party thereto shall be bound thereby, in each case without the need for execution by any party thereto other than Reorganized Broadview.

**(e)**     **New Warrants.**

On the Effective Date, Reorganized Broadview shall issue New Warrants pursuant to the New Warrant Agreement to the holders of Existing Preferred Interests.  The New Warrants shall consist of two series of warrants (the "**New Warrants**") to purchase, at any time prior to the 8th anniversary date of the Effective Date, up to:  (i) 11% of the fully diluted New Common Stock after giving pro forma effect to the issuance of primary shares underlying these warrants, but diluted for any primary shares issued pursuant to the Management Equity Plan or the warrants described under (ii) herein, at an exercise equity value, calculated prior to dilution for the issuance of the 11% warrants, equal to $171,346,154 which reflects a par plus accrued

- 26 -

recovery on the Senior Secured Notes (the "**11% Warrants**").  For example, prior to any possible dilution for the Management Equity Plan, if there were 10,000,000 shares outstanding, prior to the issuance of the warrants, a cash exercise would result in the warrant holders purchasing approximately 1,235,955 additional shares at $17.135 per share; and (ii) 4% of the fully diluted New Common Stock after giving pro forma effect to the issuance of primary shares underlying all warrants (including those described under (i) herein), but diluted for any primary shares issued pursuant to the Management Equity Plan, at an equity exercise value, calculated prior to dilution for the 4% warrants, which together with the Company's $150,000,000 New Senior Secured Notes, plus amounts outstanding under any revolving credit facility and capitalized leases, less cash and cash equivalents on the Company's balance sheet as of the Effective Date, and giving pro forma effect for any cash and shares of New Common Stock relating to the exercise of the warrants contemplated under (i) herein, would be equal to an enterprise value of $350,000,000 (the "**4% Warrants**").  For example, prior to dilution associated with the Management Equity Plan, if there were 10,000,000 shares outstanding, if total debt was $170,000,000 and cash on the balance sheet was $50,000,000 (including $21,177,614 which might be associated with a cash exercise of the 11% warrants), the equity value would be $230,000,000, resulting in a share price of $20.470, at which the additional 4%, or 468,165 shares, would be exercised.

**6.5**     *Means for Implementation.*

(a)     **Restructuring Transaction.**

On or as of the Effective Date, the Distributions provided for under the Prepackaged Plan shall be effectuated pursuant to the following transactions (collectively, the "**Restructuring Transaction**"): (i) pursuant to sections 1141(b) and (c) of the Bankruptcy Code, and except as otherwise provided in the Prepackaged Plan, the property of each Estate shall vest in the applicable Reorganized Debtor, free and clear of all Claims, liens, encumbrances, charges, and other Interests, except as provided in the Prepackaged Plan, the New Senior Secured Notes Indenture, the New ABL Agreement, the other Plan Documents or the Confirmation Order.  The Reorganized Debtors may operate their business and may use, acquire, and dispose of property free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules and in all respects as if there were no pending case under any chapter or provision of the Bankruptcy Code, except as provided herein; (ii) all Existing Preferred Interests and Other Existing Equity Interests shall be deemed cancelled as of the Effective Date.  Reorganized Broadview shall issue the New Common Stock pursuant to the terms of the Prepackaged Plan and enter into the New Stockholders Agreement; (iii) Reorganized Broadview shall issue the New Warrants to holders of Allowed Existing Preferred Interests, pursuant to the terms of Section 5.2 of the Prepackaged Plan, and enter into the New Warrant Agreement; (iv) the Debtors shall consummate the Prepackaged Plan by (A) making Distributions of the New Common Stock, New Warrants, and Cash, (B) issuing the New Senior Secured Notes in accordance with the terms of the Prepackaged Plan, and (C) entering into the New ABL Agreement, New Senior Secured Notes Indenture and the New Registration Rights Agreement; and (v) the releases provided for in the Prepackaged Plan, which are an essential element of the Restructuring Transaction, shall become effective.

### (b) Corporate Action.

The Debtors shall continue to exist as the Reorganized Debtors on and after the Effective Date, with all of the powers of corporations or limited liability companies, as the case may be, under applicable law.  The certificates of incorporation or operating agreements, as applicable, of each Reorganized Debtor shall, *inter alia,* prohibit the issuance of nonvoting stock to the extent required by section 1123(a)(6) of the Bankruptcy Code.  The adoption of any new or amended and restated operating agreements, certificates of incorporation and by-laws of each Reorganized Debtor and the other matters provided for under the Prepackaged Plan involving the corporate or entity structure of the Debtors or the Reorganized Debtors, as the case may be, or limited liability company or corporate action to be taken by or required of the Debtors or the Reorganized Debtors, as the case may be, shall be deemed to have occurred and be effective as provided herein and shall be authorized and approved in all respects, without any requirement of further action by members, stockholders or directors of the Debtors or the Reorganized Debtors, as the case may be.  Without limiting the foregoing, the Reorganized Debtors shall be authorized, without any further act or action required, to issue all New Common Stock and any instruments required to be issued hereunder, to undertake, consummate and execute and deliver any documents relating to the Restructuring Transaction and to undertake any action or execute and deliver any document contemplated under the Prepackaged Plan.  The Confirmation Order shall provide that it establishes conclusive corporate or other authority, and evidence of such corporate or other authority, required for each of the Debtors and the Reorganized Debtors to undertake any and all acts and actions required to implement or contemplated by the Prepackaged Plan, including without limitation, the specific acts or actions or documents or instruments identified in Section 7.2 of the Prepackaged Plan, and no board, member or shareholder vote shall be required with respect thereto.

### (c) Effectuating Documents and Further Transactions.

The Debtors and the Reorganized Debtors shall be authorized to execute, deliver, file, or record such documents, contracts, instruments, and other agreements and take such other action as may be necessary to effectuate and further evidence the terms and conditions of the Prepackaged Plan, so long as such documents, contracts, instruments and other agreements are consistent with the Prepackaged Plan and the Restructuring Support Agreement.

### (d) Directors of the Reorganized Debtors.

As of the Effective Date, the New Board shall consist of those certain individuals, the names of whom shall be set forth in the Plan Supplement.  The members of the board of directors of each Debtor prior to the Effective Date, in their capacities as such, shall be deemed to have resigned as of the Effective Date, and shall have no continuing obligations to the Reorganized Debtors on or after the Effective Date.  Following the occurrence of the Effective Date, the board of directors of each Reorganized Debtor may be replaced by such individuals as are selected in accordance with the organizational documents of such Reorganized Debtor.

The Debtors will disclose in the Plan Supplement, before the hearing on the confirmation of the Prepackaged Plan, such additional information as is necessary to satisfy section 1129(a)(5) of the Bankruptcy Code including (1) the identity and affiliation of any other

- 28 -

individual who is proposed to serve as one of the Debtors' officers or directors, and (2) the identity of any other insider that will be employed or retained by the Debtors and said insider's compensation.

### (e)     Management Equity Plan.

As of the Effective Date, the Reorganized Debtors will adopt and implement the Management Equity Plan, pursuant to which securities exercisable for or convertible into 6 to 10% of the New Common Stock, subject to such terms and conditions to be determined by the board of the Reorganized Debtors, shall be reserved for distribution to the Reorganized Debtors' senior management, after the Effective Date. Any such shares of the New Common Stock so reserved for distribution pursuant to the Management Equity Plan will dilute all other New Common Stock granted in connection with the Restructuring Transaction.

### (f)     General Distribution Mechanics.

Notwithstanding anything herein to the contrary, no Distribution shall be made on account of a Disputed Claim until such Disputed Claim becomes an Allowed Claim. Except with respect to Claims that are Reinstated, no claimant shall have recourse to the Reorganized Debtors (or any property thereof), other than with regard to the enforcement of rights or Distributions under the Prepackaged Plan.

Any Cash payment to be made pursuant to the Prepackaged Plan will be in U.S. dollars and may be made by draft, check, or wire transfer, in the sole discretion of the Debtors or the Reorganized Debtors, or as otherwise required or provided in any relevant agreement or applicable law. Any payment or Distribution due on a day other than a Business Day may be made, without interest, on the next Business Day.

Notwithstanding anything to the contrary herein, no holder of an Allowed Claim shall receive in respect of such Claim any Distribution in excess of the Allowed amount of such Claim. If any dispute arises as to the identity of a holder of an Allowed Claim who is to receive any Distribution, the Reorganized Debtors may, in lieu of making such Distribution to such Person, make such Distribution into a segregated account until the disposition thereof shall be determined by Court order or by written agreement among the interested parties.

Distributions on account of Senior Secured Notes Claims shall be made on the Effective Date by the Reorganized Debtors to the Senior Secured Notes Trustee. The Senior Secured Notes Trustee shall act as Distribution Agent and make applicable Distributions to holders of Senior Secured Notes Claims pursuant to the terms of the Prepackaged Plan. Distributions on account of Existing Preferred Interests shall be made on the Effective Date, or as soon as practicable thereafter, by the Reorganized Debtors, as Distribution Agent, to holders of Existing Preferred Interests pursuant to the terms of the Prepackaged Plan. Distributions on account of DIP Claims and ABL Facility Claims shall be made on the Effective Date by the Reorganized Debtors to the DIP Agent and the ABL Agent, respectively. The DIP Agent and the ABL Agent shall each act as Distribution Agents and distribute the relevant Distributions to holders of Allowed DIP Claims and Allowed ABL Claims, respectively, pursuant to the terms of the Prepackaged Plan.

The Reorganized Debtors or applicable Distribution Agent shall hold all Unclaimed Property (and all interest, dividends, and other distributions thereon), for the benefit of the holders of Claims entitled thereto under the terms of the Prepackaged Plan.  At the end of one (1) year following the relevant Distribution Date of particular Cash, Senior Secured Notes, New Warrants or New Common Stock, the holders of Allowed Claims theretofore entitled to Unclaimed Property held pursuant to this section shall be deemed to have forfeited such property, whereupon all right, title and interest in and to such property shall immediately and irrevocably revest in the Reorganized Debtors, such holders shall cease to be entitled thereto and: (i) any such Unclaimed Property that is Cash (including Cash interest, maturities, dividends and the like) shall be property of the Reorganized Debtors free of any restrictions thereon; and (ii) any Senior Secured Notes, New Warrants or New Common Stock that is Unclaimed Property shall be cancelled, or, with respect to New Warrants or New Common Stock, held as treasury shares at the Reorganized Debtors' discretion.  The Reorganized Debtors or the applicable Distribution Agent shall have no obligation to attempt to locate any holder of an Allowed Claim other than by reviewing the Debtors' books and records, proofs of Claim filed against the Debtors, or relevant registers maintained for such Claims.

Neither the Reorganized Debtors, nor any applicable Distribution Agent, shall have any obligation to make a distribution that is less than one (1) share of New Common Stock, one (1) New Warrant, or $20.00 in Cash.

### (g)  Withholding Taxes.

Any federal or state withholding taxes or other amounts required to be withheld under any applicable law shall be deducted and withheld from any Distributions under the Prepackaged Plan.  All Persons holding Claims shall be required to provide any information necessary to effect the withholding of such taxes.

### (h)  Exemption from Certain Transfer Taxes.

To the fullest extent permitted by applicable law, all sale transactions consummated by the Debtors and approved by the Bankruptcy Court on and after the Confirmation Date through and including the Effective Date, including the transfers effectuated under the Prepackaged Plan, the sale by the Debtors of any owned property pursuant to section 363(b) or 1123(b)(4) of the Bankruptcy Code, any assumption, assignment, and/or sale by the Debtors of their interests in unexpired leases of non-residential real property or executory contracts pursuant to section 365(a) of the Bankruptcy Code, and the creation, modification, consolidation or recording of any mortgage pursuant to the terms of the Prepackaged Plan, the New ABL Agreement or the New Senior Secured Notes Indenture or ancillary documents, shall constitute a "transfer under a plan" within the purview of section 1146 of the Bankruptcy Code, and shall not be subject to any stamp, real estate transfer, mortgage recording, or other similar tax.

### (i)  Exemptions from Securities Laws.

The issuance of New Common Stock, New Warrants and New Senior Secured Notes pursuant to the Prepackaged Plan (including the New Common Stock issued under the

Management Equity Plan or pursuant to exercise of New Warrants) shall be exempt from any securities laws registration requirements to the fullest extent permitted by section 1145 of the Bankruptcy Code.

### (j)      Setoffs and Recoupments.

Each Reorganized Debtor, or such entity's designee as instructed by such Reorganized Debtor, may, pursuant to section 553 of the Bankruptcy Code or applicable non-bankruptcy law, set off and/or recoup against any Allowed Claim, and the distributions to be made pursuant to the Prepackaged Plan on account of such Allowed Claim, any and all claims, rights and causes of action that a Reorganized Debtor or its successors may hold against the holder of such Allowed Claim after the Effective Date; provided, however, that neither the failure to effect a setoff or recoupment nor the allowance of any Claim hereunder will constitute a waiver or release by a Reorganized Debtor or its successor of any and all claims, rights and causes of action that a Reorganized Debtor or its successor may possess against such holder.

### (k)      Insurance Preservation and Proceeds.

Nothing in the Prepackaged Plan, including any releases, shall diminish or impair the enforceability of any policies of insurance that may cover claims against the Debtors or any other Person.

## 6.6     *Discharge.*

### (a)      Scope.

Except as otherwise provided in the Prepackaged Plan or Confirmation Order, in accordance with section 1141(d)(1) of the Bankruptcy Code, entry of the Confirmation Order acts as a discharge, effective as of the Effective Date, of all debts of, Claims against, liens on, and Interests in the Debtors, their assets or properties, which debts, Claims, liens, and Interests arose at any time before the entry of the Confirmation Order.  The discharge of the Debtors shall be effective as to each Claim, regardless of whether a proof of claim therefor was filed, whether the Claim is an Allowed Claim or whether the holder thereof votes to accept the Prepackaged Plan.  On the Effective Date, as to every discharged Claim and Interest, any holder of such Claim or Interest shall be precluded from asserting against the Debtors, the Reorganized Debtors or the assets or properties of any of them, any other or further Claim or Interest based upon any document, instrument, act, omission, transaction or other activity of any kind or nature that occurred before the Confirmation Date.

### (b)      Injunction.

In accordance with section 524 of the Bankruptcy Code, the discharge provided by this section and section 1141 of the Bankruptcy Code, *inter alia,* acts as an injunction against the commencement or continuation of any action, employment of process or act to collect, offset or recover the Claims, liens and Interests discharged by the Prepackaged Plan.

(c)   **Releases of Liens.**

Unless a particular Claim is Reinstated: (i) each holder of a Secured Claim or a Claim that is purportedly secured (including an Other Secured Claim) shall, on or immediately before the Effective Date (or, in the case of Other Secured Claims treated pursuant to Section 4.6(c) of the Prepackaged Plan, on or prior to the date of the return of the relevant collateral) and as a condition to receiving any Distribution hereunder:  (A) turn over and release to the Debtors, or the Reorganized Debtors, as applicable, any and all property of the Debtors or the Estates that secures or purportedly secures such Claim; and (B) execute such documents and instruments as the Debtors or the Reorganized Debtors require to evidence such claimant's release of such property; and (ii) on the Effective Date (or such other date described in this subsection), all claims, right, title and interest in such property shall revert to the Reorganized Debtors free and clear of all Claims and Interests, including (without limitation) liens, charges, pledges, encumbrances and/or security interests of any kind.  All liens of the holders of such Claims or Interests in property of the Debtors, the Estates, and/or the Reorganized Debtors shall be deemed to be canceled and released as of the Effective Date (or such other date described in this subsection).  Notwithstanding the immediately preceding sentence, any such holder of a Disputed Claim shall not be required to execute and deliver such release of liens until ten (10) days after such Claim becomes an Allowed Claim or is Disallowed.  To the extent any holder of a Claim described in the first sentence of this subsection fails to release the relevant liens as described above, the Reorganized Debtors may act as attorney-in-fact, on behalf of the holders of such liens, to provide any releases as may be required by any lender under the New ABL Facility or New Senior Secured Notes Indenture or for any other purpose.

(d)   **Cancellation of Stock/Instruments.**

The Existing Preferred Interests, Other Existing Equity Interests, the ABL Facility, the DIP Facility, the Senior Secured Notes (each including any related credit agreement, indenture, security and guaranty agreements, interest rate agreements and commodity hedging agreements) and any other note, bond, indenture or other instrument or document evidencing or creating any indebtedness or obligation of the Debtors are not required to be surrendered and shall be deemed cancelled on the Effective Date provided, however, the Senior Secured Notes Indenture shall continue in effect solely for purposes of (i) allowing the Senior Secured Notes Trustee to make the Distributions to be made on account of the Senior Secured Notes, and (ii) permitting the Senior Secured Notes Trustee to assert its Indenture Trustee Charging Lien against such Distributions under the Prepackaged Plan for payment of the Indenture Trustee Fees.

### 6.7   *Vesting and Retention of Causes of Action.*

Except as otherwise provided in the Prepackaged Plan (including, but not limited to, Section 8.4 of the Prepackaged Plan), on the Effective Date all property comprising the Estates (including, subject to any release provided for herein, any claim, right or cause of action which may be asserted by or on behalf of the Debtors, whether relating to the avoidance of preferences or fraudulent transfers under sections 544, 547, 548, 549 and/or 550 of the Bankruptcy Code or otherwise) shall be vested in the Reorganized Debtors free and clear of all Claims, liens, charges, encumbrances and interests of creditors and equity security holders,

except for the rights to Distribution afforded to holders of certain Claims under the Prepackaged Plan. After the Effective Date, the Reorganized Debtors shall have no liability to holders of Claims and Interests other than as provided for in the Prepackaged Plan. As of the Effective Date, the Reorganized Debtors may operate each of their respective businesses and use, acquire and settle and compromise claims or interests without supervision of the Bankruptcy Court, free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly imposed by the Prepackaged Plan and Confirmation Order.

Except as otherwise provided in the Prepackaged Plan, or in any contract, instrument, release or other agreement entered into in connection with the Prepackaged Plan or by order of the Bankruptcy Court, in accordance with section 1123(b) of the Bankruptcy Code, the Reorganized Debtors shall retain and may enforce any claims, rights and causes of action that the Debtors or the Estates may hold. The Reorganized Debtors or any successor thereto may pursue those claims, rights and causes of action in accordance with what is in its best interests and in accordance with its fiduciary duties.

## 6.8    *Survival of Certain Indemnification Obligations.*

The obligations of the Debtors to indemnify individuals who serve or served on or after the Petition Date as their respective directors, officers, agents, employees, representatives, and Professional Persons retained by the Debtors pursuant to the Debtors' operating agreements, certificates of incorporation, by-laws, applicable statutes and preconfirmation agreements in respect of all present and future actions, suits and proceedings against any of such officers, directors, agents, employees, representatives, and Professional Persons retained by the Debtors, based upon any act or omission related to service with, for, or on behalf of the Debtors on or before the Effective Date, as such obligations were in effect at the time of any such act or omission, shall not be expanded, discharged or impaired by confirmation or consummation of the Prepackaged Plan but shall survive unaffected by the reorganization contemplated by the Prepackaged Plan and shall be performed and honored by the Reorganized Debtors regardless of such confirmation, consummation and reorganization, and regardless of whether the underlying claims for which indemnification is sought are released pursuant to the Prepackaged Plan.

## 6.9    *Release, Injunction and Related Provisions.*

A "***Released Party***" means each of, and solely in its capacity as such: (a) the Debtors; (b) the ABL Agent; (c) the ABL Lenders; (d) the Consenting Noteholders; (e) the Senior Secured Notes Trustee; (f) the Consenting Equity Holders; (g) the DIP Lenders; (h) the DIP Agent; and (i) with respect to each of the foregoing entities in clauses (a) through (h), such entity's current affiliates, subsidiaries, officers, directors, principals, members, employees, agents, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, equityholders, partners and other professionals.

A "***Releasing Party***" means each of, and solely in its capacity as such, (a) the ABL Agent; (b) the ABL Lenders; (c) the Consenting Noteholders; (d) the Senior Secured Notes Trustee; (e) the Consenting Equity Holders; (f) the holders of impaired Claims or Interests other than those who (i) have been deemed to reject the Prepackaged Plan, or (ii) abstain from voting or voted to reject the Prepackaged Plan and have also checked the box on the applicable Ballot

- 33 -

indicating that they opt not to grant the releases provided in the Prepackaged Plan; (g) the Creditors' Committee, if any, and its members (solely in their capacity as members of the Creditors' Committee but not in their capacity as individual creditors), advisors and professionals (including any attorneys, financial advisors, investment bankers and other professionals retained by such persons); (h) the holders of Unimpaired Claims; and (i) with respect to the foregoing entities in clauses (a) through (h), such entity's current affiliates, subsidiaries, officers, directors, principals, members, employees, agents, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, equityholders, partners and other professionals.

### (a)     Satisfaction of Claims and Interests.

The treatment to be provided for respective Allowed Claims or Interests pursuant to the Prepackaged Plan shall be in full and final satisfaction, settlement, release and discharge of such respective Claims or Interests.

### (b)     Debtor Releases.

*Except as otherwise expressly set forth in the Prepackaged Plan or the Confirmation Order, as of the Effective Date, for the good and valuable consideration provided by each of the Released Parties, the adequacy of which is hereby confirmed, including good faith settlement and compromise of the claims released herein and the services of the Debtors' current officers, directors, managers and advisors in facilitation of the expeditious implementation of the transactions contemplated hereby, each Debtor and debtor in possession, and any person seeking to exercise the rights of the Debtors' estates, including without limitation, the Reorganized Debtors, any successor to the Debtors, or any representative of the Debtors' estates appointed or selected pursuant to sections 1103, 1104, or 1123(b)(3) of the Bankruptcy Code or under chapter 7 of the Bankruptcy Code, shall be deemed to conclusively, absolutely, unconditionally, irrevocably and forever release, waive and discharge and shall be deemed to have provided a full discharge and release to each Released Party and their respective property (and each such Released Party so released shall be deemed fully released and discharged by each Debtor, debtor in possession, and any person seeking to exercise the rights of the Debtors' estates, including without limitation, the Reorganized Debtors, any successor to the Debtors, or any representative of the Debtors' estates appointed or selected pursuant to sections 1103, 1104, or 1123(b)(3) of the Bankruptcy Code or under chapter 7 of the Bankruptcy Code) all claims (as such term "claim" is defined in section 101(5) of the Bankruptcy Code), obligations, debts, suits, judgments, damages, demands, rights, causes of action, remedies and liabilities whatsoever, (other than all rights, remedies and privileges to enforce the Prepackaged Plan, the Plan Supplement and the contracts, instruments, releases, indentures and other agreements or documents (including, without limitation, the Plan Documents) delivered thereunder) whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise that are based on, related to, or in any manner arising from, in whole or in part, any act, omission, transaction, event or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtors, the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Prepackaged Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims or*

*Interests prior to or in the Reorganization Cases, the parties released pursuant to Section 8.4(b) of the Prepackaged Plan, the Reorganization Cases, the Prepackaged Plan or the Disclosure Statement, or any related contracts, instruments, releases, agreements and documents, or upon any other act or omission, transaction, agreement, event or other occurrence taking place on or before the Effective Date, and that could have been asserted by or on behalf of the Debtors, the debtors in possession or their Estates, or any of their affiliates, whether directly, indirectly, derivatively or in any representative or any other capacity, individually or collectively, in their own right or on behalf of the holder of any Claim or Interest or other entity, against any Released Party; provided, however, that in no event shall anything in Section 8.4(b) of the Prepackaged Plan be construed as a release of any (i) Intercompany Claim or (ii) Person's fraud, gross negligence, or willful misconduct, as determined by a Final Order, for matters with respect to the Debtors.*

**(c)      Releases by Holders of Claims and Interests.**

*Except as expressly set forth in the Prepackaged Plan or the Confirmation Order, on the Effective Date, to the fullest extent permissible under applicable law, as such law may be extended or interpreted subsequent to the Effective Date, each Releasing Party (regardless of whether such Releasing Party is a Released Party), in consideration for the obligations of the Debtors and the other Released Parties under the Prepackaged Plan, the Distributions provided for under the Prepackaged Plan, and the contracts, instruments, releases, agreements or documents executed and delivered in connection with the Prepackaged Plan and the Restructuring Transaction, will be deemed to have consented to the Prepackaged Plan for all purposes and the restructuring embodied herein and deemed to conclusively, absolutely, unconditionally, irrevocably and forever release, waive and discharge (and each entity so released shall be deemed released and discharged by the Releasing Parties) all claims (as such term "claim" is defined in section 101(5) of the Bankruptcy Code), obligations, debts, suits, judgments, damages, demands, rights, causes of action, remedies or liabilities whatsoever, including all derivative claims asserted or which could be asserted on behalf of a Debtor (other than all rights, remedies and privileges of any party under the Prepackaged Plan, and the Plan Supplement and the contracts, instruments, releases, agreements and documents (including, without limitation, the Plan Documents) delivered under or in connection with the Prepackaged Plan), including, without limitation, any claims for any such loss such holder may suffer, have suffered or be alleged to suffer as a result of the Debtors commencing the Reorganization Cases or as a result of the Prepackaged Plan being consummated, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise that are based on, related to, or in any manner arising from, in whole or in part, any act or omission, transaction, event or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtors, the Reorganized Debtors, the Reorganization Cases, the purchase or sale or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Prepackaged Plan, the business or contractual arrangements between any Debtor and any Releasing Party, the restructuring of Claims or Interests prior to or in the Reorganization Cases, the Prepackaged Plan or the Disclosure Statement or any related contracts, instruments, releases, agreements and documents, or upon any other act or omission, transaction, agreement, event or other occurrence taking place on or before the Effective Date, against any Released*

- 35 -

*Party and its respective property; <u>provided</u>, <u>however</u>, that in no event shall anything in Section 8.4(c) of the Prepackaged Plan be construed as a release of any (i) Intercompany Claim or (ii) Person's fraud, gross negligence, or willful misconduct, as determined by a Final Order, for matters with respect to the Debtors.*

*Entry of the Confirmation Order will constitute the Bankruptcy Court's approval, pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019, of the releases in Sections 8.4(b) and (c) of the Prepackaged Plan, which includes by reference each of the related provisions and definitions contained herein, and further, will constitute the Bankruptcy Court's finding that such releases are (i) in exchange for the good and valuable consideration provided by the Debtors and the other Released Parties, representing good faith settlement and compromise of the claims released herein, (ii) in the best interests of the Debtors and all holders of Claims and Interests, (iii) fair, equitable, and reasonable, (iv) approved after due notice and opportunity for hearing, and (v) a bar to any of the Releasing Parties asserting any claim or cause of action released by the Releasing Parties against any of the Debtors and the other Released Parties or their respective property.*

*Notwithstanding anything to the contrary contained therein, with respect to a Released Party that is a non-Debtor, nothing in the Prepackaged Plan or the Confirmation Order shall effect a release of any claim by the United States government or any of its agencies whatsoever, including without limitation, any claim arising under the Internal Revenue Code, the environmental laws or any criminal laws of the United States against such Released Party, nor shall anything in the Confirmation Order or the Prepackaged Plan enjoin the United States from bringing any claim, suit, action or other proceeding against such Released Party for any liability whatever, including without limitation, any claim, suit or action arising under the Internal Revenue Code, the environmental laws or any criminal laws of the United States, nor shall anything in the Confirmation Order or the Prepackaged Plan exculpate any non-Debtor party from any liability to the United States Government or any of its agencies, including any liabilities arising under the Internal Revenue Code, the environmental laws or any criminal laws of the United States against such Released Party.*

*Notwithstanding anything to the contrary contained herein, except to the extent permissible under applicable law, as such law may be extended or interpreted subsequent to the Effective Date, except with respect to a Released Party that is a Debtor, nothing in the Confirmation Order or the Prepackaged Plan shall effect a release of any claim by any state or local authority whatsoever, including without limitation, any claim arising under the environmental laws or any criminal laws of any state or local authority against any Released Party that is a non-Debtor, nor shall anything in the Confirmation Order or the Prepackaged Plan enjoin any state or local authority from bringing any claim, suit, action or other proceeding against any Released Party that is a non-Debtor for any liability whatever, including without limitation, any claim, suit or action arising under the environmental laws or any criminal laws of any state or local authority, nor shall anything in the Confirmation Order or the Prepackaged Plan exculpate any party from any liability to any state or local authority whatsoever, including any liabilities arising under the environmental laws or any criminal laws of any state or local authority against any Released Party that is a non-Debtor.*

*As to the United States, its agencies, departments or agents, nothing in the Prepackaged Plan or Confirmation Order shall discharge, release, or otherwise preclude: (i) any liability of the Debtors or Reorganized Debtors arising on or after the Effective Date; or (ii) any valid right of setoff or recoupment. Furthermore, nothing in the Prepackaged Plan or the Confirmation Order: (A) discharges, releases, or precludes any environmental liability that is not a claim (as that term is defined in the Bankruptcy Code), or any environmental claim (as the term "claim" is defined in the Bankruptcy Code) of a governmental unit that arises on or after the Effective Date; (B) releases the Debtors or the Reorganized Debtors from any non-dischargeable liability under environmental law as the owner or operator of property that such persons own or operate after the Effective Date; (C) releases or precludes any environmental liability to a governmental unit on the part of any Persons other than the Debtors and Reorganized Debtors; or (D) enjoins a governmental unit from asserting or enforcing outside this Court any liability described in this paragraph.*

### (d) Injunction.

*Except as otherwise provided in the Prepackaged Plan or the Confirmation Order, as of the Confirmation Date, but subject to the occurrence of the Effective Date, all Persons who have held, hold or may hold Claims against or Interests in the Debtors or the Estates are, with respect to any such Claims or Interests, permanently enjoined after the Confirmation Date from: (i) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind (including, without limitation, any proceeding in a judicial, arbitral, administrative or other forum) against or affecting the Debtors, the Reorganized Debtors, the Estates or any of their property, or any direct or indirect transferee of any property of, or direct or indirect successor in interest to, any of the foregoing Persons or any property of any such transferee or successor; (ii) enforcing, levying, attaching (including, without limitation, any pre-judgment attachment), collecting or otherwise recovering by any manner or means, whether directly or indirectly, any judgment, award, decree or order against the Debtors, the Reorganized Debtors, or the Estates or any of their property, or any direct or indirect transferee of any property of, or direct or indirect successor in interest to, any of the foregoing Persons, or any property of any such transferee or successor; (iii) creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against the Debtors, the Reorganized Debtors, or the Estates or any of their property, or any direct or indirect transferee of any property of, or successor in interest to, any of the foregoing Persons; (iv) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Prepackaged Plan to the full extent permitted by applicable law; (v) asserting any right of setoff, subrogation or recoupment of any kind against any obligation due from the Debtors, the Reorganized Debtors, the Estates or any of their property, or any direct or indirect transferee of any property of, or successor in interest to, any of the foregoing Persons; (vi) commencing or continuing, in any manner or in any place, any action that does not comply with or is inconsistent with the provisions of the Prepackaged Plan; provided, further, that the Releasing Parties are, with respect to Claims or Interests held by such parties, permanently enjoined after the Confirmation Date from taking any actions referred to in clauses (i) through (vi) above against the Released Parties or any direct or indirect transferee of any property of, or direct or indirect successor in interest to, any of the Released Parties or any property of any such transferee or successor; provided, however, that nothing contained herein shall preclude any Person from exercising its rights, or obtaining benefits, directly and expressly*

*provided to such entity pursuant to and consistent with the terms of the Prepackaged Plan, the Plan Supplement and the contracts, instruments, releases, agreements and documents delivered in connection with the Prepackaged Plan.*

*All Persons releasing claims pursuant to Section 8.4(b) or (c) of the Prepackaged Plan shall be permanently enjoined, from and after the Confirmation Date, from taking any actions referred to in clauses (i) through (v) of the immediately preceding paragraph against any party with respect to any claim released pursuant to Section 8.4(b) or (c) of the Prepackaged Plan.*

**(e)     Exculpation.**

*None of the Released Parties shall have or incur any liability to any holder of any Claim or Interest for any prepetition or postpetition act or omission in connection with, or arising out of the Debtors' restructuring, including without limitation, the negotiation and execution of the Prepackaged Plan, the Plan Documents, the Reorganization Cases, the Disclosure Statement, the dissemination of the Prepackaged Plan, the solicitation of votes for and the pursuit of the Prepackaged Plan, the consummation of the Prepackaged Plan, or the administration of the Prepackaged Plan or the property (including without limitation the New Common Stock, the New Senior Secured Notes, and any other security offered, issued or distributed in connection with the Prepackaged Plan) to be distributed under the Prepackaged Plan, including, without limitation, all documents ancillary thereto, all decisions, actions, inactions and alleged negligence or misconduct relating thereto and all prepetition or postpetition activities taken or omission in connection with the Prepackaged Plan or the restructuring of the Debtors except fraud, gross negligence or willful misconduct, each as determined by a Final Order.  The Released Parties shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under the Prepackaged Plan; <u>provided</u>, <u>however</u>, solely to the extent that it would contravene Rule 1.8(h)(1) of the New York Rules of Professional Conduct or any similar ethical rule of another jurisdiction, if binding on an attorney of a Released Party, no attorney of any Released Party shall be released by the Debtors or the Reorganized Debtors.*

**(f)     Injunction Related to Exculpation.**

*The Confirmation Order shall permanently enjoin the commencement or prosecution by any person or entity, whether directly, derivatively or otherwise, of any Claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action or liabilities released pursuant to Section 8.4(e) of the Prepackaged Plan.*

**(g)     Exclusive Jurisdiction.**

The Bankruptcy Court (and the United States District Court for the Southern District of New York) shall retain exclusive jurisdiction to adjudicate any and all claims or causes or action (i) against any Released Party, (ii) relating to the Debtors, the Prepackaged Plan, the Distributions, the New Common Stock, the Reorganization Cases, the Restructuring Transaction, or any contract, instrument, release, agreement or document executed and delivered

in connection with the Prepackaged Plan and the Restructuring Transaction, and (iii) brought by the Debtors (or any successor thereto) or any holder of a Claim or Interest.

### 6.10   *Objections to Claims and Interest.*

Unless otherwise ordered by the Bankruptcy Court, objections to Claims shall be filed and served on the applicable holder of such Claim not later than 120 days after the later to occur of:  (a) the Effective Date; and (b) the filing of the relevant Claim.  Notwithstanding any authority to the contrary, an objection to a Claim shall be deemed properly served on the claimant if the objecting party effects service in any of the following manners: (x) in accordance with Federal Rule of Civil Procedure 4, as modified and made applicable by Bankruptcy Rule 7004; (y) by first class mail, postage prepaid, on the signatory on the proof of claim as well as all other representatives identified in the proof of claim or any attachment thereto; or (z) by first class mail, postage prepaid, on any counsel that has appeared on the claimant's behalf in the Reorganization Cases (so long as such appearance has not been subsequently withdrawn).

After the Confirmation Date, only the Reorganized Debtors shall have the authority to file, settle, compromise, withdraw, or litigate to judgment objections to Claims. From and after the Effective Date, the Reorganized Debtors may settle or compromise any Disputed Claim without Bankruptcy Court approval.  Any Claims filed after any Bar Date, if applicable, shall be deemed Disallowed and expunged in their entirety without further order of the Bankruptcy Court or any action being required on the part of the Debtors or the Reorganized Debtors, unless the Person or entity wishing to file such untimely Claim has received prior Bankruptcy Court authority to do so.

### 6.11   *Executory Contracts.*

#### (a)   **Executory Contracts and Unexpired Leases.**

On the Effective Date, all executory contracts and unexpired leases of the Debtors and/or the Estates shall be assumed by the Debtors and assigned to the Reorganized Debtors pursuant to the provisions of sections 365 and 1123 of the Bankruptcy Code, except:  (i) any executory contracts and unexpired leases that are the subject of separate rejection motions filed pursuant to section 365 of the Bankruptcy Code by the Debtors before the entry of the Confirmation Order; and (ii) any executory contract or unexpired lease that is the subject of a Cure Dispute pursuant to Section 9.2 of the Prepackaged Plan and for which the Debtors or the Reorganized Debtors, as the case may be, makes a motion to reject such contract or lease based upon the existence of such Cure Dispute filed at any time.

Subject to subsection (i) above and Section 9.2 of the Prepackaged Plan, the Confirmation Order shall constitute an order of the Bankruptcy Court approving the assumption or rejection, as applicable, of executory contracts and unexpired leases the assumption or rejection of which is provided for in Section 9.1(a) of the Prepackaged Plan pursuant to sections 365 and 1123 of the Bankruptcy Code and such assumption or rejection shall be deemed effective as of the Effective Date.

**(b)      Cure.**

At the election of the Reorganized Debtors, any monetary defaults under each executory contract and unexpired lease to be assumed under the Prepackaged Plan shall be satisfied pursuant to section 365(b)(1) of the Bankruptcy Code, in one of the following ways: (i) by payment of the default amount (the "**Cure Amount**") in Cash on or as soon as reasonably practicable after the later to occur of (A) thirty (30) days after the determination of the Cure Amount and (B) the Effective Date or such other date as may be set by the Bankruptcy Court; or (ii) on such other terms as agreed to by the Debtors or the Reorganized Debtors and the non-Debtor party to such executory contract or unexpired lease.

In the event of a dispute (each, a "**Cure Dispute**") regarding: (i) the Cure Amount; (ii) the ability of the Debtors to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed; or (iii) any other matter pertaining to the assumption of an executory contract or unexpired lease, the cure payment required by section 365(b)(1) of the Bankruptcy Code shall be made only following the entry of a Final Order resolving the Cure Dispute and approving the assumption of such executory contract or unexpired lease. If a Cure Dispute relates solely to the Cure Amount, the applicable Debtor may assume and/or assume and assign the subject contract or lease prior to resolution of the Cure Dispute, provided that the Debtors reserve Cash in an amount sufficient to pay the full amount asserted by the non-Debtor party to the subject contract (or such other amount as may be fixed or estimated by the Bankruptcy Court). Such reserve may be in the form of a book entry and evergreen in nature. The Debtors or the Reorganized Debtors shall have the right at any time to move to reject any executory contract or unexpired lease based on the existence of a Cure Dispute.

**6.12    _Conditions Precedent to Confirmation and Consummation of the Prepackaged
            Plan._**

**(a)      Conditions Precedent to Confirmation.**

Confirmation of the Prepackaged Plan is subject to: (i) entry of the Confirmation Order which shall be in form and substance reasonably satisfactory to the Debtors and the Required Consenting Noteholders; and (ii) the Plan Documents, having been filed in substantially final form prior to the Confirmation Hearing, which Plan Documents shall be in form and substance reasonably satisfactory to the Debtors and the Required Consenting Noteholders, provided, that, the New Senior Secured Notes Indenture shall be substantially in the form attached to the Disclosure Statement with all modifications to such form reasonably satisfactory to the Required Consenting Noteholders.

**(b)      Conditions to the Effective Date.**

It shall be a condition to the Effective Date of the Prepackaged Plan that the following conditions shall have been satisfied or waived pursuant to the provisions of Article X of the Prepackaged Plan: (i) the Confirmation Order in form and substance reasonably satisfactory to the Required Consenting Noteholders shall have been entered and shall have become a Final Order; (ii) the certificates of incorporation and by-laws of the Reorganized

- 40 -

Debtors in form and substance satisfactory to the Required Consenting Noteholders shall have been amended or created as provided in the Prepackaged Plan; (iii) the New Board shall have been appointed; (iv) the Debtors shall have received all authorizations, consents, regulatory approvals, rulings or documents that are necessary to implement and effectuate the Prepackaged Plan; (v) the New ABL Agreement and the New Senior Secured Notes Indenture, including all ancillary documents, opinions of counsel and closing certificates, in form and substance reasonably satisfactory to the Required Consenting Noteholders, shall have been executed and delivered; (vi) the Debtors shall have, or shall have received pursuant to the New ABL Facility, the requisite funding to make any Distributions required under the Prepackaged Plan to be made in Cash; (vii) all other Plan Documents in form and substance reasonably satisfactory to the Required Consenting Noteholders required to be executed and delivered on or prior to the Effective Date shall have been executed and delivered, and, to the extent required, filed with the applicable governmental units in accordance with applicable laws, and shall be consistent in all respects with the Prepackaged Plan; and (viii) all of the reasonable, actual and documented fees and expenses of the Required Consenting Noteholders, including, but not limited to, the fees and expenses of Dechert LLP, their legal counsel, and FTI Consulting, Inc., their financial advisors, in accordance with the existing fee arrangement between such advisors and the Debtors, shall have been paid in full.

### (c)      Waiver of Conditions Precedent.

Other than the requirement that the Confirmation Order must be entered, which cannot be waived, the requirement that a particular condition be satisfied may be waived in whole or part by the Debtors, with the consent of the Required Consenting Noteholders (which consent shall not be unreasonably withheld or delayed), without notice and a hearing, and the Debtors' benefits under the "mootness doctrine" shall be unaffected by any provision hereof. The failure to satisfy or waive any condition may be asserted by the Debtors regardless of the circumstances giving rise to the failure of such condition to be satisfied (including, without limitation, any act, action, failure to act or inaction by the Debtors). The failure of the Debtors to assert the non-satisfaction of any such conditions shall not be deemed a waiver of any other rights hereunder, and each such right shall be deemed an ongoing right that may be asserted or waived (as set forth herein) at any time or from time to time.

### (d)      Effect of Non-Occurrence of the Conditions to Consummation.

If each of the conditions to confirmation and consummation of the Prepackaged Plan and the occurrence of the Effective Date has not been satisfied or duly waived on or before the first Business Day that is more than sixty (60) days after the Confirmation Date, or by such later date as is proposed by the Debtors and is reasonably approved by the Required Consenting Noteholders and, after notice and a hearing, by the Bankruptcy Court, upon motion by any party-in-interest made before the time that each of the conditions has been satisfied or duly waived, the Confirmation Order may be vacated by the Bankruptcy Court; provided, however, that notwithstanding the filing of such a motion, the Confirmation Order shall not be vacated if each of the conditions to consummation is either satisfied or duly waived before the Bankruptcy Court enters an order granting the relief requested in such motion. If the Confirmation Order is vacated, the Prepackaged Plan shall be null and void in all respects, and nothing contained in the Prepackaged Plan shall: (i) constitute a waiver or release of any Claims against or Interests in

- 41 -

the Debtors; or (ii) prejudice in any manner the rights of the Debtors, including (without limitation) the right to seek a further extension of the exclusive periods to file and solicit votes with respect to a plan under section 1121(d) of the Bankruptcy Code.

### (e)   Withdrawal of Prepackaged Plan.

Subject to the reasonable consent of the Required Consenting Noteholders, which consent shall not be unreasonably withheld or delayed, the Debtors reserve the right to modify or revoke and withdraw the Prepackaged Plan at any time before the Confirmation Date or, if the Debtors are for any reason unable to consummate the Prepackaged Plan after the Confirmation Date, at any time up to the Effective Date.  If the Debtors revoke and withdraw the Prepackaged Plan: (i) nothing contained in the Prepackaged Plan shall be deemed to constitute a waiver or release of any claims by or against the Debtors or to prejudice in any manner the rights of the Debtors or any Persons in any further proceeding involving the Debtors; and (ii) the result shall be the same as if the Confirmation Order were not entered, the Prepackaged Plan was not filed and no actions were taken to effectuate it.

### (f)   Cramdown.

Because certain Classes are deemed to have rejected the Prepackaged Plan, the Debtors will request confirmation of the Prepackaged Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code.  The Debtors reserve the right to alter, amend, modify, revoke or withdraw the Prepackaged Plan in order to satisfy the requirements of section 1129(b) of the Bankruptcy Code, if necessary.

## 6.13   *Retention of Jurisdiction.*

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, or related to, the Reorganization Cases and the Prepackaged Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, as set forth in Article XI of the Prepackaged Plan.

## 6.14   *Amendments.*

The Debtors may modify the Prepackaged Plan at any time prior to the entry of the Confirmation Order provided that the Prepackaged Plan, as modified, and the disclosure statement pertaining thereto meet applicable Bankruptcy Code requirements and each such modification is reasonably satisfactory to the Required Consenting Noteholders.  After the entry of the Confirmation Order, the Debtors may modify the Prepackaged Plan to remedy any defect or omission or to reconcile any inconsistencies in the Prepackaged Plan or in the Confirmation Order, as may be necessary to carry out the purposes and effects of the Prepackaged Plan, provided that the Debtors obtain approval of the Bankruptcy Court for such modification, after notice and a hearing, and each such modification is reasonably satisfactory to the Required Consenting Noteholders.  Any waiver under Section 10.3 of the Prepackaged Plan shall not be considered to be a modification of the Prepackaged Plan.  After the Confirmation Date and before substantial consummation of the Prepackaged Plan, the Debtors may modify the Prepackaged Plan in a way that materially and adversely affects the interests, rights, treatment, or

Distributions of a Class of Claims or Interests, provided that: (i) the Prepackaged Plan, as modified, meets applicable Bankruptcy Code requirements; (ii) the Debtors obtain Court approval for such modification, after notice and a hearing; (iii) such modification is accepted by the holders of at least two-thirds in amount, and more than one-half in number, of Allowed Claims or Interests voting in each Class affected by such modification; and (iv) the Debtors comply with section 1125 of the Bankruptcy Code with respect to the Prepackaged Plan as modified.

## ARTICLE VII.

## CONFIRMATION OF THE PREPACKAGED PLAN

**7.1** *Confirmation Hearing.*

Section 1128(a) of the Bankruptcy Code requires the bankruptcy court, after appropriate notice, to hold a hearing on confirmation of a plan of reorganization. The Debtors shall request that the that the Bankruptcy Court hold a hearing to consider confirmation of the Prepackaged Plan (the "**Confirmation Hearing**"), including a determination that the Prepackaged Plan solicitation was in compliance with any applicable nonbankruptcy law, rule or regulation governing the adequacy of disclosure or, if there is not any such law, rule or regulation, was made after disclosure of adequate information as defined in the Bankruptcy Code, upon such notice to parties-in-interest as is required by the Bankruptcy Code and the Bankruptcy Court. Bankruptcy Rule 2002(b) requires no less than 28 days' notice by mail of the time for filing objections to confirmation of the Prepackaged Plan and of the time and place of the confirmation hearing, unless the Bankruptcy Court shortens or lengthens this period. Holders of impaired Claims and Interests, among others, will be provided notice by mail, or by publication if required by the Bankruptcy Court, of the date and time fixed by the Bankruptcy Court for the Confirmation Hearing.

Section 1128(b) of the Bankruptcy Code provides that any party-in-interest may object to confirmation of the Prepackaged Plan. The Bankruptcy Court will also establish procedures for the filing and service of objections to confirmation of the Prepackaged Plan. Such procedures will be described in the notice informing parties-in-interest of the time for filing objections to confirmation of the Prepackaged Plan.

**ANY OBJECTIONS TO CONFIRMATION OF THE PREPACKAGED PLAN MUST BE FILED WITH THE BANKRUPTCY COURT IN ACCORDANCE WITH APPLICABLE BANKRUPTCY RULES AND ANY PROCEDURES ESTABLISHED BY THE BANKRUPTCY COURT.**

**7.2** *Confirmation.*

At the Confirmation Hearing, the Bankruptcy Court will determine whether the requirements of section 1129(a) of the Bankruptcy Code have been satisfied with respect to the Prepackaged Plan.

(a)     **Confirmation Requirements.**

Confirmation of a plan under section 1129(a) of the Bankruptcy Code requires, among other things, that:

- the plan complies with the applicable provisions of the Bankruptcy Code;

- the proponent of the plan has complied with the applicable provisions of the Bankruptcy Code;

- the plan has been proposed in good faith and not by any means forbidden by law;

- any plan payment made or to be made by the proponent under the plan for services or for costs and expenses in, or in connection with, the chapter 11 case, or in connection with the plan and incident to the case, has been approved by, or is subject to the approval of, the Bankruptcy Court as reasonable;

- the proponent has disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the plan, as a director, officer, or voting trustee of the debtor, an affiliate of the debtor participating in the plan with the debtor, or a successor to the debtor under the plan. The appointment to, or continuance in, such office by such individual must be consistent with the interests of creditors and equity security holders and with public policy and the proponent must have disclosed the identity of any insider that the reorganized debtor will employ or retain, and the nature of any compensation for such insider;

- with respect to each impaired class of claims or interests, either each holder of a claim or interest of such class has accepted the plan, or will receive or retain under the plan, on account of such claim or interest, property of a value, as of the effective date of the plan, that is not less than the amount that such holder would receive or retain if the debtor were liquidated on such date under chapter 7 of the Bankruptcy Code;

- each class of claims or interests has either accepted the plan or is not impaired under the plan;

- except to the extent that the holder of a particular claim has agreed to a different treatment of such claim, the plan provides that allowed administrative expenses and priority claims will be paid in full on the effective date;

- if a class of claims is impaired, at least one (1) impaired class of claims has accepted the plan, determined without including any acceptance of the plan by any insider holding a claim in such class; and

- 44 -

- confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan.

Subject to satisfying the standard for any potential "cramdown" of Classes deemed to reject the Prepackaged Plan, the Debtors believe that:

- the Prepackaged Plan satisfies all of the statutory requirements of chapter 11 of the Bankruptcy Code;

- the Debtors have complied or will have complied with all of the requirements of chapter 11 of the Bankruptcy Code; and

- the Prepackaged Plan has been proposed in good faith.

Set forth below is a summary of the relevant statutory confirmation requirements.

### (1)  Acceptance.

Classes 2 and 8 are impaired under the Prepackaged Plan and are entitled to vote to accept or reject the Prepackaged Plan.  Classes 1, 3, 4, 5, 6 and 7 are unimpaired and, therefore, are conclusively presumed to accept the Prepackaged Plan pursuant to section 1126(f) of the Bankruptcy Code.  Classes 9 and 10 are impaired and not receiving any property under the Prepackaged Plan, and thus are deemed to have rejected the Prepackaged Plan.

Because certain Classes are deemed to have rejected the Prepackaged Plan, the Debtors will request confirmation of the Prepackaged Plan under section 1129(b) of the Bankruptcy Code.  The Debtors reserve the right, with the consent of the Required Consenting Noteholders, to alter, amend, modify, revoke or withdraw the Prepackaged Plan, any exhibit, or schedules thereto or any Plan Document in order to satisfy the requirements of section 1129(b) of the Bankruptcy Code, if necessary.  The Debtors believe that the Prepackaged Plan will satisfy the "cramdown" requirements of section 1129(b) of the Bankruptcy Code with respect to Claims and Interests in Classes 9 and 10.

The Debtors will also seek confirmation of the Prepackaged Plan over the objection of any individual holders of Claims or Interests who are members of an accepting Class.  However, there can be no assurance that the Bankruptcy Court will determine that the Prepackaged Plan meets the requirements of section 1129(b) of the Bankruptcy Code.

### (2)  Unfair Discrimination and Fair and Equitable Test.

To obtain nonconsensual confirmation of the Prepackaged Plan, it must be demonstrated to the Bankruptcy Court that the Prepackaged Plan "does not discriminate unfairly" and is "fair and equitable" with respect to each impaired, non-accepting Class.  The Bankruptcy Code provides a non-exclusive definition of the phrase "fair and equitable" for, respectively, secured creditors, unsecured creditors and holders of equity interests.

A plan of reorganization does not "discriminate unfairly" with respect to a non-accepting class if the value of the cash and/or securities to be distributed to the non-accepting class is equal to, or otherwise fair when compared to, the value of the distributions to other classes whose legal rights are the same as those of the non-accepting class.

### (3)   Feasibility; Financial Projections; Valuation.

The Bankruptcy Code permits a plan to be confirmed only if confirmation is not likely to be followed by liquidation or the need for further financial reorganization. For purposes of determining whether the Prepackaged Plan meets this requirement, the Company has analyzed its ability to meet its obligations under the Prepackaged Plan. As part of this analysis, the Company has prepared projections of the financial performance of the Reorganized Debtors for each of the five fiscal years from 2012-2017 (the "**Financial Projections**"). The Financial Projections, and the assumptions on which they are based, are set forth in the Projected Financial Information contained in Exhibit 6 hereto.

The Financial Projections are based on the assumption that the Prepackaged Plan will be confirmed by the Bankruptcy Court and, for projection purposes, that the Effective Date under the Prepackaged Plan will occur in October 2012.

THE PROJECTIONS, INCLUDING THE UNDERLYING ASSUMPTIONS, SHOULD BE CAREFULLY REVIEWED IN EVALUATING THE PREPACKAGED PLAN. THE PROJECTIONS WERE PREPARED DURING THE FIRST QUARTER OF 2012 AND SUBSEQUENTLY UPDATED TO REFLECT TRANSACTION COSTS AND THE PRO FORMA BALANCE SHEET. WHILE THE DEBTORS BELIEVE THE ASSUMPTIONS UNDERLYING THE PROJECTIONS, WHEN CONSIDERED ON AN OVERALL BASIS, WERE REASONABLE WHEN PREPARED IN LIGHT OF CURRENT CIRCUMSTANCES AND EXPECTATIONS, NO ASSURANCE CAN BE GIVEN THAT THE PROJECTIONS WILL BE REALIZED. THE COMPANY MAKES NO REPRESENTATION OR WARRANTY AS TO THE ACCURACY OF THE PROJECTIONS, AND DOES NOT UNDERTAKE ANY OBLIGATION TO UPDATE THESE FINANCIAL PROJECTIONS TO REFLECT NEW INFORMATION, FUTURE EVENTS OR OTHERWISE, EXCEPT AS MAY BE REQUIRED UNDER APPLICABLE LAW.

The Company prepared these Financial Projections based upon certain assumptions that it believes to be reasonable under the circumstances. Those assumptions considered to be significant are described in Exhibit 6. The Financial Projections have not been examined or compiled by independent accountants. The Company makes no representation as to the accuracy of the projections or its ability to achieve the projected results. Many of the assumptions on which the projections are based are inherently subject to significant economic and competitive uncertainties and contingencies beyond the control of the Company and its management, and are subject to significant incremental uncertainty as a result of the scope and potential duration of the current economic recession underway both in the United States and abroad. Inevitably, some assumptions will not materialize and unanticipated events and circumstances may affect the Reorganized Debtors' actual financial results. Therefore, the actual results achieved throughout the five-year period of the Financial Projections may vary from the projected results and the variations may be material. All holders of Claims or Interests that are

- 46 -

entitled to vote to accept or reject the Prepackaged Plan are urged to examine carefully all of the assumptions on which the Financial Projections are based in connection with their evaluation of the Prepackaged Plan.

**(b)** **Valuation of the Reorganized Debtors.**

THE VALUATION INFORMATION SET FORTH IN THIS SECTION REPRESENTS A HYPOTHETICAL VALUATION OF THE REORGANIZED COMPANY, WHICH ASSUMES THAT THE REORGANIZED COMPANY CONTINUES AS AN OPERATING BUSINESS. THE ESTIMATED VALUE SET FORTH IN THIS SECTION DOES NOT PURPORT TO CONSTITUTE AN APPRAISAL OF THE COMPANY'S ASSETS, AND THE ESTIMATED VALUE SET FORTH HEREIN DOES NOT NECESSARILY REFLECT THE ACTUAL MARKET VALUE THAT MIGHT BE REALIZED THROUGH A SALE OR LIQUIDATION OF THE REORGANIZED COMPANY, ITS SECURITIES OR ASSETS, WHICH VALUE MAY BE SIGNIFICANTLY HIGHER OR LOWER THAN THE ESTIMATE SET FORTH IN THIS SECTION.

The valuation of the Company for purposes of the Prepackaged Plan is set forth on Exhibit 8 hereto. Evercore has estimated the going concern value of the enterprise to be comprised of the Reorganized Company as of June 30, 2012. The valuation analysis is based on the Financial Projections provided by the Company's management for the years 2012 through 2017. The valuation analysis assumes that the Effective Date takes place on or about October 31, 2012. Evercore undertook the analysis to estimate the value available for distribution to holders of Allowed Claims pursuant to the Prepackaged Plan and to analyze the relative recoveries to such holders thereunder. The estimated total value available for distribution to holders of Allowed Claims consists of the estimated value of the Reorganized Company's operations on a going concern basis.

Based on the Financial Projections and subject to the disclaimers and the descriptions of Evercore's methodology set forth in Exhibit 8, and solely for purposes of the Prepackaged Plan, Evercore estimates that the Enterprise Value of the Reorganized Company falls within a range of approximately $281 to $343 million.

The foregoing valuation is based on a number of assumptions and subject to a number of qualifications, as set forth in Exhibit 8, including the successful reorganization of the Company's business in a timely manner, the achievement of the forecasts reflected in the Financial Projections, the continuation of current market conditions through the Effective Date and the Prepackaged Plan become effective in accordance with its terms.

THE SUMMARY SET FORTH ABOVE DOES NOT PURPORT TO BE A COMPLETE DESCRIPTION OF THE ANALYSES PERFORMED BY EVERCORE. THE PREPARATION OF A VALUATION ESTIMATE INVOLVES VARIOUS DETERMINATIONS AS TO THE MOST APPROPRIATE AND RELEVANT METHODS OF FINANCIAL ANALYSIS AND THE APPLICATION OF THESE METHODS IN THE PARTICULAR CIRCUMSTANCES AND, THEREFORE, SUCH AN ESTIMATE IS NOT READILY SUITABLE TO SUMMARY DESCRIPTION. IN PERFORMING THESE ANALYSES, EVERCORE AND THE COMPANY MADE NUMEROUS ASSUMPTIONS

WITH RESPECT TO INDUSTRY PERFORMANCE, BUSINESS AND ECONOMIC CONDITIONS AND OTHER MATTERS.  THE ANALYSES PERFORMED BY EVERCORE ARE NOT NECESSARILY INDICATIVE OF ACTUAL VALUES OR FUTURE RESULTS, WHICH MAY BE SIGNIFICANTLY MORE OR LESS FAVORABLE THAN SUGGESTED BY SUCH ANALYSES.

### (c)    Best Interests Test.

With respect to each impaired Class of Claims and Interests, confirmation of the Prepackaged Plan requires that each holder of a Claim or Interest either (i) accept the Prepackaged Plan or (ii) receive or retain under the Prepackaged Plan property of a value, as of the Effective Date, that is not less than the value such holder would receive if the Company were liquidated under chapter 7 of the Bankruptcy Code.  To determine what holders of Claims in each impaired Class would receive if the Company were liquidated under chapter 7, the Bankruptcy Court must determine the dollar amount that would be generated from the liquidation of the Company's assets and properties in the context of liquidation under chapter 7 of the Bankruptcy Code.  The Cash amount that would be available for satisfaction of Claims and Interests would consist of the proceeds resulting from the disposition of the assets and properties of the Company, augmented by the Cash held by the Company at the time of the commencement of the liquidation case.  Such Cash amount would be (i) first, reduced by the amount of the Allowed Secured Claims, (ii) second, reduced by the costs and expenses of liquidation and such additional administrative claims that might result from the termination of the Company's business and the use of chapter 7 for the purposes of liquidation, and (iii) third, reduced by the Company's costs of liquidation under chapter 7, including the fees payable to a trustee in bankruptcy, as well as those fees that might be payable to attorneys and other professionals that such a trustee might engage.  In addition, claims would arise by reason of the breach or rejection of leases and executory contracts (including vendor, agent and customer contracts) assumed or entered into by the Company prior to the filing of the chapter 7 case.

To determine if the Prepackaged Plan is in the best interests of each impaired class, the present value of the distributions from the proceeds of a liquidation of the Company's assets and properties, after subtracting the amounts attributable to the foregoing claims, must be compared with the value of the property offered to such Classes of Claims under the Prepackaged Plan.

After considering the effects that a chapter 7 liquidation would have on the ultimate proceeds available for distribution to creditors in the Reorganization, the Company has determined that confirmation of the Prepackaged Plan will provide each holder of an Allowed Claim with a recovery that is not less than such holder would receive pursuant to the liquidation of the Company under chapter 7.

Moreover, the Company believe that the value of any distributions to each Class of Allowed Claims in a chapter 7 case would be less than the value of distributions under the Prepackaged Plan because in a chapter 7 case the Company would not have the proceeds of the New ABL Facility to make such distributions to the holders of Allowed Claims and any distribution in a chapter 7 case would not occur for a substantial period of time.  It is likely that distribution of the proceeds of the liquidation could be delayed for up to 18 months after the

- 48 -

completion of such liquidation in order to resolve claims and prepare for distributions.  In the likely event litigation was necessary to resolve claims asserted in the chapter 7 case, the delay could be prolonged.

The Company prepared a liquidation analysis which is annexed hereto as Exhibit 5 (the "**Liquidation Analysis**").  The information set forth in Exhibit 5 provides  (i) a summary of the liquidation values of the Company's assets, assuming a chapter 7 liquidation in which a trustee appointed by the Bankruptcy Court would liquidate the assets of the Debtors' estates and (ii) the expected recoveries of the Company's creditors and equity interest holders under the Prepackaged Plan.  The Liquidation Analysis indicates that holders of Senior Secured Notes Claims would, after payment of liquidation costs and expenses, receive a 40.6% to 52.6% recovery on their Claims in a liquidation scenario.  In contrast, holders of Senior Secured Notes Claims would receive a 100% recovery under the Prepackaged Plan.  As reflected in Exhibit 5, the following Classes of Claims and Interests would have a zero percent (0%) recovery on their Claims and Interests in a liquidation scenario: General Unsecured Claims, Existing Preferred Interests, Other Existing Equity Interests, and Subordinated Securities Claims.  In contrast, the holders of Allowed General Unsecured Claims would have a 100% recovery on their Claims under the Prepackaged Plan and the holders of Existing Preferred Interests would receive value of approximately $14.6 million on account of their Interests under the Prepackaged Plan.

Underlying the Liquidation Analysis are a number of estimates and assumptions that, although developed and considered reasonable by the Company's management, are inherently subject to significant economic and competitive uncertainties and contingencies beyond the control of the Company and its management.  The Liquidation Analysis also is based on assumptions with regard to liquidation decisions that are subject to change and significant economic and competitive uncertainties and contingencies beyond the control of the Company and its management.  Inevitably, some assumptions will not materialize and unanticipated events and circumstances may affect the results of a liquidation of the Company.  Accordingly, the values reflected might not be realized if the Company were, in fact, to be liquidated.  The chapter 7 liquidation period is assumed to last six months following the appointment of a chapter 7 trustee, allowing for, among other things, the discontinuation and wind-down of operations, the sale of the operations, the sale of assets and the collection of receivables.  All holders of Claims and Interests that are entitled to vote to accept or reject the Prepackaged Plan are urged to examine carefully all of the assumptions on which the Liquidation Analysis is based in connection with their evaluation of the Prepackaged Plan.

### 7.3    *Classification of Claims and Interests.*

Section 1123 of the Bankruptcy Code provides that a plan of reorganization must classify claims against, and interests in, a debtor.  Under section 1122 of the Bankruptcy Code, a plan of reorganization may classify claims and interests only into classes containing claims and interests which are substantially similar to the other claims or interests in the same class.  The Prepackaged Plan designates eight classes of claims and two classes of interests.  The Company believes that they have classified all claims and interests in compliance with the provisions of section 1122 of the Bankruptcy Code.  However, should the Company commence chapter 11 cases, a holder of a Claim or Interest could challenge the Company's classification of Claims and Interests, and the Bankruptcy Court could determine that a different classification is required for

- 49 -

the Prepackaged Plan to be confirmed.  In such event, it is the Company's intention to seek to modify the Prepackaged Plan to provide for whatever classification might be required by the Bankruptcy Court and to use the acceptances received, to the extent permitted by the Bankruptcy Court, the Bankruptcy Code and the Bankruptcy Rules to demonstrate the acceptance of the Class or Classes which are affected.  Any such reclassification could affect a Class's acceptance of the Prepackaged Plan by changing the composition of such Class and the required vote for acceptance of the Prepackaged Plan and could potentially require a resolicitation of votes on the Prepackaged Plan.  The Company believes that the Prepackaged Plan meets the classification requirements of the Bankruptcy Code.

**7.4**    *Consummation.*

The Prepackaged Plan will be consummated on the Effective Date.  The Effective Date will occur on the first Business Day on which the conditions precedent to the effectiveness of the Prepackaged Plan, as set forth in the Prepackaged Plan, have been satisfied or waived pursuant to the Prepackaged Plan.  For a more detailed discussion of such conditions precedent and the consequences of the failure to meet such conditions, see Article VI herein.

The Prepackaged Plan is to be implemented pursuant to its terms, consistent with the provisions of the Bankruptcy Code.

## ARTICLE VIII.

### ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PREPACKAGED PLAN

If the Prepackaged Plan is not consummated, the Company's capital structure will remain over-leveraged and the Company will remain unable to service its debt obligations including repayment of the Senior Secured Notes upon maturity.  Accordingly, if the Prepackaged Plan is not confirmed and consummated, the alternatives include:

**8.1**    *Alternative Plan(s) of Reorganization.*

In formulating and developing the Prepackaged Plan, the Company has explored numerous other alternatives and engaged in an extensive negotiating process with the Required Consenting Noteholders.  The Company believes that the Prepackaged Plan fairly adjusts the rights of various Classes of Claims and Interests, and also provides superior recoveries to Classes 1, 2, 3, 4, 5, 6, 7 and 8 over any alternative capable of rational consideration (such as a chapter 7 liquidation), thus enabling stakeholders to maximize their returns.

**THE COMPANY BELIEVES THAT CONFIRMATION OF THE PREPACKAGED PLAN IS PREFERABLE TO ANY ALTERNATIVE PLAN OR TRANSACTION BECAUSE THE PREPACKAGED PLAN MAXIMIZES THE AMOUNT OF DISTRIBUTIONS TO ALL HOLDERS OF CLAIMS AND INTERESTS AND ANY ALTERNATIVE TO CONFIRMATION OF THE PLAN WILL RESULT IN SUBSTANTIAL DELAYS IN THE DISTRIBUTION OF ANY RECOVERIES.**

**8.2**  *Liquidation Under the Bankruptcy Code.*

The Company could be liquidated under chapter 7 of the Bankruptcy Code.  The Company believes that liquidation would result in lower aggregate distributions being made to creditors than those provided for in the Prepackaged Plan, which is demonstrated by the Liquidation Analysis set forth in attached as Exhibit 5 to this Disclosure Statement.

Further, the Company could liquidate by selling all or substantially all of the Company's assets pursuant to a sale conducted through either section 363 of the Bankruptcy Code or through a chapter 11 plan.  The Company considered such options, but believes that neither approach would likely increase the value of the recovery by the Company's stakeholders and would likely result in lower aggregate distributions being made to creditors and equity holders than those provided for in the Prepackaged Plan.

**8.3**  *Inaction/Maintenance of Status Quo.*

On May 31, 2012, the ABL Agreement was amended to extend the maturity of the ABL Facility through August 1, 2012.  In addition, the Company has $300 million in principal amount of Senior Secured Notes issued and outstanding that mature on September 1, 2012 and bear interest at a rate of 11.375% per annum.  As the Company believes it will be unable to repay such indebtedness at maturity, the Company believes that inaction is not an option.  Further, if the Company is forced to file for bankruptcy protection without a consensual deal, the bankruptcy cases could be time-consuming and much more costly than the currently contemplated restructuring.  The Company believes that these actions could hinder its ability to obtain financing and make it difficult to restructure its debt obligations.  Therefore, the Company believes that inaction is not a viable alternative to consummation of the Prepackaged Plan.

## ARTICLE IX.

## SUMMARY OF VOTING PROCEDURES

The following summarizes briefly the procedures to accept or reject the Prepackaged Plan.  Holders of Claims and Interests are encouraged to review the relevant provisions of the Bankruptcy Code and/or to consult their own attorneys.

**9.1**  *The Solicitation Package.*

The following materials constitute the solicitation package (collectively, the "**Solicitation Package**"):

- the applicable Ballots and applicable voting instructions;

- a pre-addressed, postage pre-paid return envelope; and

- the Disclosure Statement with all exhibits, including the Prepackaged Plan and any other supplements or amendments to these documents.

The Voting Classes shall be sent paper copies of the appropriate Ballots and applicable voting instructions and copies of the Disclosure Statement with all exhibits, including

the Prepackaged Plan.  Any party who desires paper copies of these documents may request copies by writing to Kurtzman Carson Consultants, 599 Lexington Avenue, 39th Floor, New York, NY 10022, Attn: Broadview Networks Holdings Ballot Processing.  All parties entitled to vote to accept or reject the Prepackaged Plan shall receive a paper copy of each appropriate Ballot.

**9.2    *Voting Deadline.***

The period during which Ballots with respect to the Prepackaged Plan will be accepted by the Voting Agent will terminate on the Voting Deadline, or 5:00 p.m., New York City time, on August 13, 2012, unless the Company extends the date until which Ballots will be accepted.  Except to the extent the Company so determines in its sole discretion or as permitted by the Bankruptcy Court, Ballots that are received after the Voting Deadline will not be counted or otherwise used by the Company in connection with the Company's request for confirmation of the Prepackaged Plan (or any permitted modification thereof).

The Company reserves the absolute right, at any time or from time to time, to extend the period of time (on a daily basis, if necessary) during which Ballots will be accepted for any reason, including determining whether or not the requisite number of acceptances has been received.  The Company will give notice of any such extension in a manner deemed reasonable to the Company in its discretion.

**9.3    *Voting and Revocation Instructions.***

Only the Voting Classes are entitled to vote to accept or reject the Prepackaged Plan, and they may do so by following the instructions below and the voting instructions attached to the Ballot.  The failure of a holder of a Claim or Interest in the Voting Classes to deliver a duly executed Ballot will be deemed to constitute an abstention by such holder with respect to voting on the Prepackaged Plan, and such abstentions will not be counted as votes for or against the Prepackaged Plan.

The Company is providing the Solicitation Package to holders of Claims or Interest in the Voting Classes whose names (or the names of their nominees) appear as of the Voting Record Date, which was July 11, 2012, in the records maintained by the Company.

If you hold Claims or Interests in the Voting Classes that are registered in your own name, including by a participant whose name appears on a security position listing as the owner of the Senior Secured Notes or Existing Preferred Interests, you can vote on the Prepackaged Plan by completing the information requested on the appropriate Ballot, signing, dating and indicating your vote on the Ballot, and returning the completed original Ballot in the enclosed, pre-addressed, postage pre-paid envelope so that it is actually received by the Voting Agent before the Voting Deadline, 5:00 p.m., New York City time, on August 13, 2012 (unless the Voting Deadline is extended, in which case the Ballots must be received by the Voting Agent by any subsequent time or date to which the Voting Deadline is extended).

(a)      **Instructions for Beneficial Owners.**

If you are a beneficial owner holding securities as a record holder in your own name you should complete the information requested on the Ballot, indicate your vote on the Ballot, and return the completed original Ballot in the enclosed, pre-addressed, postage pre-paid envelope so that it is actually received by the Voting Agent before the Voting Deadline.

If you are a beneficial owner holding securities through a broker, dealer, commercial bank, trust company or other nominee, you or your "nominee" can vote on the Prepackaged Plan in one of the two following ways:

- *If your Ballot has already been signed (or "prevalidated") by your nominee (as described below)*, you can vote on the Prepackaged Plan by completing the information requested on the Ballot, indicating your vote on the Ballot, and returning the completed original Ballot in the enclosed, pre-addressed, postage pre-paid envelope so that it is actually received by the Voting Agent before the Voting Deadline.

- *If your Ballot has not been signed (or "prevalidated") by your nominee,* you can vote on the Prepackaged Plan by completing the information requested on the Ballot, indicating your vote on the Ballot, and returning the completed original Ballot to your nominee in sufficient time for your nominee then to process the Ballot and return it to the Voting Agent so that it is actually received by the Voting Agent before the Voting Deadline. If no pre-addressed, postage pre-paid envelope was enclosed for this purpose, the nominee must be contacted for instructions.

Any Ballot returned to a nominee by a beneficial owner will not be counted for purposes of acceptance or rejection of the Prepackaged Plan until such nominee properly completes and delivers to the Voting Agent that Ballot (properly validated) or a master Ballot that reflects the vote of such beneficial owner.

(b)      **Instructions for Nominees.**

If you are a broker, dealer, commercial bank, trust company or other nominee that is the registered holder of securities, please forward a copy of this Disclosure Statement, the appropriate Ballot, and any other enclosed materials to each beneficial owner as of the Voting Record Date and arrange for beneficial owners to vote in accordance with the voting procedures described herein and:

- *If you have signed (or "prevalidated") a Ballot* by: (1) signing the Ballot; (2) indicating on the Ballot the name of the registered holder and the amount of securities held by the nominee; and (3) forwarding such Ballot together with the solicitation package and other materials requested to be forwarded, to the beneficial owner for voting, then the beneficial owner must vote on the Prepackaged Plan by completing the information requested on the Ballot, indicating its vote on the Ballot, and returning the completed original Ballot in the enclosed, pre-addressed, postage pre-paid envelope so that it is actually received

by the Voting Agent before the Voting Deadline.  A list of the beneficial owners to whom "pre-validated" Ballots were delivered should be maintained by the nominee for inspection for at least <u>one</u> year from the Voting Deadline.

- *If you have not signed (or "prevalidated") the appropriate Ballot*, then you, as nominee, may obtain the votes of beneficial owners by forwarding to the beneficial owners the unsigned Ballots, together with this Disclosure Statement, a return envelope provided by, and addressed to, the nominee, and other materials requested to be forwarded.  Each such beneficial owner may vote on the Prepackaged Plan by completing the information requested on the Ballot, indicating its vote on the Ballot, and returning the completed original Ballot to you, as nominee.  After collecting the Ballots, you, as nominee, should, in turn, complete a master Ballot compiling the votes and other information from the Ballot, execute the master Ballot, and deliver the master Ballot to the Voting Agent so that it is actually received by the Voting Agent before the Voting Deadline.  All Ballots returned by beneficial owners should either be forwarded to the Voting Agent (along with the master Ballot) or be retained by nominees for inspection for at least <u>one</u> year from the Voting Deadline.

**Each nominee should advise its beneficial owners to return their Ballots to the nominee by a date calculated by the nominee to allow it to prepare and return the master Ballot to the Voting Agent so that it is actually received by the Voting Agent before the Voting Deadline.**

The Company expects that DTC as a nominee holder of the Senior Secured Notes, will arrange for its participants to vote by executing a letter of authorization in favor of such participants.  As a result of such letter, each such participant will be authorized to vote its Voting Record Date positions held in the name of such securities clearing agencies, and the Company shall, in any event, rely on the listing of participants provided by DTC as of the Voting Record Date.

Any holder of a Claim or Interest in the Voting Classes that has not received a Ballot should contact its nominee or the Voting Agent at its address and telephone number listed in this Disclosure Statement.

The Company has engaged the Voting Agent as the noticing, claims and balloting agent to assist in the balloting and tabulation process.  The Voting Agent will process and tabulate Ballots for each class entitled to vote to accept or reject the Prepackaged Plan and will file a voting report as soon as practicable on or after the Petition Date.

**Any Ballot that is properly executed by the holder of a Claim or Interest, but that does not clearly indicate an acceptance or rejection of the Prepackaged Plan or which indicates both an acceptance and a rejection of the Prepackaged Plan, shall not be counted.**

Each holder of a Claim or Interest in the Voting Classes must vote all of its Claims or Interests within a particular class either to accept or reject the Prepackaged Plan and may not split its votes.

- 54 -

**(c)**     **Releases under the Prepackaged Plan.**

Pursuant to Section 8.4(c) of the Prepackaged Plan, holders of Class 2 Claims and holders of Class 8 Interests shall be deemed to forever release, waive and discharge all claims against the Released Parties in any way relating to the Debtors, the Reorganization Cases, the Prepackaged Plan or the Disclosure Statement unless a holder abstains from voting or votes to reject the Prepackaged Plan and also marks such holder's Ballot indicating that such holder opts out of the releases in Section 8.4(c) of the Prepackaged Plan.

All Ballots are accompanied by a pre-addressed, postage pre-paid envelope.  It is important to follow the specific instructions provided on each Ballot.

**(d)**     **Withdrawal or Revocation of a Ballot.**

Acceptances or rejections may be withdrawn or revoked at any time before the Voting Deadline by the beneficial owner on the Voting Record Date who completed the original Ballot, or by the nominee who completed the master Ballot in such beneficial owner's name, as the case may be.  However, after commencement of a reorganization case in connection with the Prepackaged Plan, withdrawal or revocation of votes accepting or rejecting the Prepackaged Plan may be effected only with the approval of the Bankruptcy Court.

Acceptances or rejections in regard to the Prepackaged Plan may be withdrawn or revoked before commencement of a reorganization case in connection with the Prepackaged Plan by complying with the following procedures: (1) a holder of a Claim or Interest in the Voting Classes should deliver a written notice of withdrawal or revocation to the record holder for endorsement and delivery to the Voting Agent and (2) a record holder of a Claim or Interest in the Voting Classes who voted securities held for its own account should deliver a written notice of withdrawal or revocation to the Voting Agent.

To be effective, a notice of revocation and withdrawal must:

- be received prior to the Voting Deadline by the Voting Agent at its address;

- specify the name and/or customer account number of the beneficial owner whose vote on the Prepackaged Plan is being withdrawn or revoked;

- contain the description of the Claim or Interest as to which a vote on the Prepackaged Plan is withdrawn or revoked; and

- be signed by the beneficial owner of the Claim or Interest who executed the Ballot reflecting the vote being withdrawn or revoked, or by the nominee who executed the master Ballot reflecting the vote being withdrawn or revoked, as applicable, in each case in the same manner as the original signature on the Ballot or master Ballot, as the case may be.

**9.4**     *Note to Holders of Claims or Interests in the Voting Classes.*

By signing and returning a Ballot, each holder of a Claim or Interest in the Voting Classes will be certifying to the Bankruptcy Court and the Company that, among other things:

- 55 -

- the holder has received and reviewed a copy of the Disclosure Statement and Solicitation Package and acknowledges that the solicitation is being made pursuant to the terms and conditions set forth therein;

- the holder has cast the same vote with respect to all Claims and Interests in the same respective class; and

- no other Ballots with respect to the same Claim and Interest have been cast, or, if any other Ballots have been cast with respect to such Claims or Interests, then any such Ballots are thereby revoked.

**9.5    *Voting Tabulation.***

The Ballot does not constitute, and shall not be deemed to be, a proof of claim or an assertion or admission of a claim.

Unless the Company decides otherwise, Ballots received after the Voting Deadline may not be counted.  The method of delivery of the Ballots to be sent to the Voting Agent is at the election and risk of each holder of a Claim or Interest in the Voting Classes. Except as otherwise provided herein, a Ballot will be deemed delivered only when the Voting Agent actually receives the original executed Ballot.  **No Ballot should be sent to the Company, the Company's agents (other than the Voting Agent), or the Company's financial or legal advisors.**

The Company reserves the right to use the acceptances to seek confirmation of any permitted amendment or modification of the Prepackaged Plan, provided that the Company may not make any amendment or modification to the Prepackaged Plan prohibited by the Bankruptcy Code and Bankruptcy Rules.

The Bankruptcy Code may require the Company to disseminate additional solicitation materials if the Company makes material changes to the terms of the Prepackaged Plan or if the Company waives a material condition to confirmation of the Prepackaged Plan.  In that event, the solicitation will be extended to the extent directed by the Bankruptcy Court.

If multiple Ballots are received from the same holder with respect to the same Claim or Interest in the respective Voting Class, the last Ballot timely received will be deemed to reflect that voter's intent and will supersede and revoke any prior Ballot.  Holders of a Claim or Interest in the Voting Classes must vote all of their Claims or Interests within a particular Class either to accept or reject the Prepackaged Plan and may not split their vote.  Accordingly, a Ballot that partially rejects and partially accepts the Prepackaged Plan will not be counted.

In the event a designation of a vote with respect to a Claim or Interest on the basis of a lack of good faith is requested by a party-in-interest under section 1126(e) of the Bankruptcy Code, the Bankruptcy Court will determine whether any vote to accept and/or reject the Prepackaged Plan cast with respect to that Claim or Interest will be counted for purposes of determining whether the Prepackaged Plan has been accepted and/or rejected.

The Company will file with the Bankruptcy Court, on the Petition Date, or as soon as practicable thereafter, the voting report prepared by the Voting Agent.  The voting report

shall, among other things, delineate every Ballot that does not conform to the voting instructions or that contains any form of irregularity, including, but not limited to, those Ballots that are late or (in whole or in material part) illegible, unidentifiable, lacking signatures or lacking necessary information, received via facsimile or e-mail or damaged.  The voting report also shall indicate the Company's intentions with regard to such irregular Ballots.  Neither the Company nor any other person or entity will be under any duty to provide notification of defects or irregularities with respect to delivered Ballots other than as provided in the voting report, nor will any of them incur any liability for failure to provide such notification.

## ARTICLE X.

## THE REORGANIZATION CASES

### 10.1   *Continuation of Business After the Petition Date.*

Following the Petition Date, the Debtors intend to operate their business in the ordinary course as debtors-in-possession under sections 1107 and 1108 of the Bankruptcy Code.

### 10.2   *First Day Relief.*

The Debtors expect that the Reorganization Cases will be of a short duration, and expect to request that the Bankruptcy Court schedule a confirmation hearing within 30 to 45 days of the Petition Date.  To expedite their emergence from chapter 11, the Debtors intend to seek, among other things, the relief detailed below from the Bankruptcy Court on the Petition Date.  If granted, this relief will facilitate the administration of the Reorganization Cases.  There can be no assurances, however, that the Bankruptcy Court will grant the requested relief.  Bankruptcy courts customarily provide various forms of administrative and other relief in the early stages of chapter 11 cases.  The Debtors intend to seek all necessary and appropriate relief from the Bankruptcy Court in order to facilitate their reorganization goals, including the matters described below.

Together with its petition for relief, the Debtors anticipate filing a number of "first day" motions on the Petition Date.  The Debtors' first day motions may include, among other things, motions for orders:

- an order authorizing the Debtors to obtain debtor-in-possession financing and to use cash claimed as collateral;

- an order authorizing the Debtors (i) to continue the Debtors' current cash management system, (ii) to maintain prepetition bank accounts, (iii) to continue use of existing business forms and existing books and records and (iv) authorizing the Debtors to continue their current investment guidelines and invest their available cash in the customary manner and consistent with past practices;

- an order authorizing the Debtors to pay (i) prepetition employee wages, salaries and other compensation, (ii) prepetition employee business expenses, and (iii) other miscellaneous employee expenses and employee benefits;

- an order authorizing the Debtors to pay prepetition obligations to certain independent sales agents;

- an order authorizing the Debtors to pay certain prepetition general unsecured claims and pay other unimpaired claims in the ordinary course of business; and

- such other orders as are typical in reorganization cases or that may be necessary for the preservation of the Debtors' assets or for confirmation of the Prepackaged Plan.

The orders will be sought pursuant to accompanying motions and, if appropriate, memoranda of law. The foregoing list is subject to change depending upon the Debtors' needs in connection with its operations during the Reorganization Cases. Failure of the Bankruptcy Court to enter one or more of these orders, or a delay in doing so, could result in the Reorganization Cases becoming protracted and could delay, perhaps materially, the hearing on, and the ultimate confirmation of, the Prepackaged Plan.

**10.3** *Case Administration.*

### (a)   Joint Administration of the Reorganization Cases.

The Debtors will seek an order authorizing joint administration of their chapter 11 cases for procedural purposes only. As many of the motions, hearings, and other matters involved in the Reorganization Cases will affect all of the Debtors, joint administration will reduce costs and facilitate the administrative process by avoiding the need for duplicative notices, applications and orders. No party should be prejudiced by the joint administration of the Reorganization Cases as such relief is solely procedural and is not intended to affect substantive rights.

### (b)   Scheduling of Combined Disclosure Statement and Confirmation Hearing and Approval of Prepetition Solicitation Procedures.

The Debtors intend to seek an order scheduling a combined Confirmation Hearing and hearing on this Disclosure Statement at which time the Debtors will seek approval of this Disclosure Statement and confirmation of the Prepackaged Plan pursuant to sections 1125, 1128 and 1129 of the Bankruptcy Code. The Debtors will request this hearing no later than forty-five (45) days after the Petition Date. Additionally, the Debtors will seek approval of the prepetition solicitation procedures of acceptances of the Prepackaged Plan from holders of Claims in Voting Classes.

### (c)   Schedules and Statement of Financial Affairs.

The Debtors do not believe that detailed schedules of assets and liabilities ("**Schedules**") and statements of financial affairs ("**SOFAs**"), which otherwise must be filed in bankruptcy cases, should be required in their proposed prepackaged Reorganization Cases. In light of the expense to be incurred in connection with preparation of such documents and the lack of impairment of all Classes except Class 2 Claims and Class 8 Interests (which Classes shall vote on the Prepackaged Plan) and Class 9 Interests and Class 10 Claims (which Classes are

deemed to reject the Prepackaged Plan), the Debtors believe the filing of such detailed Schedules and SOFAs is unnecessary and is seeking a waiver of the requirement to file such documents, or alternatively, if such relief is not granted, an extension of time to file its Schedules and SOFAs.

### (d)   Retention of Professionals.

Upon the commencement of the Reorganization Cases, the Debtors intend to file certain applications to retain professionals who will assist the Debtors in the administration of the Reorganization Cases. Among other professionals, the Debtors intend to retain Willkie Farr & Gallagher LLP as bankruptcy counsel, Evercore Group L.L.C., as financial advisor, and Kurtzman Carson Consultants, as claims and noticing agent.

## ARTICLE XI.

## CERTAIN RISK FACTORS TO BE CONSIDERED

**11.1** *Certain Bankruptcy Considerations.*

### (a)   General.

While the Company believes that the Reorganization Cases, commenced in order to implement an agreed-upon restructuring, will be of short duration and will not be materially disruptive to it business, the Company cannot be certain that this will be the case. Although the Prepackaged Plan is designed to minimize the length of the bankruptcy proceeding, it is impossible to predict with certainty the amount of time that the Company may spend in bankruptcy or to assure parties-in-interest that the Prepackaged Plan will be confirmed.

Even if the Prepackaged Plan is confirmed on a timely basis, the Reorganization Cases could have an adverse effect on the Company's business. Among other things, it is possible that bankruptcy proceedings could adversely affect the Company's relationships with its key vendors and suppliers, customers, employees and agents. Bankruptcy proceedings also will involve additional expenses and may divert some of the attention of the Company's management away from the operation of the business.

The extent to which bankruptcy proceedings disrupt the Company's business will likely be directly related to the length of time it takes to complete the proceedings. If the Company is unable to obtain confirmation of the Prepackaged Plan on a timely basis because of a challenge to confirmation of the Prepackaged Plan or a failure to satisfy the conditions to consummation of the Prepackaged Plan, it may be forced to operate in bankruptcy for an extended period while it tries to develop a different reorganization plan that can be confirmed. That would increase both the probability and the magnitude of the potentially adverse effects described herein.

### (b)   Failure to Receive Adequate Acceptances.

Classes 2 and 8 are the only Classes that are entitled to vote to accept or reject the Prepackaged Plan. The Company believes it will receive the requisite amount of votes in favor

of the Prepackaged Plan, in light of the fact that the Consenting Noteholders who hold approximately two-thirds of the aggregate principal amount of the outstanding Senior Secured Notes, and the Consenting Equity Holders, who hold approximately 70% of the Existing Preferred Interests, have agreed to vote for, support and not object to the Prepackaged Plan. However, if the Company does not receive votes from holders of at least two-thirds in amount and a majority in number of holders of Senior Secured Notes who submit Ballots (the "**Requisite Acceptances**"), the Company will not be able to seek confirmation of the Prepackaged Plan under section 1129(b) of the Bankruptcy Code, because at least one impaired Class will not have voted in favor of the Prepackaged Plan as required by section 1129(a)(10) of the Bankruptcy Code. Further, if the Requisite Acceptances are not received, the Company may seek to accomplish an alternative restructuring of its capitalization and obligations to creditors and obtain acceptances to an alternative plan of reorganization for the Company, or otherwise, that may not have the support of the holders of Senior Secured Notes or Existing Preferred Interests and/or the Company may be required to liquidate under chapter 7 or 11 of the Bankruptcy Code. There can be no assurance that the terms of any such alternative restructuring arrangement or plan would be similar to or as favorable to the Company's creditors as those proposed in the Prepackaged Plan.

### (c)      Failure to Confirm the Prepackaged Plan.

Even if the Requisite Acceptances are received, the Bankruptcy Court, which, as a court of equity may exercise substantial discretion, may decide not to confirm the Prepackaged Plan. Section 1129 of the Bankruptcy Code requires, among other things, a showing that confirmation of the Prepackaged Plan will not be followed by liquidation or the need for further financial reorganization of the Company, and that the value of distributions to dissenting holders of Claims and Interests may not be less than the value such holders would receive if the Company was liquidated under chapter 7 of the Bankruptcy Code. Although the Company believes that the Prepackaged Plan meets such test, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

There can be no assurance that modifications to the Prepackaged Plan would not be required for confirmation, or that such modifications would not require a resolicitation of votes on the Prepackaged Plan. The Company believes that, if the Prepackaged Plan is confirmed, it would not be followed by a liquidation or an immediate need for further financial reorganization and that holders of claims and interests would receive or retain value that is not less than the value such holders would receive or retain if the Company was liquidated under chapter 7 of the Bankruptcy Code.

Moreover, the Bankruptcy Court could determine that the disclosures made herein were inadequate and that the votes in favor of the Prepackaged Plan did not count. The Company would then have to commence the solicitation process again, which would include re-filing a plan of reorganization and disclosure statement. Typically, this process involves a 90-day or longer period and includes a court hearing for the required approval of a disclosure statement, followed (after Bankruptcy Court approval) by another solicitation of votes for the plan of reorganization, followed by a confirmation hearing where the bankruptcy court determines whether the requirements for confirmation have been satisfied, including the requisite claim and (if applicable) interest holder acceptances.

If no plan of reorganization can be confirmed, the Reorganization Cases may be converted to cases under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be appointed to liquidate the Company's assets for distribution in accordance with the priorities established by the Bankruptcy Code.  A discussion of the effects that a chapter 7 liquidation would have on the recoveries of holders of claims and interests are set forth in Exhibit 5.  The Company believes that liquidation under chapter 7 would result in (i) smaller distributions being made to creditors than those provided for in the Prepackaged Plan because of (a) the likelihood that the Company's assets would have to be sold or otherwise disposed of over a short period of time, (b) additional administrative expenses involved in the appointment of a trustee and (c) additional expenses and claims, some of which would be entitled to priority, which would be generated during the liquidation and from the rejection of leases and other executory contracts in connection with a cessation of the Company's operations and (ii) no distributions being made to holders of equity interests of the Company.

### (d)      Improper Solicitation of Acceptances.

Usually, a plan of reorganization is filed and votes to accept or reject the plan are solicited after the filing of a petition commencing a chapter 11 case.  Nevertheless, a debtor may solicit votes before the commencement of a chapter 11 case in accordance with section 1126(b) of the Bankruptcy Code and Bankruptcy Rule 3018(b).  Section 1126(b) of the Bankruptcy Code and Bankruptcy Rule 3018(b) require that:

- the plan of reorganization be transmitted to substantially all creditors and other interest holders entitled to vote;

- the time prescribed for voting is not unreasonably short; and

- the solicitation of votes is in compliance with any applicable non-bankruptcy law, rule or regulation governing the adequacy of disclosure in such solicitation or, if no such law, rule or regulation exists, votes be solicited only after the disclosure of adequate information.

Section 1125(a)(1) of the Bankruptcy Code describes adequate information as information of a kind and in sufficient detail as would enable a hypothetical reasonable investor typical of holders of claims and interests to make an informed judgment about the plan.  With regard to solicitation of votes before the commencement of a bankruptcy case, if the Bankruptcy Court concludes that the requirements of Bankruptcy Rule 3018(b) have not been met, then the Bankruptcy Court could deem such votes invalid, whereupon the Prepackaged Plan could not be confirmed without a resolicitation of votes to accept or reject the Prepackaged Plan.  While the Company believes that the requirements of section 1126(b) of the Bankruptcy Code and Bankruptcy Rule 3018 will be met, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

     **(e)**     **Failure to Receive Bankruptcy Court Approval of the Compromises
and Settlements Contemplated by the Prepackaged Plan.**

     The Prepackaged Plan constitutes a settlement, compromise and release of all
rights arising from or relating to the allowance, classification and treatment of all Allowed
Claims and Interests and their respective distributions and treatments under the Prepackaged
Plan, taking into account and conforming to the relative priority and rights of the Claims and
Interests in each Class in connection with any contractual, legal and equitable subordination
rights relating thereto, whether arising under general principles of equitable subordination or
section 510(b) and (c) of the Bankruptcy Code.  This settlement, compromise and release require
approval by the Bankruptcy Court in the form of a confirmation order.  The Company cannot
ensure that the Bankruptcy Court will approve of the settlement contemplated in the Prepackaged
Plan.

     **(f)**     **Alternative Plans of Reorganization May Be Proposed.**

     Once the Reorganization Cases have commenced, other parties-in-interest could
seek authority from the Bankruptcy Court to propose an alternative plan of reorganization.
Under the Bankruptcy Code, a debtor in possession initially has the exclusive right to propose
and solicit acceptances of a plan of reorganization.  However, such exclusivity period can be
reduced or terminated upon order of the Bankruptcy Court.  Were such an order to be entered,
other parties-in-interest would then have the opportunity to propose alternative plans of
reorganization.

     If other parties-in-interest were to propose an alternative plan following expiration
or termination of the Company's exclusivity period, such a plan may be less favorable to, among
others, the existing holders of Senior Secured Notes, Existing Preferred Interests, and General
Unsecured Claims.  Alternative plans of reorganization also may treat less favorably the claims
of a number of other constituencies, including the Company's employees, agents, vendors and
customers.  The Company considers maintaining relationships with its employees, agents,
customers and vendors as critical to maintaining the value of its business as it restructures, and
have sought to treat those constituencies accordingly.  However, proponents of alternative plans
of reorganization may not share the Company's assessment and seek to impair the claims of such
constituencies.  If there are competing plans of reorganization, the Reorganization Cases are
likely to become longer and more complicated.

     **(g)**     **Failure to Consummate the Prepackaged Plan.**

     One condition to consummation of the Prepackaged Plan is the entry of the
Confirmation Order that will approve, among other things, the assumption of the majority of the
Company's executory contracts and unexpired leases and the execution of the New ABL Facility
and the New Senior Secured Notes Indenture.  In addition, in order to consummate the
Prepackaged Plan, the Company must enter into the New ABL Facility with one or more lenders.
There can be no assurance that the Company will be able to find lenders that are willing to enter
into the New ABL Facility, in which case the Company may be unable to consummate the
Prepackaged Plan.  Nor is there any assurance as to when or whether the Company will receive
the requisite regulatory approval to consummate the Prepackaged Plan from the FCC, state

public utility commissions or any similar requisite agency approvals, in which case the Restructuring Transaction may be delayed or the Company may ultimately be unable to consummate the Prepackaged Plan.

As of the date of this Disclosure Statement, there can be no assurance that these or the other conditions to consummation will be satisfied or waived. Accordingly, even if the Prepackaged Plan is confirmed by the Bankruptcy Court, there can be no assurance that the Prepackaged Plan will be consummated and the Restructuring Transaction completed.

### (h)    Extended Stay in Bankruptcy Proceeding.

While the Company expects that a chapter 11 bankruptcy filing solely for the purpose of implementing the Prepackaged Plan would be of short duration (such as 45-60 days, which may be delayed subject to obtaining necessary regulatory approvals) and would not be unduly disruptive to the Company's business, the Company cannot be certain that this will be the case. Although the Prepackaged Plan is designed to minimize the length of the bankruptcy proceeding, it is impossible to predict with certainty the amount of time that the Company may spend in bankruptcy, and the Company cannot be certain that the Prepackaged Plan would be confirmed. Even if confirmed on a timely basis, a bankruptcy proceeding to confirm the Prepackaged Plan could itself have an adverse effect on the Company's business. There is a risk, due to uncertainty about the Company's future, that:

- customers could seek alternative sources of products and services from the Company's competitors, including competitors that have comparatively greater financial resources and that are in little or no relative financial or operational distress;

- employees could be distracted from performance of their duties or more easily attracted to other career opportunities; and

- vendors, suppliers or agents and other business partners could terminate their relationship with the Company or require financial assurances or enhanced performance.

A lengthy bankruptcy proceeding would also involve additional expenses and divert the attention of management from operating the Company's business, as well as creating concerns for employees, suppliers and customers.

The disruption that a bankruptcy proceeding would inflict upon the Company's business would increase with the length of time it takes to complete the proceeding and the severity of that disruption would depend upon the attractiveness and feasibility of the Prepackaged Plan from the perspective of the constituent parties on whom the Company depends, including vendors, employees, agents and customers. If the Company is unable to obtain confirmation of the Prepackaged Plan on a timely basis, because of a challenge to the Prepackaged Plan or a failure to satisfy the conditions to the effectiveness of the Prepackaged Plan, the Company may be forced to operate in bankruptcy for an extended period while they try

- 63 -

to develop a different reorganization plan that can be confirmed.  A protracted bankruptcy case would increase both the probability and the magnitude of the adverse effects described above.

### (i)  Failure to Receive Bankruptcy Court Approval of Debtor-in-Possession Financing or Use of Cash Collateral.

On or shortly after commencing chapter 11 cases, the Company intends to ask the Bankruptcy Court to authorize them to enter into a debtor-in-possession financing facility and to use cash collateral to fund the chapter 11 cases.  Such financing arrangements and access to cash collateral will provide liquidity during the pendency of the chapter 11 cases.  There can be no assurance that the Bankruptcy Court will approve the financing or use of cash collateral on the terms requested.  Moreover, if the chapter 11 cases take longer than expected to conclude, the Company may exhaust its available cash collateral or its ability to access financing may terminate.  There is no assurance that the Company will be able to obtain an extension of the right to use cash collateral from its secured lenders or obtain additional debtor-in-possession financing.  In such case, the liquidity necessary for the orderly functioning of the Company's business may be materially impaired.

### (j)  Changes, Amendments, Modification or Withdrawal of the Prepackaged Plan.

Except as otherwise specifically provided in the Prepackaged Plan and the Restructuring Support Agreement, the Company reserves the right to modify the Prepackaged Plan, whether such modification is material or immaterial, and seek confirmation of the Prepackaged Plan as modified, to the extent allowed by the Bankruptcy Court, the Bankruptcy Code and Bankruptcy Rules.  The potential impact of any such amendment or waiver on the holders of Claims and Interests cannot presently be foreseen, but may include a change in the economic impact of the Prepackaged Plan on some or all of the Classes or a change in the relative rights of such Classes.  All holders of Claims and Interests will receive notice of such amendments or waivers required by applicable law and the Bankruptcy Court.  If, after receiving sufficient acceptances, but before confirmation of the Prepackaged Plan, the Company seeks to modify the Prepackaged Plan, the previously solicited acceptances will be valid only if (i) all classes of adversely affected creditors and interest holders accept the modification in writing or (ii) the Bankruptcy Court determines, after notice to designated parties, that such modification was *de minimis* or purely technical or otherwise did not adversely change the treatment of holders of accepting Claims and Interests.

If chapter 11 cases are commenced by, or against the Company, the Company reserves the right not to file the Prepackaged Plan and to revoke or withdraw the Prepackaged Plan at any time before confirmation of the Prepackaged Plan.  If the Company revokes or withdraws the Prepackaged Plan, all votes thereon will be deemed to be null and void.  In such event, nothing contained in the Prepackaged Plan will be deemed to constitute a waiver or release of any claims by or against, or interests of or in, the Company or any other person, or to prejudice in any manner the Company's rights or those of any other person.

**(k)     Termination of the Restructuring Support Agreement in Certain Circumstances.**

While pursuant to the Restructuring Support Agreement holders of approximately two-thirds of the Senior Secured Notes and holders of 70% of the Existing Preferred Interests have agreed to support and vote in favor of the Prepackaged Plan, such support can be terminated and such votes revoked upon the occurrence of certain "Termination Events" (as defined therein) under the Restructuring Support Agreement.  Such Termination Events include, among other things, the failure of the Company to reach certain milestones in the Reorganization Cases in a timely manner, such as orders from the Bankruptcy Court approving the DIP Facility and the Prepackaged Plan, and the occurrence of the Effective Date in accordance with the timeline set forth in the Restructuring Support Agreement.  While the Company believes that it will be able to meet such milestones, there can be no assurance that will be the case.  Additional events that constitute Termination Events under the Restructuring Support Agreement include the conversion of the Reorganization Cases to cases under chapter 7 of the Bankruptcy Code, a material breach by the Company of its obligations under the Restructuring Support Agreement, the termination or acceleration of the DIP Facility, or a final determination by a court or governmental agency of competent jurisdiction that the transactions contemplated by the Prepackaged Plan cannot legally go forward.  See  Exhibit 2 for additional detail.  If a Termination Event occurs and the support of the Consenting Noteholders and Consenting Equity Holders were to be withdrawn, and the votes of such holders were revoked, the Company may need to amend the Prepackaged Plan and re-solicit votes thereon, or formulate a new chapter 11 plan and solicit votes on such new plan.  Such amendment and/or re-solicitation could cause material delay in the Reorganization Cases, and may adversely impact the Company's businesses and its ability to reorganize.

**(l)     Distributions Will Be Delayed.**

If the Prepackaged Plan can be confirmed, the date of the distributions to be made pursuant to the Prepackaged Plan will be delayed until after confirmation of the Prepackaged Plan.  The Company estimates that the process of obtaining confirmation of the Prepackaged Plan will last approximately 30 to 45 days from the date of the commencement of the Company's chapter 11 cases and could last considerably longer.  Distributions could be delayed for a minimum of 14 days thereafter and may be delayed for a substantially longer period if the Company has not received all required regulatory approvals, or if other conditions to consummation have not yet been met.

**(m)     Objections to Classification of Claims and Interests.**

Section 1122 of the Bankruptcy Code provides that a plan of reorganization may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests in such class.  The Company believes that the classification of Claims and Interests under the Prepackaged Plan complies with the requirements set forth in the Bankruptcy Code.  However, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

(n)      **Failure to Assume Executory Contracts and Unexpired Leases.**

The Prepackaged Plan provides for the assumption of all executory contracts and unexpired leases, other than those leases and contracts that the Company specifically rejects. The Company's intention is to preserve as much of the benefit of its existing contracts and leases as possible.  However, some limited classes of executory contracts, such as certain types of intellectual property licenses, may not be assumed in this way.  In such cases, the Company would need the consent of the counterparty to maintain the benefit of the contract.  There is no guarantee that such consent would either be forthcoming or that conditions would not be attached to any such consent that make assuming the contracts unattractive.  The Company would then be required to either forego the benefits offered by such contracts or to find alternative arrangements to replace them.

(o)      **Failure to Receive Bankruptcy Court Approval of First Day Orders.**

In the event of a bankruptcy filing, the Company will seek to address potential concerns of its customers, vendors, employees, licensors/licensees and other key parties-in-interest that might arise from the filing of the Prepackaged Plan through its intention to seek appropriate court orders to permit them to pay accounts payable to key parties-in-interest in the ordinary course of business.  There can be no guarantee that the Company will be successful in obtaining the necessary approvals of the Bankruptcy Court for such arrangements or for every party-in-interest the Company may seek to treat in this manner.

(p)      **Failure to Receive Requisite Regulatory Approvals.**

The Company is in the telecommunications and information technology industry and holds licenses issued by the FCC and other regulatory regimes.  As a result, any plan of reorganization confirmed by the Bankruptcy Court will be subject to the further consent of the FCC, certain state public utility commissions, among others.  Accordingly, the Company must obtain certain regulatory approvals from the FCC, state public utility commissions and other applicable agencies in conjunction with the consummation of the Prepackaged Plan.  The Company anticipates that obtaining regulatory approval from the FCC and other regulatory agencies will take approximately 90 to 120 days from the date hereof.  The Company will commence the regulatory approval process as promptly as practicable following the distribution of this Disclosure Statement and expect to obtain the requisite regulatory approvals in a timely manner, although the regulatory approval process may take substantially more time than the Company anticipates.  Moreover, the FCC or other regulatory agencies may request modifications, additions or amendments to the Restructuring Transaction, including the Prepackaged Plan, before issuing the requisite approvals, causing additional delays or potential denial of approvals for the Restructuring Transaction.

**11.2**   *Risks Relating to the New Credit Agreement, the New Common Stock and the New Notes.*

(a)      **Variances from Financial Projections.**

The projections attached hereto as <u>Exhibit 6</u> reflect numerous assumptions concerning the Company's anticipated future performance, some of which may not occur.  Such

assumptions include, among others, assumptions concerning the general economy, the Company's ability to manage costs and achieve cost reductions, the Company's ability to establish market strength, consumer purchasing trends and preferences, the Company's ability to stabilize and grow its sales base and control future operating expenses and other risk factors described below.  Unanticipated events and circumstances occurring subsequent to the preparation of the projections may also affect the Company's actual financial results.

**(b)      Substantial Leverage.**

The degree to which Reorganized Broadview, together with its subsidiaries (collectively, the "**Reorganized Company**") will be leveraged after the consummation of the Prepackaged Plan could have important consequences because substantial indebtedness may restrict the Reorganized Company's operating flexibility, could adversely affect the Reorganized Company's financial health and could prevent the Reorganized Company from fulfilling its financial obligations.

While the Prepackaged Plan will substantially de-lever the Reorganized Company, the Reorganized Company will still have significant long-term debt obligations.  As of the Effective Date, on a pro forma basis, the Reorganized Company will have an estimated $167 million of total outstanding indebtedness if the Prepackaged Plan is consummated.  If the Reorganized Company exits chapter 11 over-leveraged it could significantly affect the Reorganized Company's financial health and ability to fulfill financial obligations.  For example, a high level of indebtedness could:

- make it more difficult for the Reorganized Company to satisfy current and future debt obligations;

- make it more difficult for the Reorganized Company to obtain additional financing for working capital, capital expenditures, acquisitions or general corporate purposes;

- require the Reorganized Company to dedicate a substantial portion of cash flows from operating activities to the payment of principal and interest on the indebtedness, thereby reducing the funds available to the Reorganized Company for operations and other purposes, including investments in service development, capital spending and acquisitions;

- place the Reorganized Company at a competitive disadvantage to its competitors who are not as highly leveraged as the Reorganized Company is;

- make the Reorganized Company vulnerable to interest rate fluctuations, if it incurs any indebtedness that bears interest at variable rates;

- impair the Reorganized Company's ability to adjust to changing industry and market conditions; and

- make the Reorganized Company more vulnerable in the event of a further downturn in general economic conditions or in its business or changing market conditions and regulations.

Although the indenture governing the New Senior Secured Notes and the New ABL Facility will limit the Reorganized Company's ability to incur additional indebtedness, these restrictions are subject to a number of qualifications and exceptions and, under certain circumstances, debt incurred in compliance with these restrictions could be substantial.  In addition, the New Senior Secured Notes Indenture and the New ABL Agreement will not prevent the Reorganized Company from incurring obligations that do not constitute indebtedness.  To the extent that the Reorganized Company incurs additional indebtedness or such other obligations, the risks associated with the Reorganized Company's substantial leverage, including possible inability to service debt, would increase.

### (c)    Ability to Service Debt.

The Reorganized Company's ability to repay or to refinance obligations with respect to indebtedness, including the New Senior Secured Notes and the New ABL Facility and to fund planned capital expenditures depends on the Reorganized Company's future financial and operating performance.  This, to a certain extent, is subject to general economic, financial, competitive, business, legislative, regulatory and other factors that are beyond the Reorganized Company's control.  These factors could include operating difficulties, diminished access to necessary network facilities, increased operating costs, significant customer churn, pricing pressures, the response of competitors, regulatory developments and delays in implementing strategic initiatives.

There can be no assurance that the Reorganized Company's business will generate sufficient cash flow from operations or that future borrowings will be available in an amount sufficient to enable the Reorganized Company to pay its indebtedness or to fund other liquidity needs.  The Reorganized Company will need to refinance all or a portion of its indebtedness, including the New Senior Secured Notes and the New ABL Facility, at or before maturity.  There can be no assurances that the Reorganized Company will be able to refinance any of its indebtedness, including the New Senior Secured Notes and the New ABL Facility, on commercially reasonable terms or at all.

### (d)    Value of the New Common Stock and the New Senior Secured Notes.

The value of the New Common Stock and the New Senior Secured Notes may be adversely affected by a number of factors, including many of the risks described in this Disclosure Statement.  If, for example, the Reorganized Company fails to comply with the covenants in the New Senior Secured Notes Indenture or the New ABL Agreement resulting in an event of default thereunder, certain of the Reorganized Company's outstanding indebtedness could be accelerated, which could have a material adverse effect on the value of the New Common Stock and the New Senior Secured Notes.

**(e)     The New Common Stock will be Subordinated to the New Debt
Financing.**

The New Common Stock will be the most junior of all of the securities in the
Reorganized Company's capital structure and will not be secured by any of the Reorganized
Company's collateral.  As a result, the Reorganized Company's existing and future indebtedness
under the New Senior Secured Notes and the New ABL Facility and other non-equity claims will
rank senior to the New Common Stock as to rights upon any foreclosure, dissolution, winding-
up, liquidation or reorganization, or other bankruptcy proceeding.  In the event of any
distribution or payment of the Reorganized Company's assets in any foreclosure, dissolution,
winding-up, liquidation or reorganization, or other bankruptcy proceeding, the Reorganized
Company's creditors will have a superior claim and interest, as applicable, to the interests of
holders of the New Common Stock.  If any of the foregoing events occur, there can be no
assurance that there will be assets in an amount significant enough to warrant any distribution in
respect of the New Common Stock.

Assuming that the Company completes the Restructuring Transaction and all of
the Senior Secured Notes are retired pursuant to the Prepackaged Plan, at the closing of, and after
giving effect to, the Restructuring Transaction, holders of Senior Secured Notes would receive
their pro rata share of (i) 97.5% of New Common Stock subject to dilution by shares of New
Common Stock issued pursuant to the Management Equity Plan or upon exercise of the New
Warrants and (ii) $150 million principal amount of New Senior Secured Notes.

**(f)     Issuance of New Common Stock.**

In connection with the restructuring pursuant to the Prepackaged Plan under
chapter 11 of the Bankruptcy Code, the Company will rely on section 1145 of the Bankruptcy
Code to exempt the issuance of the New Senior Secured Notes and the New Common Stock
from the registration requirements of the Securities Act (and of any state securities or "blue sky"
laws).  Section 1145 exempts from registration the sale of a debtor's securities under a chapter
11 plan if such securities are offered or sold in exchange for a claim against, or equity interest in,
or a claim for an administrative expense in a case concerning, such debtor.  In reliance upon this
exemption, the New Senior Secured Notes and the New Common Stock will generally be exempt
from the registration requirements of the Securities Act.  Accordingly, recipients will be able to
resell the New Senior Secured Notes and the New Common Stock without registration under the
Securities Act or other federal securities laws, unless the recipient is an "underwriter" with
respect to such securities, within the meaning of section 1145(b) of the Bankruptcy Code.
Section 1145(b) of the Bankruptcy Code defines "underwriter" as one who (i) purchases a claim
with a view to distribution of any security to be received in exchange for the claim, or (ii) offers
to sell securities issued under a plan for the holders of such securities, or (iii) offers to buy
securities issued under a plan from persons receiving such securities, if the offer to buy is made
with a view to distribution, or (iv) is an "issuer" of the relevant security, as such term is used in
Section 2(11) of the Securities Act.

Notwithstanding the foregoing, statutory underwriters may be able to sell
securities without registration pursuant to the resale limitations of Rule 144 under the Securities
Act.  Parties that believe that they may be statutory underwriters as defined in section 1145 of the

Bankruptcy Code are advised to consult with their own counsel as to the availability of the exemption provided by Rule 144.

Holders of shares of New Common Stock will, however, be subject to the terms of the New Stockholders Agreement which will contain certain transfer restrictions, including rights of first refusal and tag-along rights.

There can be no assurance that any market for the New Common Stock will develop or be sustained.  If an active market does not develop or is not sustained, the market price and liquidity of the New Common Stock may be adversely affected.  The liquidity of any market for the New Common Stock will depend on a number of factors, including:

- the number of holders of the New Common Stock;
- the Reorganized Company's operating performance and financial condition;
- the market for similar securities;
- the Reorganized Company's credit rating; and
- the interest of securities dealers in making a market in the New Common Stock.

**(g)     The Valuation of New Senior Secured Notes is Not Intended to Represent the Trading Value of the New Senior Secured Notes.**

The valuation of the Reorganized Debtors, set forth in Section 7.2(b) prepared by Evercore with the assistance of the Company, is based on financial projections developed by the Company and the assumption that the holders of Senior Secured Notes will receive all of the New Senior Secured Notes.  The valuation is not intended to represent any value of the New Senior Secured Notes, including their trading value in public or private markets.

**(h)     Dividend Policies.**

Historically, the Company has not paid cash dividends on its common stock and the Company has no current plans to pay cash dividends on the New Common Stock in the future.  Furthermore, the Company's future indebtedness may restrict payment of dividends on the New Common Stock.

**11.3    *Risks Associated with the Business.***

**(a)     The Reorganization Cases May Negatively Impact the Reorganized Company's Future Operations.**

While the Company believes it will be able to emerge from chapter 11 relatively expeditiously, there can be no assurance as to timing for approval of the Prepackaged Plan or the Company's emergence from chapter 11.  Additionally, notwithstanding the support of the Consenting Noteholders, the Reorganization Cases may adversely affect the Reorganized Company's ability to retain existing customers and suppliers, attract new customers and maintain contracts that are critical to its operations.

**(b)**     **History of Net Losses.**

The Company has experienced significant net losses.  The Company has recorded net losses of $11.9 million, $18.8 million and $13.9 million in 2011, 2010 and 2009, respectively, and $5.3 million for the quarter ended March 31, 2012.  The Company expects to continue to have losses for the foreseeable future.  There can be no assurances that revenues will grow or that the Company will become profitable in the future.

**(c)**     **Vendor Disputes.**

The Company is involved in a variety of disputes with multiple carrier vendors relating to billings of approximately $18.9 million as of March 31, 2012.  When the Company identifies an error in a vendor's bill, the Company disputes the amount that it believes to be incorrect and often withholds payment for that portion of the invoice.  Errors the Company routinely identifies on bills include, but are not limited to, vendors billing for services the Company did not consume, vendors billing for services the Company did not order, vendors billing for services that should have been billed to another carrier, vendors billing for services using incorrect rates or the wrong tariff, and vendors failing to provide the necessary supporting detail to allow the Company to bill its customers or verify the accuracy of the bill.  These problems are exacerbated because vendors periodically bill for services months or years after the services are provided.  While the Company hopes to resolve these disputes through negotiation, the Company may be compelled to arbitrate these matters.  The resolution of these disputes may require the Company to pay the vendor an amount that is greater than the amount for which the Company has planned or even the amount the vendor claims is owed if late payment charges are assessed, which could materially adversely affect the Company's business, financial condition, results of operations and cash flows and which may cause the Company to be unable to meet certain financial covenants related to its senior indebtedness, which would result in a default under such indebtedness.  In the event that disputes are not resolved in the Company's favor and the Company is unable to pay the vendor charges in a timely manner, the vendor may deny the Company access to the network facilities that the Company requires to serve its customers.  If the vendor notifies the Company of an impending "embargo" of this nature, the Company may be required to notify customers of a potential loss of service, which may cause a substantial loss of customers.  It is not possible at this time to predict the outcome of these disputes.

**(d)**     **Elimination or Relaxation of Regulatory Rights and Protections.**

Section 10 of the Communications Act of 1934 (the "**Communications Act**") requires the FCC to forbear from applying individual provisions of the Communications Act or its various enabling regulations upon a showing that a statutory provision or a regulation is unnecessary to ensure that rates and practices remain just, reasonable and non-discriminatory and to otherwise protect consumers and that forbearance is generally in the public interest and would promote competition.  Pursuant to Section 10, the FCC has effectively deregulated Verizon's provision of certain broadband services provided to enterprise customers and has more recently extended similar relief to other ILECs.  Exercising its forbearance authority, the FCC has also relieved certain ILECs in certain markets of their obligation to provide competitive local exchange carriers ("**CLECs**") with unbundled access to network elements at rates mandated by state regulatory commissions.  Although the Company does not provide service in any of the

- 71 -

impacted markets and hence are not directly affected by these latter rulings, Verizon has sought, albeit without success, forbearance from the application of the FCC's dominant carrier regulation of interstate services, and Section 251(c) unbundling requirements in six Metropolitan Statistical Areas, including the New York-Northern New Jersey-Long Island, NY-NJ-PA Metropolitan Statistical Area, the Philadelphia-Camden-Wilmington PA-NJ-DE-MD Metropolitan Statistical Area and the Boston-Cambridge-Quincy, MA-NH Metropolitan Statistical Area — three of the Company's largest markets.

FCC rules currently allow Verizon and other ILECs to unilaterally retire copper loop facilities that provide the "last-mile" connection to certain customers with limited regulatory oversight. Verizon has filed hundreds of notices of copper plant retirement with the FCC and has announced its intention to retire its copper network over the next several years. While the Company, in conjunction with CLECs, has petitioned the FCC to strengthen the rules governing copper plant retirement, there are no assurances that the Company will be successful in this effort. Because it would limit the availability of facilities necessary to provide certain services to customers, wide scale retirement of copper loops by Verizon could have an adverse impact on the Company's business and operations.

### (e)    Competitiveness of Communications Industry.

The communications industry is highly competitive and is affected by the introduction of new services and systems by, and the market activities of, major industry participants. The Company has not achieved, and does not expect to achieve, a major share of the local access lines for any of the communications services the Company offers. In each of the Company's markets it competes with the ILEC serving that area. Large competitors have the following advantages over the Company:

- long-standing relationships and strong brand reputation with customers;
- financial, technical, marketing, personnel and other resources substantially greater than the Company's;
- more funds to deploy communications services and systems that compete with the Company's;
- the potential to subsidize competitive services with revenue from a variety of businesses;
- anticipated increased pricing flexibility and relaxed regulatory oversight;
- larger networks; and
- benefits from existing regulations that favor the ILECs.

The Company also faces, and expects to continue to face, competition from other existing and potential market participants, such as CLECs, cable television companies, wireless service providers and electric utility companies. While many CLECs have always targeted small and medium sized enterprises and multi-location customers, cable television companies are increasingly targeting these customers and are doing so at rates lower than the Company generally offers. The Company is also increasingly subject to competition from providers using VoIP over the public Internet or private networks. VoIP providers are currently subject to substantially less regulation than traditional local telephone companies and do not pay certain

taxes and regulatory charges that the Company is required to pay. In addition, the development of new technologies could give rise to significant new competitors in the local market.

In the long distance communications market, the Company faces competition from the ILECs, large and small IXCs, wireless carriers and IP-based service providers. Long distance prices have decreased substantially in recent years and are expected to continue to decline in the future as a result of increased competition. If this trend continues, the Company anticipates that revenues from network services and other service offerings will likely be subject to significant price pressure.

The Company's customers are impacted by conditions in the economy as a whole. If conditions in the economy worsen, the Company's customers may experience increasing business downturns or bankruptcies. Such adverse economic impacts could result in reduced sales, higher churn and greater bad debt for the Company. Reduced sales and higher churn could also result from concerns that the Company may not be able to repay or refinance its indebtedness, including the Senior Secured Notes and the borrowings under the ABL Facility or, in the alternative, consummate the Prepackaged Plan. Any combination of these factors could adversely impact the Company's operating results and financial performance.

The Company's revenues have declined for the past several years and there can be no assurance that the Company can reverse that trend of revenue declines or offset such declines with cost reductions.

### (f)    System Disruptions and Failures.

The Company's success ultimately depends on providing reliable service. The Company's provision of services may be disrupted by problems in the network, such as equipment failures and problems with a competitor's or vendor's system, such as physical damage to telephone lines or power surges and outages. In addition, the Company's engineering and operations organizations continually monitor and analyze the utilization of the Company's network. As a result, the Company may develop projects to modify or eliminate network circuits that are underutilized. This ongoing process may result in limited network outages for a subset of the Company's customers. Any disruption in the Company's network could cause the loss of customers and result in additional expenses.

Disruptions caused by security breaches, terrorism or for other reasons, could harm the Company's future operating results. The day-to-day operation of the Company's business is highly dependent on its ability to protect its communications and information technology systems from damage or interruptions by events beyond its control. Sabotage, computer viruses or other infiltration by third parties could damage or disrupt service, damage facilities, damage the Company's reputation, and cause the Company to lose customers, among other things. A catastrophic event could materially harm the Company's operating results and financial condition. Catastrophic events could include a terrorist attack in markets where the Company operates or a major earthquake, fire, or similar event that would affect the Company's central offices, corporate headquarters, network operations center or network equipment.

(g)     **Ability to Negotiate and Enforce Favorable Interconnection and
        Other Agreements.**

The Company's ability to continue to obtain favorable interconnection,
unbundling, service provisioning and pricing terms, and the time and expense involved in
negotiating interconnection agreements and amendments, can be adversely affected by ongoing
legal and regulatory activity.  All of the Company's interconnection agreements provide either
that a party is entitled to demand renegotiation of particular provisions or of the entire agreement
based on intervening changes in law resulting from ongoing legal and regulatory activity, or that
a change of law is immediately effective in the agreement and that a dispute resolution process
will be implemented if the parties do not agree upon the change of law.  The initial terms of all
of the Company's interconnection agreements with ILECs have expired; however, each of the
Company's agreements contain an "evergreen" provision that allows the agreement to continue
in effect until terminated.  If the Company was to receive a termination notice from an ILEC, the
Company might be able to negotiate a new agreement or initiate an arbitration proceeding at the
relevant state commission before the agreement expired.  In addition, the Telecommunications
Act of 1996 (the "**Telecommunications Act**") gives the Company the right to opt into
interconnection agreements, which have been entered into by other carriers, provided the
agreement is still in effect and provided that the Company adopts the entire agreement.  The
Company is in the process of renegotiating the terms of its New York interconnection
agreements with Verizon.  There can be no assurance that the Company will be able to
successfully renegotiate these agreements or any other interconnection agreement on terms
favorable or at all.

During 2010, the Company entered into an amended and restated commercial
agreement with Verizon pursuant to which the Company will continue to purchase a product
called Verizon Wholesale Advantage Service at UNE-P rates subject to a tiered surcharge
reflective of the number of lines that the Company maintains under the agreement.  This
amended and restated commercial agreement will continue in effect into 2013.

If the amended and restated agreement were to be terminated or expire, the
Company would be required to convert all of the lines thereunder to resale, which would be
substantially less favorable to the Company.  There can be no assurance that the Company will
execute an amended and restated commercial agreement with Verizon or that the Company's
amended and restated agreement, once executed, will be renewed at the end of its term or that it
will not be terminated before the end of its term.

The Company has also entered into a commercial agreement with AT&T pursuant
to which the Company serves a significant percentage of customers in Connecticut, as well as
customers in other AT&T ILEC markets.  This agreement will expire at the end of 2014.  If the
Company's AT&T commercial agreement were to expire, the Company would be required to
convert all of the lines thereunder to resale, which would likely be substantially less favorable to
the Company.  There can be no assurance that the Company's commercial agreement with
AT&T will be renewed at the end of its term.

The Company has entered into amendments of various interconnection and
commercial agreements with Verizon, which provide for assurance of timely payment.  Under

- 74 -

these amendments, the Company could be compelled to provide letters of credit in an amount of up to two months' anticipated billings if, in any two months of a consecutive 12 month period, the Company fails to pay when due undisputed amounts that in total exceed 5% of the total amount invoiced by Verizon during the month and fails to cure such non-payment within five business days of Verizon's written notice of non-payment.  The provision of such letters of credit could adversely impact the Company's liquidity position.  The amendments also substantially limit the time period within which both the Company and Verizon can (i) backbill for services rendered to the other and (ii) dispute charges for services rendered to the other.

### (h)      Relationships with ILECS.

The Company's business depends on its ability to interconnect with incumbent local exchange carrier networks and to lease from them certain essential network elements.  The Company obtains access to these network elements and services under terms established in interconnection agreements with incumbent local exchange carriers.  Like many competitive communications services providers, from time to time, the Company has experienced difficulties in working with incumbent local exchange carriers with respect to obtaining information about network facilities, ordering and maintaining network elements and services, interconnecting with incumbent local exchange carrier networks and settling financial disputes.  These difficulties can impair the Company's ability to provide local service to customers on a timely and competitive basis.  If an incumbent local exchange carrier refuses to cooperate or otherwise fails to support the Company's business needs for any other reason, including labor shortages, work stoppages, cost-cutting initiatives or disruption caused by mergers, other organizational changes or terrorist attacks, the Company's ability to offer services on a timely and cost-effective basis will be materially and adversely affected.

### (i)      Government Regulation.

The Company is subject to varying degrees of federal, state and local regulation. Pursuant to the Communications Act, the FCC exercises jurisdiction over the Company with respect to interstate and international services.  The Company must comply with various federal regulations, such as the duty to contribute to the Universal Service Fund ("**USF**") and other subsidies.  If the Company fails to comply with federal reporting and regulatory requirements, it may incur fines or other penalties, including loss of the authority to provide services.

The FCC's Triennial Review Order ("**TRO**"), subsequent Triennial Review Remand Order and related decisions have reduced the Company's ability to access certain elements of ILEC telecommunications platforms in several ways that have affected the Company's operations.  First, the Company no longer has the right to require ILECs to sell it unbundled network platforms. Because of this, the Company entered into commercial agreements with Verizon to purchase a product called Verizon Wholesale Advantage Services at UNE-P rates subject to a surcharge, which increased over time.  The Company has entered into an amended and restated commercial agreement with Verizon pursuant to which the Company will continue to purchase Verizon Wholesale Advantage Service at UNE-P rates subject to a tiered surcharge reflective of the number of lines that the Company places under the agreement. This amended and restated commercial agreement will continue in effect into 2013.  The Company is required under the Company's amended and restated commercial agreement with

- 75 -

Verizon to maintain a certain volume of lines on a "take-or-pay" basis. Expiration or termination of the current amended and restated commercial agreement would result in a substantial increase in the Company's cost of service. Second, in certain central offices, the Company no longer has the right to require ILECs to sell to it unbundled network elements, or have limited access rights to unbundled network element high capacity circuits that connect the Company's central switching office locations to customers' premises. Third, the Company no longer has the right to require ILECs to sell to it unbundled network element transport between the Company's switches and ILEC switches. Fourth, the Company has only limited or no access to unbundled network element DS1 or DS3 transport on certain interoffice routes. Petitions currently pending before the FCC could, if granted, further reduce the Company's access to UNE-Ls and transport. In these instances where the Company loses unbundled access to high capacity circuits or interoffice transport, the Company must either find alternative suppliers or purchase substitute circuits from the ILEC as special access, which increases costs. Finally, the Company's access to certain broadband elements of the ILEC network has been limited or eliminated in certain circumstances.

State regulatory commissions also exercise jurisdiction over the Company to the extent the Company provides intrastate services. The Company is required to obtain regulatory authorization and/or file tariffs with regulators in most of the states in which it operates. State regulatory commissions also often regulate the rates, terms and conditions at which the Company offers service. The Company has obtained the necessary certifications to provide service, but each commission retains the authority to revoke the certificate if that commission determines that the Company has violated any condition of the certification or if it finds that doing so would be in the public interest. While the Company believes it is in compliance with regulatory requirements, the Company's interpretation of the obligations may differ from those of regulatory authorities.

Both federal and state regulators require the Company to pay various fees and assessments, file periodic reports and comply with various rules regarding the contents of its bills, protection of subscriber privacy, service quality and similar consumer protection matters on an ongoing basis. If the Company fails to comply with these requirements, the Company may be subject to fines or potentially be asked to show cause as to why its certificate of authority to provide service should not be revoked.

**(j)**      **Difficulties with ILECs, IXCs and Wholesale Customers over Payment Issues.**

The Company has at times experienced difficulties collecting amounts due for services provided to ILECs and IXCs. These balances due to the Company can be material. There can be no assurance that the Company will be able to reach mutually acceptable settlements to collect overdue and disputed payments in the future.

The Company's interconnection agreements allow ILECs to decrease order processing, disconnect customers and increase the Company's security deposit obligations for delinquent payments. If an ILEC makes an enforceable demand for an increased security deposit, the Company could have less cash available for other expenses. If an ILEC were to

cease order processing or disconnect customers, the Company's business and operations would be materially and adversely affected.

Periodically, the Company's wholesale customers experience financial difficulties. To the extent that the credit quality of the Company's wholesale customers deteriorates or they seek bankruptcy protection, the Company may have difficulty collecting amounts due for services that it has provided to such customers. While the Company maintains security deposits and often retain the right to solicit end-user customers, there can be no assurance that such mechanisms will provide the Company with adequate protection.

The Company periodically has disagreements with ILECs and IXCs regarding the interpretation and application of laws, rules, regulations, tariffs and agreements. Adverse resolution of these disagreements may impact the Company's revenues and its costs of service, both prospectively and retroactively. Some of the disagreements can be quantified and are included among the Company's outstanding billing disputes with Verizon and other carriers, while others cannot be quantified because their resolution will depend upon public policy determinations not yet made by the FCC. If one or more of such disagreements were resolved through litigation or arbitration against the Company, such adverse resolution could have a material adverse effect on the Company's business, results of operations and financial condition.

### (k) Continued Industry Consolidation.

Consolidation in the telecommunications industry is occurring at a rapid pace. In addition to the combinations of Verizon and MCI and SBC, AT&T and BellSouth, numerous CLEC combinations have occurred, including several that directly impact the Company's markets such as Windstream/Paetec, Paetec/Cavalier, Earthlink/ITCDeltaCom and Earthlink/One Communications. This consolidation strengthens the Company's competitors and poses increased competitive challenges for the Company. The ILEC/interexchange carrier combinations not only provide the ILECs with national and international networks, but eliminate the two most effective and well financed opponents of the ILECs in federal and state legislative and regulatory forums and potentially reduce the availability of non-ILEC network facilities. The CLEC combinations will provide direct competitors with greater financial, network and marketing assets.

### (l) Intellectual Property Issues.

The Company provides a variety of advanced services, such as "cloud" and hosted IP services. These services rely on patents and other intellectual property that third parties may claim infringes their intellectual property. Such claims may materially and adversely affect the Company's ability to continue to sell or provide advanced services to retail and wholesale customers.

The Company licenses certain software to certain other carriers for the provision of hosted IP service. The Company is contractually bound to indemnify these other carriers in the event that a third-party alleges that the Company's software infringes the third-party's intellectual property rights. If the Company's licensees' provision of hosted IP services were the

subject of intellectual property infringement claims, the Company's financial position could be adversely impacted.

The Company relies on a combination of patent, copyright, trademark and trade secret laws, as well as licensing agreements, third-party non-disclosure agreements and other contractual provisions and technical measures to protect its intellectual property rights.  There can be no assurance that these protections will be adequate to prevent the Company's competitors from copying or reverse-engineering its hardware or software products, or that the Company's competitors will not independently develop technologies that are substantially equivalent or superior to the Company's technology.

In addition, there can be no assurances that the products, services, technologies and advertising the Company employs in its business do not or will not infringe valid patents, trademarks, copyrights or other intellectual property rights held by third parties.  The Company may be subject to legal proceedings and claims from time to time relating to intellectual property of others in the ordinary course of business.  Defending against intellectual property infringement or misappropriation claims could be time consuming and expensive regardless of whether the Company is successful, and could cause substantial expenses and disrupt the Company's business.

**(m)     Restrictive Covenants in the New Senior Secured Notes Indenture and the New ABL Agreement Will Limit Operating Flexibility.**

The New Senior Secured Notes Indenture and the New ABL Agreement will contain covenants that will, among other things, restrict the Reorganized Company's ability to take specific actions, even if the Reorganized Company believes it to be in its best interest, including restrictions on the Reorganized Company's ability to:

- incur or guarantee additional indebtedness or issue preferred stock;
- create liens with respect to the Reorganized Company's assets;
- make investments, loans or advances;
- prepay subordinated indebtedness;
- enter into transactions with affiliates;
- merge, consolidate or sell assets; and
- engage in any business other than activities related or complementary to communications.

In addition, any future credit facility may impose financial covenants that require the Reorganized Company to comply with specified financial ratios and tests, including minimum quarterly EBITDA, senior debt to total capitalization, maximum capital expenditures, maximum leverage ratios and minimum interest coverage ratios.  There can be no assurance that the Reorganized Company will be able to meet these requirements or satisfy these covenants in the future.  If the Reorganized Company fails to do so, its indebtedness thereunder could become accelerated and payable at a time when the Reorganized Company is unable to pay it.  This could adversely affect the Reorganized Company's ability to carry out its business plan and would have a negative effect on its financial condition.

- 78 -

(n)      **Regulatory Uncertainties.**

If current or future regulations change, there can be no assurance that the FCC or state regulators will grant the Company or Reorganized Company any required regulatory authorization or refrain from taking action against the Company or Reorganized Company if it is found to have provided services without obtaining the necessary authorizations, or to have violated other requirements of their rules and orders.  Delays in receiving required regulatory approvals or the enactment of new adverse regulation or regulatory requirements may slow the Company's or Reorganized Company's growth and have a material adverse effect upon its business, results of operations and financial condition.  The Telecommunications Act remains subject to judicial review and ongoing proceedings before the FCC and state regulators, including proceedings relating to interconnection pricing, access to and pricing for unbundled network elements and special access services and other issues that could result in significant changes to the Company's business and business conditions in the communications industry generally.  Recent decisions by the FCC have eliminated or reduced the Company's access to certain elements of ILEC telecommunications platforms that the Company uses to serve customers and have increased the rates that the Company pays for such elements.  Other proceedings are pending before the FCC that could potentially further limit its access to these network elements or further increase the rates the Company must pay for such elements.  Likewise, proceedings before the FCC could impact the availability and price of special access facilities.  Other proceedings before the FCC could result in increases in the cost of regulatory compliance.  A number of states also have proceedings pending that could impact the Company's access to and the rates the Company pays for network elements.  Other state proceedings could limit the Company's pricing and billing flexibility.  The Company's business would be substantially impaired if the FCC, the courts, or state commissions eliminated the Company's access to the facilities and services they use to serve customers, substantially increased the rates the Company pays for facilities and services or adversely impacted the revenues the Company receives from other carriers or customers.  In addition, congressional legislative efforts to rewrite the Telecommunications Act or enact other telecommunications legislation, as well as various state legislative initiatives, may cause major industry and regulatory changes.  The Company cannot predict the outcome of these proceedings or legislative initiatives or the effects, if any, that these proceedings or legislative initiatives may have on the Company's business and operations.

The FCC has recently revamped its intercarrier compensation mechanism and its USF program.  The changes implemented by the FCC in its intercarrier compensation mechanism could reduce the Company's high margin carrier revenue and limit or eliminate its ability to provide and charge for certain access services.  The changes implemented by the FCC in its USF program could increase the Company's program costs.

(o)      **Declining Prices for Communications Services May Reduce Revenues and Profitability.**

The Reorganized Company may fail to achieve acceptable profits due to pricing.  Prices in telecommunication services have declined substantially in recent years, a trend that continues. Accordingly, the Company cannot predict to what extent they may need to reduce its prices to remain competitive or whether it will be able to sustain future pricing levels as its

competitors introduce competing services or similar services at lower prices.  The Reorganized Company's ability to meet price competition may depend on its ability to operate at costs equal to or lower than its competitors or potential competitors.

### (p)     Maintaining Real Estate Leases and Agreements.

The Company's switches are housed in facilities owned by third parties.  The Company's use of these various facilities is subject to multiple real estate leases.  If the Company was to lose one or more of these leases, the resultant relocation of one or more of the Company's switches would be costly and disruptive to the Company's business and customers.  There can be no assurance that the Company will be able to maintain all of the real estate leases governing the multiple switch sites.

The Company has agreements in place with approximately 420 buildings that allow the Company to colocate network equipment in order to reduce last-mile cost (lit buildings).  If the Company was to lose some or all of the lit building agreements, its business could be adversely impacted.

### (q)     Dependence on Third-Party Service Providers.

The Company depends on a limited number of third-party service providers for long distance, data and other services.  If any of these third-party providers were to experience significant interruptions in their business operations, terminate its agreements with the Company or fails to perform the services or meet the standards of quality required under the terms of the Company's agreements with them, the Company's ability to provide these services to its customers could be materially and adversely affected for an unpredictable period of time.  If the Company has to migrate the provision of these services to an alternative provider, there can be no assurance that the Company would be able to timely locate alternative providers of such services, migrate such services in a short period of time without significant customer disruption so as to avoid a material loss of customers or business, or that the Company could do so at economical rates.

### (r)     Customer Uncertainties.

Customers, whether on "month-to-month" arrangements or long-term contracts, periodically terminate their contracts, with or without penalties.  If a significant percentage of these customers or a significant number of key customers should terminate their service agreements with the Company, the Company's business, results of operations and financial condition could be adversely affected.

Also, certain of the Company's agreements with sales agents do not expressly preclude the sales agent from migrating the customers they secured for the Company to other carriers.  Sales agents could attempt to obtain from these customers the authorization to replace the Company as the customers' service provider.  If a number of customers migrated away from the Company's service, the Company's business, results of operations and financial condition could be adversely affected.

### (s)   Rapid Changes in the Communications Industry.

The communications industry is subject to rapid and significant changes in technology and in customer requirements and preferences.  If the Company fails to anticipate and keep up with such changes, the Company could lose market share, which could reduce revenue.  The Company has developed its business based, in part, on traditional telephone technology.  Subsequent technological developments may reduce the competitiveness of the Company's network and require expensive, unanticipated upgrades or additional communications products that could be time consuming to integrate into its business and could cause it to lose customers and impede its ability to attract new customers.  The Company may be required to select one technology over another at a time when it might be impossible to predict with any certainty which technology would prove to be more economic, efficient or capable of attracting customers.  In addition, even though the Company utilizes new technologies, such as VoIP, the Company may not be able to implement them as effectively as other companies with more experience with those new technologies.  In addition, while the Company has recently purchased and deployed new technology, including VoIP softswitches, EoC and MPLS, core and edge routers, the Company may not be able to implement new technology as effectively as other companies with more experience with new technology.

### (t)   Financial Difficulties in the Communications Industry.

Certain competitive communications services providers, long distance carriers and other communications providers have experienced substantial financial difficulties over the past few years.  To the extent that carriers in financial difficulties purchase services from the Company, the Company may not be paid in full or at all for services the Company has rendered.  Further, the perception of instability of companies in the telecommunications and information technology industry may diminish the Company's ability to obtain further capital and may adversely affect the willingness of potential customers to purchase their communications services from the Company.

### (u)   Retaining Key Management and Personnel.

The Company believes its success is due, in part, to its experienced management team.  Losing the services of one or more members of the Company's management team could adversely affect its business and expansion efforts, and possibly prevent the Company from further improving its operational, financial and information management systems and controls.  The Company does not maintain key man life insurance on any of its officers.

The Company's ability to implement its business plan is dependent on its ability to retain and hire a large number of qualified new employees each year.  The competition for qualified technical and sales personnel is intense in the telecommunications and information technology industry and markets.  Moreover, the pending maturity of the Company's indebtedness, including the Senior Secured Notes and ABL Facility, could render the hiring of such personnel more difficult.  If the Company is unable to hire sufficient qualified personnel, its customers could experience inadequate customer service and delays in the installation and maintenance of access lines, which could have a material adverse effect on its business, results of operations and financial condition.

**(v)      The Ability to Manage and Expand Operations Effectively.**

The Company's ability to manage and expand operations effectively will depend on the ability to:

- offer high-quality, reliable services at reasonable costs;
- introduce new technologies;
- install and operate telecommunications switches and related equipment;
- lease access to suitable transmission facilities at competitive prices;
- scale operations;
- obtain successful outcomes in disputes and in litigation, rule-making, legislation and regulatory proceedings;
- successfully negotiate, adopt or arbitrate interconnection agreements with other carriers;
- acquire necessary equipment, software and facilities;
- integrate existing and newly acquired technology and facilities, such as switches and related equipment;
- evaluate markets;
- add products;
- monitor operations;
- control costs;
- maintain effective quality controls;
- hire, train and retain qualified personnel;
- enhance operating and accounting systems;
- address operating challenges;
- adapt to market and regulatory developments; and
- obtain and maintain required governmental authorizations.

In order for the Company to succeed, these objectives must be achieved in a timely manner and on a cost-effective basis.  If these objectives are not achieved, the Company may not be able to compete in existing markets or expand into new markets.

**(w)      Failure to Effectively and Profitably Integrate Future Acquisitions.**

As part of the Company's business strategy, the Company has historically and may continue to seek to expand through the acquisition of other businesses that the Company believes are complementary to its business. The Company may be unable to identify suitable acquisition candidates, or if they do, the Company may not successfully complete those acquisitions.

If the Company acquires another business, it may face difficulties, including:

- integrating that business's personnel, services, products or technologies into the Company's operations;

- retaining key personnel or customers of the acquired business;

- failing to adequately identify or assess liabilities of that business;

- failing to achieve the forecasts used to determine the purchase price of that business; and

- diverting management's attention from the normal daily operation of the Company's business.

These difficulties could disrupt the Company's ongoing business and increase its expenses. Further, failure to successfully integrate acquisitions may adversely affect the Company's profitability by creating significant operating inefficiencies that could increase operating expenses as a percentage of sales and reduce operating income. In addition, the Company may not realize the expected cost savings from such acquisitions. As of the date of this Disclosure Statement, the Company has no agreements to enter into any material acquisition transaction.

### (x)  Potential Liability as an Internet Access Provider.

The law relating to the liability of Internet access providers and online services companies for information carried on or disseminated through their networks is unsettled. As the law in this area develops, the potential imposition of liability upon the Company for information carried on and disseminated through its network could require the Company to implement measures to reduce its exposure to such liability, which may require the expenditure of substantial resources or the discontinuation of certain products or service offerings. Any costs that are incurred as a result of such measures or the imposition of liability could harm the Company's business.

### (y)  Following the Consummation of the Prepackaged Plan, a Small Group of Significant Investors Will Control the Reorganized Company.

Following the consummation of the Prepackaged Plan, a small number of institutional investors will control the Reorganized Company's equity. Solely through their concentrated ownership of New Common Stock, the institutional investors will be able to cause the election of a majority of the members of the Reorganized Company's board of directors and the approval of any action requiring the approval of stockholders, including a change of control, a public offering, merger or sale of assets or stock. Changes in control of the Reorganized Company or equity holders could trigger requirements that the Reorganized Company repay the New Senior Secured Notes, which will be held by these significant investors. In addition, these significant stockholders may in the future own businesses that directly or indirectly compete with the Reorganized Company. They may also pursue acquisition opportunities that may be complementary to the Reorganized Company's business, and as a result, those acquisition opportunities may not be available to the Reorganized Company.

# ARTICLE XII.

## SECURITIES LAW MATTERS

**12.1**   *General.*

This section discusses certain securities law matters that are raised by the Prepackaged Plan.  This section should not be considered applicable to all situations or to all holders of Senior Secured Notes or Existing Preferred Interests.  Holders of Senior Secured Notes or Existing Preferred Interests should consult their own legal counsel with respect to these and other issues.

**12.2**   *Issuance and Resale of the New Senior Secured Notes and the New Common Stock Under the Prepackaged Plan.*

In connection with the restructuring pursuant to the Prepackaged Plan under chapter 11 of the Bankruptcy Code, the Company will rely on section 1145 of the Bankruptcy Code to exempt the issuance of the New Senior Secured Notes and the New Common Stock from the registration requirements of the Securities Act (and of any state securities or "blue sky" laws).  Section 1145 exempts from registration the sale of a debtor's securities under a chapter 11 plan if such securities are offered or sold in exchange for a claim against, or equity interest in, or a claim for an administrative expense in a case concerning, such debtor.  In reliance upon this exemption, the New Senior Secured Notes and the New Common Stock will generally be exempt from the registration requirements of the Securities Act.  Accordingly, recipients will be able to resell the New Senior Secured Notes and the New Common Stock without registration under the Securities Act or other federal securities laws, unless the recipient is an "underwriter" with respect to such securities, within the meaning of section 1145(b) of the Bankruptcy Code.  Section 1145(b) of the Bankruptcy Code defines "underwriter" as one who (i) purchases a claim with a view to distribution of any security to be received in exchange for the claim, or (ii) offers to sell securities issued under a plan for the holders of such securities, or (iii) offers to buy securities issued under a plan from persons receiving such securities, if the offer to buy is made with a view to distribution, or (iv) is an "issuer" of the relevant security, as such term is used in Section 2(11) of the Securities Act.

Notwithstanding the foregoing, statutory underwriters may be able to sell securities without registration pursuant to the resale limitations of Rule 144 under the Securities Act.  Parties that believe that they may be statutory underwriters as defined in section 1145 of the Bankruptcy Code are advised to consult with their own counsel as to the availability of the exemption provided by Rule 144.

**12.3**   *Where You Can Find More Information.*

The Company voluntarily files annual, quarterly and current reports and other information with the SEC.  These reports and other information can be read and copied at the SEC's public reference room at 100 F Street, N.E., Washington, D.C. 20549.  Please call the SEC at 1-800-SEC-0330 for further information on the public reference room.  The SEC

maintains a website (http://www.sec.gov) that contains reports and other information regarding companies that file electronically with the SEC, including the Company.

This Disclosure Statement contains summaries of certain agreements that the Company has entered into or expects to enter into in connection with the Prepackaged Plan. The descriptions contained in this Disclosure Statement of these agreements are not purported to be complete and are subject to, or qualified in their entirety by reference to, the definitive agreements, copies of which, once complete, will be made available without charge to you by making a written request at the following address:

**Kurtzman Carson Consultants**
**599 Lexington Avenue, 39th Floor**
**New York, NY 10022**
**Attn: Broadview Networks Holdings Ballot Processing**

## ARTICLE XIII.

## CERTAIN FEDERAL INCOME TAX
## CONSEQUENCES OF THE PREPACKAGED PLAN

**13.1** *Introduction.*

The following is a discussion of certain material U.S. federal income tax considerations relating to the treatment of the exchange of the Senior Secured Notes for New Common Stock and New Senior Secured Notes and the Existing Preferred Interests for New Common Stock and the New Warrants, and relating to the ownership and disposition of the New Common Stock and the New Senior Secured Notes and the New Warrants. This discussion is only for general information purposes and only describes the expected tax consequences to holders entitled to vote on the Prepackaged Plan. It is not a complete analysis of all potential federal income tax consequences and does not address any tax consequences arising under any state, local or foreign tax laws or federal estate or gift tax laws. This discussion is based on the Internal Revenue Code of 1986, as amended (the "**IRC**"), Treasury Regulations promulgated thereunder, judicial decisions, and published rulings and administrative pronouncements of the Internal Revenue Service (the "**IRS**"), all as in effect on the date of this Disclosure Statement. These authorities may change, possibly retroactively, resulting in federal income tax consequences different from those discussed below. No ruling has been or will be sought from the IRS, and no legal opinion of counsel will be rendered, with respect to the matters discussed below. There can be no assurance that the IRS will not take a contrary position regarding the federal income tax consequences resulting from the consummation of the Prepackaged Plan or that any contrary position would not be sustained by a court. **This discussion is not tax advice, and holders are urged to consult their independent tax advisors regarding the tax consequences to them of the Restructuring Transaction and of the ownership and disposition of the New Common Stock, New Senior Secured Notes and New Warrants received in respect of the Senior Secured Notes and Existing Preferred Interests.**

**IRS CIRCULAR 230 DISCLOSURE: TO ENSURE COMPLIANCE WITH REQUIREMENTS IMPOSED BY THE IRS, THE COMPANY INFORMS YOU THAT**

**ANY TAX ADVICE CONTAINED IN THIS DISCLOSURE STATEMENT WAS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY ANY TAXPAYER FOR THE PURPOSE OF AVOIDING TAX-RELATED PENALTIES UNDER THE CODE. TAX ADVICE CONTAINED IN THIS DISCLOSURE STATEMENT WAS WRITTEN IN CONNECTION WITH THE PROMOTION OR MARKETING OF THE TRANSACTION(S) OR MATTER(S) ADDRESSED BY THIS DISCLOSURE STATEMENT. EACH TAXPAYER SHOULD SEEK ADVICE BASED ON THE TAXPAYER'S PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.**

This discussion assumes that holders of the Senior Secured Notes and the Existing Preferred Interests have held such property as "capital assets" within the meaning of IRC Section 1221 (generally, property held for investment) and holders will hold the New Senior Secured Notes, New Common Stock and New Warrants as capital assets. In addition, this discussion assumes that the Senior Secured Notes and New Senior Secured Notes will be treated as debt for U.S. federal income tax purposes.

This discussion does not address all federal income tax considerations that may be relevant to a particular holder in light of that holder's particular circumstances or to holders subject to special rules under the federal income tax laws, such as financial institutions, insurance companies, brokers, dealers or traders in securities, commodities or currencies, tax-exempt organizations, tax-qualified retirement plans, partnerships and other pass-through entities, foreign corporations, foreign trusts, foreign estates, holders who are not citizens or residents of the U.S., holders subject to the alternative minimum tax, holders holding Claims relating to the Senior Secured Notes, the New Senior Secured Notes, New Common Stock or New Warrants as part of a hedge, straddle or other risk reduction strategy or as part of a conversion transaction or other integrated investment, holders who have a functional currency other than the U.S. dollar and holders that acquired the Senior Secured Notes in connection with the performance of services.

**13.2** *Federal Income Tax Consequences to the Company.*

(a) **Cancellation of Indebtedness and Reduction of Tax Attributes.**

The exchange of Senior Secured Notes pursuant to the Prepackaged Plan may result in cancellation of indebtedness income ("**COD Income**") to the Company for U.S. federal income tax purposes to the extent the sum of (a) cash and the fair market value of any property (including New Common Stock) and (b) the issue price of the New Senior Secured Notes received by holders is less than the sum of (x) the adjusted issue prices of the Senior Secured Notes, (y) the adjusted issue price of any other debt exchanged for property pursuant to the Prepackaged Plan and (z) the amount of any unpaid accrued interest on the Senior Secured Notes and such other debt to the extent previously deducted by the Company. Thus, the precise amount of COD Income, if any, resulting from the exchange of Senior Secured Notes cannot be determined before the date of the exchange.

COD Income realized by a debtor will be excluded from income if the discharge of debt occurs in a case brought under the Bankruptcy Code, the debtor is under the court's

- 86 -

jurisdiction in such case and the discharge is granted by the court or is pursuant to a plan approved by the court (the "**Bankruptcy Exception**").  Because the Bankruptcy Exception will apply to the transactions consummated pursuant to the Prepackaged Plan, the Company will likely not be required to recognize any COD Income realized as a result of the implementation of the Prepackaged Plan. If and to the extent any COD Income is excluded from taxable income pursuant to the Bankruptcy Exception, the Company generally will be required to reduce certain of the Company's tax attributes, including, but not limited to, its net operating losses, loss carryforwards, credit carryforwards and tax basis in certain assets.

A debtor that does not recognize COD Income under the Bankruptcy Exception generally must reduce certain tax attributes by the amount of the excluded COD Income. Attributes subject to reduction include NOLs, NOL carryforwards and certain other losses, credits and carryforwards, and the debtor's tax basis in its assets (including stock of subsidiaries).  Usually a debtor must reduce its own assets first before then reducing stock of subsidiaries, following which the assets of subsidiaries may be reduced.  A debtor's tax basis in its assets generally may not be reduced below the amount of liabilities remaining immediately after the discharge of indebtedness.  If the debtor is a member of a consolidated group and reduces its basis in the stock of another group member, a "look-through rule" requires a corresponding reduction in the tax attributes of the lower-tier member.  NOLs for the taxable year of the discharge and NOL carryovers to such year generally are the first attributes subject to reduction.  However, a debtor may elect under IRC Section 108(b)(5) (the "**Section 108(b)(5) Election**") to reduce its basis in its depreciable property first.  If the debtor is a member of a consolidated group, the debtor may treat stock in another group member as depreciable property for purposes of the Section 108(b)(5) Election, provided the lower-tier member consents to a corresponding reduction in its basis in its depreciable property.  If a debtor makes a Section 108(b)(5) Election, the limitation on reducing the debtor's basis in its assets below the amount of its remaining liabilities does not apply.

If any COD Income is not excluded from the Company's taxable income and the Company does not have sufficient losses to offset fully such COD Income, the Company may incur tax liability from such COD income.

### (b)     Section 382 Limitation on NOLs.

Under IRC Section 382, if a corporation or a consolidated group with NOLs (a "**Loss Corporation**") undergoes an "ownership change," the Loss Corporation's use of its pre-change NOLs (and certain other tax attributes) generally will be subject to an annual limitation in the post-change period.  In general, an "ownership change" occurs if the percentage of the value of the Loss Corporation's stock owned by one or more direct or indirect "five percent shareholders" increases by more than fifty percentage points over the lowest percentage of value owned by the five percent shareholders at any time during the applicable testing period (an "**Ownership Change**").  The testing period generally is the shorter of (i) the three-year period preceding the testing date or (ii) the period of time since the most recent Ownership Change of the corporation.

Subject to the special bankruptcy rules discussed below, the amount of the annual limitation on a Loss Corporation's use of its pre-change NOLs (and certain other tax attributes)

- 87 -

is generally equal to the product of the applicable long-term tax-exempt rate (as published by the IRS for the month in which the Ownership Change occurs) and the value of the Loss Corporation's outstanding stock immediately before the Ownership Change (excluding certain capital contributions). If a Loss Corporation has a net unrealized built-in gain ("**NUBIG**") immediately prior to the Ownership Change, the annual limitation may be increased during the subsequent five-year period (the "**Recognition Period**"). If a Loss Corporation has a net unrealized built-in loss ("**NUBIL**") immediately prior to the Ownership Change, certain losses recognized during the Recognition Period also would be subject to the annual limitation and thus would reduce the amount of pre-change NOLs that could be used by the Loss Corporation during the five-year period.

The Company expects the consummation of the Prepackaged Plan will result in an Ownership Change of the Company within the meaning of Section 382 of the Code. The remainder of this discussion assumes that the expected Ownership Change will occur on the Effective Date, though it is possible the IRS could take the position that the Ownership Change occurred on the date the Prepackaged Plan is confirmed by the Bankruptcy Court. If the IRS took the position that the ownership change occurred on the Confirmation Date, the consequences of such change could be other than as described below. Because the Ownership Change that occurs on the Effective Date will occur in a case brought under the Bankruptcy Code, one of the following two special rules will apply in determining the Company's ability to utilize NOLs attributable to tax periods preceding the Effective Date in post-Effective Date tax periods.

Under IRC Section 382(l)(5), an Ownership Change in bankruptcy will not result in any annual limitation on the debtor's pre-change NOLs if the stockholders or "qualified creditors" of the debtor receive at least fifty percent (50%) of the stock (by vote and value) of the reorganized debtor in the bankruptcy reorganization as a result of being shareholders or creditors of the debtor. Instead, the debtor's pre-change NOLs are reduced by the amount of any interest deductions with respect to debt converted into stock in the bankruptcy reorganization that were allowed in the three taxable years preceding the taxable year in which the Ownership Change occurs and in the part of the taxable year prior to and including the effective date of the bankruptcy reorganization. However, if any pre-change NOLs of the debtor already are subject to an annual usage limitation under IRC Section 382 at the time of an Ownership Change subject to IRC Section 382(l)(5), those NOLs will continue to be subject to such limitation.

A qualified creditor is any creditor who has held the debt of the debtor continuously during the period beginning at least eighteen months prior to the Commencement Date or who has held "ordinary course indebtedness" at all times since it has been outstanding. A creditor who does not become a direct or indirect five percent shareholder of the reorganized debtor generally may be treated by the debtor as having always held any debt exchanged for stock for purposes of determining whether such creditor is a qualified creditor unless the creditor's participation in formulating the plan of reorganization makes evident to the debtor that the creditor has not owned the debt for the requisite period. The Company believes that the Ownership Change expected to result from the consummation of the Prepackaged Plan may satisfy the requirements of IRC Section 382(l)(5), though no assurance can be given in this regard.

If IRC Section 382(l)(5) applies to an Ownership Change, any subsequent Ownership Change of the debtor within a two-year period will result in the debtor being unable to use any pre-change losses following such subsequent Ownership Change. A debtor may elect not to apply IRC Section 382(l)(5) to an Ownership Change that otherwise satisfies its requirements. This election must be made on the debtor's federal income tax return for the taxable year in which the Ownership Change occurs. The Company has not yet determined whether to elect out of the application of IRC Section 382(l)(5) if it is determined they otherwise qualify.

If an Ownership Change pursuant to a bankruptcy plan does not satisfy the requirements of IRC Section 382(l)(5), or if a debtor elects not to apply IRC Section 382(l)(5), the debtor's use of its pre-change NOLs will be subject to an annual limitation as determined under IRC Section 382(l)(6). In such case, the amount of the annual limitation generally will be equal to the product of the applicable long-term tax-exempt rate (3.26% for June 2012) and the value of the debtor's outstanding stock immediately after the bankruptcy reorganization, provided such value may not exceed the value of the debtor's gross assets immediately before the Ownership Change, subject to certain adjustments. Depending on whether the debtor has a NUBIG or NUBIL immediately prior to the Ownership Change, the annual limitation may be increased or decreased during the Recognition Period. However, if any pre-change NOLs of the debtor already are subject to an annual limitation at the time of an Ownership Change subject to IRC Section 382(l)(6), those NOLs will be subject to the lower of the two annual limitations.

NOLs not utilized in a given year due to the annual limitation may be carried forward for use in future years until their expiration dates. To the extent the Reorganized Debtors' annual limitation exceeds the consolidated group's taxable income in a given year, the excess will increase the annual limitation in future taxable years.

### (c)   Alternative Minimum Tax.

In general, an alternative minimum tax ("**AMT**") is imposed on a corporation's alternative minimum taxable income ("**AMTI**") at a 20% rate to the extent such tax exceeds the corporation's regular federal income tax for the taxable year. For purposes of computing AMTI, certain tax deductions and other beneficial allowances are modified or eliminated, with further adjustments required if AMTI, determined without regard to adjusted current earnings ("**ACE**"), differs from ACE. In addition, even though a corporation otherwise might be able to offset all of its taxable income for regular tax purposes by available NOL carryforwards, under current law only 90% of its AMTI generally may be offset by available NOL carryforwards. Accordingly, for tax periods after the Effective Date, the Reorganized Debtors may have to pay AMT regardless of whether they generate non-AMT NOLs or have sufficient non-AMT NOL carryforwards to offset regular taxable income for such periods. In addition, if a corporation undergoes an Ownership Change and is in a NUBIL position on the date of the Ownership Change, the corporation's aggregate tax basis in its assets would be reduced for certain AMT purposes to reflect the fair market value of such assets as of the change date. A corporation that pays AMT generally is later allowed a nonrefundable credit (equal to a portion of its prior year AMT liability) against its regular federal income tax liability in future taxable years when it is no longer subject to the AMT.

**13.3**   *Federal Income Tax Consequences to Holders of Certain Claims.*

(a)   **Holders of Senior Secured Notes Claims (Class 2).**

(1)   **Tax Securities**

The tax consequences of the Prepackaged Plan to a holder of a Claim may depend in part upon (1) whether such Claim is based on an obligation that constitutes a "security" for federal income tax purposes and (2) whether all or a portion of the consideration received for such Claim is an obligation that constitutes a "security" for federal income tax purposes.  The determination of whether a debt obligation constitutes a security for federal tax purposes is complex and depends on the facts and circumstances surrounding the origin and nature of the claim.  Generally, obligations arising out of the extension of trade credit have been held not to be tax securities, while corporate debt obligations evidenced by written instruments with original maturities of ten years or more have been held to be tax securities.  It is uncertain whether the Senior Secured Notes or the New Senior Secured Notes will be considered securities for federal tax purposes and Holders are advised to consult their tax advisors with respect to this issue.

(2)   **Exchange of Senior Secured Notes for New Common Stock and New Senior Secured Notes.**

If the Senior Secured Notes and New Senior Secured Notes are treated as securities for federal income tax purposes, the exchange of Senior Secured Notes for New Senior Secured Notes and New Common Stock will constitute a recapitalization and holders of the Senior Secured Notes will not recognize gain or loss on the exchange.  A Senior Secured Note holder's holding period in the New Senior Secured Notes and the New Common Stock would include the Senior Secured Note holder's holding period in its Senior Secured Notes, and the holder of the Senior Secured Notes would have a basis in the New Senior Secured Notes and the New Common Stock equal, in the aggregate, to the holder's basis in its Senior Secured Notes.

If the Senior Secured Notes are treated as securities for federal income tax purposes, but the New Senior Secured Notes are not treated as securities, each holder of the Senior Secured Notes will recognize gain, but not loss, in an amount equal to the lesser of (i) the issue price of the New Senior Secured Notes and (ii) the excess of (A) the sum of fair market value of the New Common Stock plus the issue price of the New Senior Secured Notes over (B) the adjusted basis of the holder in the Senior Secured Notes.  A Senior Secured Note holder's holding period in the New Common Stock would include the holder's holding period in its Senior Secured Notes, while the holder would start a new holding period in the New Senior Secured Notes.  The Senior Secured Notes holder's basis in the New Senior Secured Notes would equal their issue price, and the Senior Secured Notes holder's basis in the New Common Stock would equal the Senior Secured Notes holder's basis in its Senior Secured Notes Claim less the issue price of the New Senior Secured Notes plus the amount of gain, if any, recognized on the exchange.

If the Senior Secured Notes are not treated as securities for federal income tax purposes, a holder of Senior Secured Notes will generally recognize gain or loss on the exchange of the Senior Secured Notes for the New Senior Secured Notes and New Common Stock.  Such

gain or loss will generally be equal to the difference between (i) the sum of the fair market value of the New Common Stock and the issue price of the New Senior Secured Notes and (ii) the Senior Secured Notes holder's tax basis in the Senior Secured Notes. Any gain or loss generally will be capital gain or loss, and will be long-term capital gain or loss if the holder has held the Senior Secured Notes for more than one year as of the date of disposition. Holders should consult their tax advisors regarding the applicable tax rates and netting rules for capital gains and losses. There are limitations on the deduction of capital losses by both corporate and noncorporate taxpayers.

### (3)     New Senior Secured Notes.

*Interest and Original Issue Discount*. Payments of stated interest under the New Senior Secured Notes will constitute payments of "qualified stated interest" and generally will be taxable to holders as ordinary income at the time the payments are received or accrued, in accordance with the holder's method of tax accounting.

The preceding discussion assumes the amount of the New Senior Secured Notes will not be issued with original issue discount ("**OID**"). The New Senior Secured Notes generally would be treated as issued with OID if the principal amount of the New Senior Secured Notes plus all scheduled interest payments thereon, other than payments of qualified stated interest, exceeds the issue price of the notes by more than a *de minimis* amount. The issue price of a debt instrument issued in exchange for another debt instrument depends on whether either debt instrument is considered publicly traded for purposes of the OID rules at any time during the sixty-day period ending thirty days after the issue date. If neither debt instrument is publicly traded, the issue price of the new debt instrument will be its stated principal amount if the new debt instrument provides for adequate stated interest (*i.e.*, interest at least at the applicable federal rate as of the issue date), or will be its imputed principal amount if the instrument does not provide for adequate stated interest. If the new debt instrument is publicly traded, its issue price generally will be its trading price immediately following issuance. If the old debt instrument is publicly traded, but the new debt instrument is not, the issue price of the new debt instrument generally will be the fair market value of the old debt instrument at the time of the exchange less the fair market value of the portion of the old debt instrument allocable to any other property received in the exchange.

A debt instrument will be considered to be publicly traded if certain pricing information related to the instrument is generally available on a quotation medium. Because the relevant trading period is generally in the future, it is impossible to predict whether the Senior Secured Notes Claims or the New Senior Secured Notes will be publicly traded during the relevant period.

*Sale, Retirement or Other Taxable Disposition*. A holder of the New Senior Secured Notes will recognize gain or loss upon the sale, redemption, retirement or other taxable disposition of the obligations due under the New Senior Secured Notes equal to the difference between the amount realized upon the disposition (less a portion allocable to any unpaid accrued interest which generally will be taxable as ordinary income) and the holder's adjusted tax basis in the New Senior Secured Notes. Any such gain or loss generally will be capital gain or loss, and will be long-term capital gain or loss if the holder has held the New Senior Secured Notes

- 91 -

for more than one year as of the date of disposition.  Holders should consult their tax advisors regarding the applicable tax rates and netting rules for capital gains and losses.  There are limitations on the deduction of capital losses by both corporate and noncorporate taxpayers.

### (4)   New Common Stock.

*Distributions*.  A holder of New Common Stock generally will be required to include in gross income as ordinary dividend income the amount of any distributions paid on the New Common Stock to the extent such distributions are paid out of the Reorganized Debtors' current or accumulated earnings and profits as determined for federal income tax purposes.  Distributions not treated as dividends for federal income tax purposes will first constitute a return of capital and will be applied against and reduce a holder's adjusted tax basis in the New Common Stock, but not below zero.  Any excess amount will be treated as gain from a sale or exchange of the New Common Stock.  Holders that are treated as corporations for federal income tax purposes may be entitled to a dividends received deduction with respect to distributions out of earnings and profits.

*Sale or Other Taxable Disposition*.  A holder of New Common Stock will recognize gain or loss upon the sale or other taxable disposition of New Common Stock equal to the difference between the amount realized upon the disposition and the holder's adjusted tax basis in the New Common Stock.  Subject to the rules discussed below in "*Other Considerations—Market Discount*" and the recapture rules under IRC Section 108(e)(7), any such gain or loss generally will be capital gain or loss, and will be long-term capital gain or loss if the holder has held the New Common Stock for more than one year as of the date of disposition.  Under the IRC Section 108(e)(7) recapture rules, a holder may be required to treat gain recognized on the taxable disposition of the New Common Stock as ordinary income if the holder took a bad debt deduction with respect to the Secured Lender Claims or recognized an ordinary loss on the exchange of the Secured Lender Claims for New Common Stock.  Holders should consult their tax advisors regarding the applicable tax rates and netting rules for capital gains and losses.  There are limitations on the deduction of capital losses by both corporate and noncorporate taxpayers.

### (b)   Holders of Existing Preferred Interests Claims (Class 8)

The exchange of Existing Preferred Interests for New Common Stock and New Warrants will constitute a recapitalization; and holders of the Existing Preferred Interests will not recognize gain or loss on the exchange.  A Existing Preferred Interests holder's holding period in the New Common Stock and New Warrants would include the Existing Preferred Interests holder's holding period in its Existing Preferred Interests, and the holder of the Existing Preferred Interests would have a basis in the New Common Stock and New Warrants equal, in the aggregate, to the holder's basis in its Senior Secured Notes. See "*Federal Income Tax Consequences to Holders of Certain Claims - Holders of Senior Secured Notes Claims – New Common Stock*," for a discussion of the tax consequences of holding New Common Stock.

### (c) Other Considerations.

*Accrued Interest*. There is general uncertainty regarding the extent to which the receipt of cash or other property should be treated as attributable to unpaid accrued interest. The Reorganized Debtors intend to take the position that cash or property distributed pursuant to the Prepackaged Plan will first be allocable to the principal amount of a holder's Claim and then, to the extent necessary, to any unpaid accrued interest thereon. The IRS, however, could take a contrary position.

To the extent any property received pursuant to the Prepackaged Plan is considered attributable to unpaid accrued interest, a holder will recognize ordinary income to the extent the value of the property exceeds the amount of unpaid accrued interest previously included in gross income by the holder. A holder's tax basis in such property should be equal to the amount of interest income treated as satisfied by the receipt of the property, and its holding period in the property should begin on the day after the Effective Date. A holder generally will be entitled to recognize a loss to the extent any accrued interest previously included in its gross income is not paid in full. Holders should consult their tax advisors regarding the extent to which consideration received under the Prepackaged Plan should be treated as attributable to unpaid accrued interest.

*Market Discount*. A holder that acquires a debt instrument at a market discount generally is required to treat any gain realized on the disposition of the instrument as ordinary income to the extent of accrued market discount not previously included in gross income by the holder. However, special rules apply to the disposition of a market discount obligation in certain types of non-recognition transactions, such as a recapitalization.

### (d) Information Reporting and Backup Withholding.

The Reorganized Debtors (or their paying agent) may be obligated to furnish information to the IRS regarding the consideration received by holders (other than corporations and other exempt holders) pursuant to the Prepackaged Plan. In addition, the Reorganized Debtors will be required to report annually to the IRS with respect to each holder (other than corporations and other exempt holders) the amount of interest paid and OID, if any, accrued on the New Senior Secured Notes, the amount of dividends paid on the New Common Stock, and the amount of any tax withheld from payment thereof.

Holders may be subject to backup withholding (currently, at a rate of 28% and scheduled to increase to 31% for tax years beginning after December 31, 2012) on the consideration received pursuant to the Prepackaged Plan. Backup withholding may also apply to interest, OID and principal payments on the New Senior Secured Notes, dividends paid on the New Common Stock and proceeds received upon sale or other disposition of the New Senior Secured Notes or New Common Stock. Certain holders (including corporations) generally are not subject to backup withholding. A holder that is not otherwise exempt generally may avoid backup withholding by furnishing to the Reorganized Debtors (or their paying agent) its taxpayer identification number and certifying, under penalties of perjury, that the taxpayer identification number provided is correct and that the holder has not been notified by the IRS that it is subject to backup withholding.

- 93 -

Backup withholding is not an additional tax.  Taxpayers may use amounts withheld as a credit against their federal income tax liability or may claim a refund of any excess amounts withheld by timely filing an appropriate claim for refund with the IRS.

**THE FOREGOING DISCUSSION OF FEDERAL INCOME TAX CONSIDERATIONS IS FOR GENERAL INFORMATION PURPOSES ONLY AND IS NOT TAX ADVICE.  EACH HOLDER SHOULD CONSULT ITS OWN TAX ADVISOR REGARDING THE FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES OF THE PREPACKAGED PLAN DESCRIBED HEREIN.  NEITHER THE PROPONENTS NOR THEIR PROFESSIONALS WILL HAVE ANY LIABILITY TO ANY PERSON OR HOLDER ARISING FROM OR RELATED TO THE FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES OF THE PLAN OR THE FOREGOING DISCUSSION.**

## ARTICLE XIV.

## CONCLUSION

The Company believes that confirmation and implementation of the Prepackaged Plan is preferable to any of the alternatives described herein because it will provide the greatest recovery to holders of Claims and Interests.  Other alternatives would involve significant delay, uncertainty and substantial administrative costs and are likely to reduce any return to creditors who hold Claims or Interests.

Dated: July 13, 2012
　　　　New York, New York

　　　　　　　　　　　　　　　　Respectfully submitted,

　　　　　　　　　　　　　　　　Broadview Networks Holdings, Inc.
　　　　　　　　　　　　　　　　on behalf of itself and its Affiliates


　　　　　　　　　　　　　　　　By:  /s/ Michael K. Robinson
　　　　　　　　　　　　　　　　　　Michael K. Robinson
　　　　　　　　　　　　　　　　　　President and Chief Executive Officer


Counsel:

WILLKIE FARR & GALLAGHER LLP

787 Seventh Avenue
New York, NY 10019
(212) 728-8000
Counsel for the Company

[THIS PAGE INTENTIONALLY LEFT BLANK]

## **Exhibits**

- Prepackaged Plan (Exhibit 1)

- Restructuring Support Agreement (Exhibit 2)

- Prepetition Organizational Chart (Exhibit 3)

- Audited Consolidated Financial Statements for the Company for the fiscal year ended December 31, 2011 (Exhibit 4)

- Liquidation Analysis (Exhibit 5)

- Reorganized Company's Projected Financial Information (Exhibit 6)

- New Senior Secured Notes Indenture (Exhibit 7)

- Valuation Analysis (Exhibit 8)

[THIS PAGE INTENTIONALLY LEFT BLANK]