## EXHIBIT 2

**Restructuring Support Agreement**

## RESTRUCTURING SUPPORT AGREEMENT

Reference is made to (i) that certain Credit Agreement, dated as of August 23, 2006, by and among Broadview Networks Holdings, Inc., Broadview Networks, Inc., Broadview Networks of Massachusetts, Inc., Broadview Networks of Virginia, Inc., and Bridgecom International, Inc., as borrowers, the lenders party thereto (collectively, the "Revolving Lenders"), and The CIT Group/Business Credit, Inc., as administrative agent, collateral agent and documentation agent, amended as of July 27, 2007, November 12, 2010, December 8, 2011 and May 31, 2012 (as further amended, supplemented or otherwise modified, together with ancillary documents, the "Revolving Credit Agreement"); and (ii) those certain 11 3/8% Senior Secured Notes due 2012 (the "Notes"), issued pursuant to that certain Indenture, dated as of August 23, 2006, among Broadview Networks Holdings, Inc., as issuer, the guarantors named therein, and The Bank of New York as trustee and collateral agent, supplemented as of September 29, 2006, May 14, 2007 and May 31, 2007 (as further amended, supplemented or otherwise modified, together with ancillary documents, the "Indenture").

This RESTRUCTURING SUPPORT AGREEMENT is made and entered into as of July 13, 2012 (as amended, supplemented or otherwise modified, this "Support Agreement") by each of Broadview Networks Holdings, Inc. ("BNHI") and each of its direct and indirect subsidiaries (collectively, the "Company"), the undersigned holders of preferred and common stock in BNHI (collectively, the "Consenting Equity Holders") and the holders of the Notes that are from time to time party hereto (collectively, the "Consenting Noteholders" and, together with the Consenting Equity Holders, the "Plan Support Parties") with respect to a restructuring of the Company's outstanding obligations under the Revolving Credit Agreement, the Notes and the Indenture (the "Restructuring") contemplated by the restructuring term sheet attached hereto as Exhibit A (the "Term Sheet"). Each party to this Support Agreement may be referred to as a "Party" and, collectively, as the "Parties."

**Section 1.  Restructuring, Term Sheet and Definitive Documentation.**

**1.1    Support of the Restructuring, Term Sheet and Definitive Documentation.**

(a)    Until the Termination Date (as defined below), the Company and the Plan Support Parties, severally and not jointly, agree (i) to support and consummate the Restructuring contemplated by the Term Sheet, including (A) the Company's granting of a first priority priming lien on its existing and after-acquired assets pursuant to the terms of the DIP Facility (as defined herein), and (B) subject to Section 2.1(r) of this Support Agreement, cooperating in a commercially reasonable manner obtaining requisite regulatory approvals, including the timely provision of necessary information for any required regulatory submissions or other governmental filings, (ii) that the Company shall solicit holders of Notes (each, a "Noteholder" and, collectively, the "Noteholders") for acceptances of the Restructuring, (iii) that the Company shall solicit holders of BNHI's Series A, A-1, B, B-1 and C Preferred Stock (the

"Preferred Stock" and, together with all other equity interests in BNHI, the "Equity") for acceptances of the Restructuring, and (iv) the Company shall consummate the Restructuring either through the Chapter 11 Cases (as defined herein) or out of court in accordance with applicable law.

(b)     Until the Termination Date, the Company, jointly and severally, agrees: (i) to take any and all necessary and appropriate actions in furtherance of the Restructuring contemplated under this Support Agreement and the Term Sheet, (ii) to commence a solicitation for acceptances of a prepackaged chapter 11 plan of reorganization for the Company, which, in the Company's sole discretion, may be combined with an exchange offer for the Notes (provided that any such exchange offer shall result in 100% of the Notes being exchanged for the consideration described in the Term Sheet), in accordance with the terms of this Support Agreement and the Term Sheet (the "Solicitation"), (iii) if necessary to consummate the Restructuring, to commence reorganization cases (the "Chapter 11 Cases") by filing voluntary petitions under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"), (iv) if the Chapter 11 Cases are filed, to file and seek approval on an interim and final (to the extent applicable) basis of "first day" motions (including, if necessary, a motion seeking approval of a post-petition credit facility (the "DIP Facility") (the material terms of any such DIP Facility (excluding the identity of the lender(s)) to be in form and substance reasonably satisfactory to the Required Consenting Noteholders (as defined below)) and consensual use of cash pledged as collateral to the Revolving Lenders and the Noteholders and providing adequate protection to the Revolving Lenders and the Noteholders in connection therewith consisting, *inter alia* of monthly cash interest on the Notes at a rate of 10.5% per annum), each of which shall be in form and substance reasonably acceptable to Fidelity Management & Research Company, BlackRock Financial Management, Inc., MSD Credit Opportunity Master Fund, L.P. and Watershed Asset Management, L.L.C. (each as a holder, fund manager or account manager, as the case may be, collectively, the "Required Consenting Noteholders"), (v) if the Chapter 11 Cases are filed, to file a prepackaged chapter 11 plan of reorganization substantially in the form attached hereto as Exhibit B (the "Plan"), and a related offering memorandum and disclosure statement (the "Disclosure Statement"), the Plan and Disclosure Statement each in form and substance reasonably satisfactory to the Required Consenting Noteholders, with the Bankruptcy Court and seek approval of the Disclosure Statement and confirmation of the Plan, (vi) to take any and all necessary and appropriate actions in furtherance of all of the restructuring transactions contemplated under this Support Agreement, the Plan (if applicable) and the Term Sheet, (vii) pay all reasonable, actual and documented fees and expenses of Dechert LLP and FTI Consulting incurred pursuant to their representation of the Required Consenting Noteholders in connection with the Restructuring, in

2

accordance with the terms of the fee arrangements agreed between the Company and such advisors which were incurred prior to the Termination Date, regardless of whether such fees were billed prior to or after the Termination Date; notwithstanding the foregoing, the termination of this Support Agreement shall not affect the Company's obligations to pay the fees and expenses of Dechert LLP and FTI Consulting in accordance with any applicable order of the Bankruptcy Court, (viii) that any agreement that the Company enters into with any of the Revolving Lenders (including, without limitation, any amendment, modification, supplement or amendment and restatement to the Revolving Credit Agreement, any restructuring support agreement or any settlement agreement) shall be, in form and substance, reasonably satisfactory to the Required Consenting Noteholders, and (ix) that any DIP Facility shall be reasonably satisfactory to the Required Consenting Noteholders and consistent with the terms of this Support Agreement.

(c)     Until the Termination Date, each Consenting Noteholder, severally and not jointly, in its capacity as a holder of Notes, or in any other capacity, hereby agrees to (i) when solicited, and subject to the acknowledgements set forth in Section 7 hereof, exchange all Notes now or hereafter beneficially owned by such Consenting Noteholder or for which such Consenting Noteholder now or hereafter serves as the nominee, investment manager or advisor for beneficial holders, if applicable, and for which such Consenting Noteholder has sole voting power, and concurrently vote all such Notes in favor of the Plan and not change or withdraw (or cause to be changed or withdrawn) such agreement to exchange or such vote (provided, that if any such exchange offer fails to result in the exchange of 100% of the Notes for the consideration set forth in the Term Sheet, then, in its sole discretion, each Consenting Noteholder may withdraw its acceptance of the exchange offer), (ii) if the Chapter 11 Cases are filed, at the sole cost of the Company, use its reasonable efforts to support confirmation of the Plan and approval of the Disclosure Statement, and not object to, or support any other person's efforts to oppose or object to, confirmation of the Plan, (iii) at the sole cost of the Company, use its reasonable efforts to support (and not object to) the "first day" motions and other motions consistent with this Support Agreement filed by the Company in furtherance of the Restructuring, including one motion to preserve or extend exclusivity, if applicable, (iv) refrain from taking any action that is materially inconsistent with, or that would materially delay or impede approval, confirmation or consummation of the Restructuring, the Plan (if applicable), or that is otherwise inconsistent with the terms of this Support Agreement and the Term Sheet, and (v) not, directly or indirectly, propose, support, solicit, encourage, or participate in the formulation of any restructuring for the Company, including any plan of reorganization or liquidation in the Chapter 11 Cases other than the Restructuring contemplated by this Support Agreement and the Term Sheet.

(d)     Until the Termination Date, each Consenting Equity Holder, severally and not jointly, in its capacity as a holder of Equity, or in any other capacity, hereby agrees to (i) when solicited, and subject to the acknowledgements set forth in Section 7 hereof, vote all Preferred Stock held by such Consenting Equity Holder in favor of the Plan and not change or withdraw (or cause to be changed or withdrawn) such vote, (ii) if the Chapter 11 Cases are filed, use its reasonable efforts to support confirmation of the Plan and approval of the Disclosure Statement, and not object to, or support any other person's efforts to oppose or object to, confirmation of the Plan, (iii) use its reasonable efforts to support (and not object to) the "first day" motions and other motions consistent with this Support Agreement filed by the Company in furtherance of the Restructuring, including motions to preserve or extend exclusivity, if applicable, (iv) refrain from taking any action that is inconsistent with, or that would materially delay or impede approval, confirmation or consummation of the Restructuring, the Plan (if applicable), or that is otherwise inconsistent with the terms of this Support Agreement and the Term Sheet, and (v) not, directly or indirectly, propose, support, solicit, encourage, or participate in the formulation of any restructuring for the Company, including any plan of reorganization or liquidation in the Chapter 11 Cases, other than the Restructuring contemplated by this Support Agreement and the Term Sheet.

(e)     Without limiting any other provision hereof, until the Termination Date, the Company, each Consenting Equity Holder, and the Consenting Noteholders hereby agree to negotiate in good faith each of the definitive agreements, documents, motions and other pleadings referenced in, or reasonably necessary or desirable to effectuate the transactions contemplated by, the Term Sheet. Such definitive agreements and documents may include, without limitation, the Plan, the Disclosure Statement, a DIP Facility, if necessary, an exit revolving credit agreement, a new indenture, an intercreditor agreement, guaranties, collateral agreements, shareholders agreement and all motions, including but not limited to the "first-days," the Plan and the Disclosure Statement motions, all of which shall be in form and substance reasonably satisfactory to the Required Consenting Noteholders and shall be consistent in all respects with and incorporate, as applicable, the terms of the Term Sheet (collectively, the "Definitive Documentation"). The Company or the Required Consenting Noteholders, as applicable, agrees to timely deliver drafts of all such Definitive Documentation such that the other Parties shall, where exigencies permit, have sufficient time to review and provide comments on the same.

(f)     Each of the Parties agrees, severally and not jointly, that, unless this Support Agreement is terminated in accordance with the terms hereof, and except with respect to the exercise of its rights hereunder, it will not take any action that would interfere with, delay, or postpone the effectuation of

4

the Restructuring contemplated by this Support Agreement and the Term Sheet and, if necessary, confirmation and consummation of the Plan and implementation of the restructuring transactions contemplated thereunder.

**Section 2.  Termination Events.**

**2.1    Noteholder Termination Events.**

The occurrence of any of the following shall be a "Noteholder Termination Event":

(a)    11:59 p.m. (EST) on July 16, 2012, unless the Solicitation has commenced;

(b)    11:59 p.m. (EST) on the date that is thirty-five (35) days from the date that Solicitation commences, unless either the Restructuring has been consummated, or the Chapter 11 Cases have commenced in the Bankruptcy Court;

(c)    if the Chapter 11 Cases are filed, three Business Days after the date of the commencement of the Chapter 11 Cases (the "Petition Date"), unless the Bankruptcy Court enters an interim order in form and substance reasonably satisfactory to the Company, the Revolving Lenders and the Required Consenting Noteholders, authorizing the Company to enter into the DIP Facility and use cash collateral, granting adequate protection to the Revolving Lenders and the Noteholders (which shall include the reimbursement of all reasonable, actual and documented fees and expenses of Dechert LLP and FTI Consulting and adequate protection to the Noteholders consisting, *inter alia*, of monthly cash interest on the Notes at a rate of 10.5% per annum), and scheduling a final hearing with respect to such matters;

(d)    if the Chapter 11 Cases are filed, forty calendar days after the Petition Date, unless the Bankruptcy Court enters a final order, in form and substance reasonably satisfactory to the Company and the Required Consenting Noteholders, authorizing the Company to enter into the DIP Facility, use cash collateral, and granting adequate protection to the Revolving Lenders and the Noteholders (which shall include the reimbursement of all reasonable, actual and documented fees and expenses of Dechert LLP and FTI Consulting and adequate protection to the Noteholders consisting, *inter alia*, of monthly cash interest on the Notes at a rate of 10.5% per annum);

(e)    if the Chapter 11 Cases are filed, five calendar days after the Petition Date, unless the Company has filed the Plan and the Disclosure Statement with the Bankruptcy Court;

(f)     if the Chapter 11 Cases are filed, sixty-five calendar days after the Petition Date, unless the Bankruptcy Court has entered an order approving the Plan and Disclosure Statement (the "Confirmation Order");

(g)     if the Chapter 11 Cases are filed, thirty calendar days after the date upon which the Confirmation Order is entered, unless the Company has substantially consummated the Plan pursuant to its terms prior thereto (the "Effective Date Deadline"), provided, however, that the Effective Date Deadline shall be automatically extended by an additional sixty calendar days if the Company has not yet obtained the requisite clearances or approvals under any applicable laws or regulations for the consummation of the Plan, and the requests for such clearances or approvals are still pending;

(h)     any court of competent jurisdiction or other competent governmental or regulatory authority issues a final, non-appealable order making illegal or otherwise preventing or prohibiting the consummation of the transactions contemplated in the Term Sheet or any of the Definitive Documentation in a way that cannot be reasonably remedied by the Company subject to the reasonable satisfaction of the Required Consenting Noteholders;

(i)     the occurrence of any material breach of this Support Agreement, the Indenture, the Revolving Credit Agreement, the Notes and any and all documents relating thereto by the Company (to the extent not otherwise cured or waived in accordance with the terms hereof);

(j)     if the Chapter 11 Cases are filed, any of the Chapter 11 Cases shall be dismissed or converted to a chapter 7 case, or a chapter 11 trustee with plenary powers, or an examiner with enlarged powers relating to the operation of the businesses of the Company (powers beyond those set forth in section 1106(a)(3) and (4) of the Bankruptcy Code) shall be appointed in any of the Chapter 11 Cases or the Company shall file a motion or other request for such relief;

(k)     the Company takes any action that is materially inconsistent with the Company's obligations pursuant to Section 1.1 hereof or materially adverse to the Consenting Noteholders, including, but not limited to, withdrawing the Plan (if applicable), publicly announcing its intention not to support the Plan or filing any plan of reorganization and/or disclosure statement that is not consistent with the Term Sheet;

(l)     a filing by the Company of any motion, application or adversary proceeding challenging the validity, enforceability, perfection or priority of or seeking avoidance of the liens securing the obligations referred to in the Indenture or the documents related thereto (collectively, the "Secured Obligations") or, other than as contemplated by the Restructuring, any other cause of action against and/or seeking to restrict the rights of the

Noteholders with respect to the Secured Obligations, or the prepetition liens securing such Secured Obligations (or if the Company supports any such motion, application or adversary proceeding commenced by any third party or consents to the standing of any such third party);

(m)     if the Chapter 11 Cases are filed, the amendment or modification of the Plan, the Disclosure Statement or any documents related to the Plan, notices, exhibits or appendices, without the reasonable consent of the Required Consenting Noteholders, which amendment or modification is (i) materially inconsistent with this Support Agreement, (ii) inconsistent with the Term Sheet, or (iii) materially adverse to the Consenting Noteholders;

(n)     if the Chapter 11 Cases are filed, the occurrence of either (i) an acceleration of the obligations or termination of commitments under the DIP Facility, (ii) the termination or revocation of any interim or final debtor-in-possession financing and/or cash collateral order entered in the Chapter 11 Cases, or (iii) a modification or amendment of any interim or final debtor-in-possession financing and/or cash collateral order entered in the Chapter 11 Cases that is not reasonably satisfactory to the Required Consenting Noteholders;

(o)     the board of directors of BNHI (the "Board of Directors") terminates this Support Agreement pursuant to Section 3 hereof (a "Board Termination");

(p)     the failure by the Company to have substantially consummated the Restructuring pursuant to the terms of this Support Agreement and the Term Sheet prior to December 31, 2012; provided, however, that such date shall be automatically extended by an additional sixty calendar days if the Company has not yet obtained the requisite clearances or approvals under any applicable laws or regulations for the consummation of the Plan, and the requests for such clearances or approvals are still pending;

(q)     the Company does not: (i) enter into a restructuring support agreement or similar agreement, or a maturity extension with respect to the Revolving Credit Agreement, with the Revolving Lenders by August 1, 2012; or (ii) satisfy the obligations owing under the Revolving Credit Agreement in full and, in connection therewith, receive a pay-off letter in form and substance reasonably satisfactory to the Required Consenting Noteholders by August 1, 2012; and

(r)     if the transactions contemplated by the Restructuring: (i) result in regulatory requirements or filings (disclosure or otherwise), other than (x) initial Federal Communications Commission or state public utility commission filings that contain information of a type set forth on Schedule A, (y) a statement filed in compliance with Rule 2019 of the Federal Rule of Bankruptcy Procedure, or (z) a routine tax filing; or

7

(ii) cause other legal requirements, restrictions or obligations (other than that expressly undertaken by the execution of this Support Agreement) with respect to a Consenting Noteholder that are not acceptable or otherwise not satisfactory to such Consenting Noteholder, in its sole and absolute discretion; <u>provided</u> that such Consenting Noteholder and the other Parties have used commercially reasonable efforts to avoid or modify any such applicable requirements, filings, restrictions, obligations by proposing to the Parties modified series, classes or terms of the securities the Consenting Noteholder is to be offered in connection with the Restructuring prior to asserting a Noteholder Termination Event under this Section 2.1; <u>provided</u>, <u>further</u> that the undertaking in this Section 2.1(r) to use commercially reasonable efforts shall not be construed as an obligation to disclose financial or other information other than that which is expressly agreed to in this Section 2.1(r).

**2.2**     **<u>Equity Holder Termination Events</u>**.

The occurrence of any of the following shall be an "<u>Equity Holder Termination Event</u>":

(a)     if the Chapter 11 Cases are filed, any of the Chapter 11 Cases shall be dismissed or converted to a chapter 7 case, or a chapter 11 trustee with plenary powers, or an examiner with enlarged powers relating to the operation of the businesses of the Company (powers beyond those set forth in section 1106(a)(3) and (4) of the Bankruptcy Code) shall be appointed in any of the Chapter 11 Cases or the Company shall file a motion or other request for such relief;

(b)     the Company takes any action that is materially inconsistent with the Company's obligations pursuant to Section 1.1 hereof and materially adverse to the Consenting Equity Holders, including, but not limited to, modifying this Support Agreement in a manner materially adverse to the Consenting Equity Holders, withdrawing the Plan (if applicable), publicly announcing its intention not to support the Plan or filing any plan of reorganization and/or disclosure statement that is not consistent with the Term Sheet;

(c)     if the Chapter 11 Cases are filed, the amendment or modification of the Plan, the Disclosure Statement or any documents related to the Plan, notices, exhibits or appendices, which amendment or modification is materially (i) inconsistent with this Support Agreement and the Term Sheet, and (ii) adverse to the Consenting Equity Holders;

(d)     any court of competent jurisdiction or other competent governmental or regulatory authority issues a final, non-appealable order making illegal or otherwise preventing or prohibiting the consummation of the Restructuring contemplated in the Term Sheet or any of the Definitive

8

Documentation in a way that cannot be reasonably remedied by the Company subject to the reasonable satisfaction of the Required Consenting Noteholders; or

(e)     the failure by the Company to have substantially consummated the Restructuring pursuant to the terms of this Support Agreement and the Term Sheet prior to December 31, 2012; <u>provided</u>, <u>however</u>, that such date shall be automatically extended by an additional sixty calendar days if the Company has not yet obtained the requisite clearances or approvals under any applicable laws or regulations for the consummation of the Plan, and the requests for such clearances or approvals are still pending.

**2.3     <u>Company Termination Events</u>**.

The occurrence of any of the following shall be a "<u>Company Termination Event</u>" and together with any Equity Holder Termination Event and any Noteholder Termination Event, a "<u>Termination Event</u>":

(a)     any Board Termination;

(b)     the Consenting Noteholders at any time hold less than 66% of the principal amount of the Notes;

(c)     one or more Consenting Noteholders materially breaches its obligations under this Support Agreement, such that the non-breaching Consenting Noteholders at any time hold less than 66% of the principal amount of the Notes;

(d)     any court of competent jurisdiction or other competent governmental or regulatory authority issues a final, non-appealable order making illegal or otherwise preventing or prohibiting the consummation of the Restructuring contemplated in the Term Sheet or any of the Definitive Documentation in a way that cannot be reasonably remedied by the Company subject to the reasonable satisfaction of the Required Consenting Noteholders;

(e)     August 15, 2012, unless the Company has received acceptances by holders representing at least 66 2/3% of the principal amount of the Notes pursuant to the Solicitation; or

(f)     the failure by the Company to have substantially consummated the Restructuring pursuant to the terms of this Support Agreement and the Term Sheet prior to December 31, 2012; <u>provided</u>, <u>however</u>, that such date shall be automatically extended by an additional sixty calendar days if the Company has not yet obtained the requisite clearances or approvals under any applicable laws or regulations for the consummation of the Plan, and the requests for such clearances or approvals are still pending.

**2.4**     **Consensual Termination.**

In addition to the Termination Events set forth in Section 2 hereof, this Support Agreement shall terminate effective upon a written agreement of the Company and the Required Consenting Noteholders to terminate this Support Agreement.

**2.5**     **Termination Event Procedures.**

(a)     Company Termination Event Procedures.  Upon the occurrence of any Company Termination Event, the termination of this Support Agreement shall be effective upon delivery of written notice to counsel to the Required Consenting Noteholders by the Company (the date of the effectiveness of such termination, the "Company Termination Date").

(b)     Noteholder Termination Event Procedures.  Upon the occurrence of (i) a Noteholder Termination Event under subsections 2.1 (h), (j), (l), (n) or (o) of this Support Agreement, this Support Agreement shall terminate automatically without further action, (ii) the Company withdrawing the Plan (if applicable), publicly announcing its intention not to support the Plan or filing any plan of reorganization and/or disclosure statement that is materially inconsistent with the Term Sheet, this Support Agreement shall terminate automatically without further action, and (iii) a Noteholder Termination Event under subsections 2.1 (a), (b), (c), (d), (e), (f), (g), (i), (k), (m), (p), (q) or (r) of this Support Agreement, this Support Agreement shall terminate three (3) Business Days after counsel to the Required Consenting Noteholders shall have given written notice to the Company of the intent to terminate this Support Agreement and the breach or other matter giving rise to the right to so terminate this Support Agreement shall not have been cured during the three (3) Business Day period after receipt of such notice (the date of termination under clause (i), (ii) or (iii) hereof, the "Noteholder Termination Date").  The automatic stay arising pursuant to section 362 of the Bankruptcy Code shall be deemed waived or modified for purposes of providing notice hereunder. Except as otherwise provided herein, upon termination of this Support Agreement, the Consenting Noteholders shall be released from their respective commitments, undertakings and agreements under or related to this Support Agreement and shall have the rights and remedies that they would have had and shall be entitled to take all actions that they would have been entitled to take had they not entered into this Support Agreement.  Without limiting the foregoing, in the event of a termination of this Support Agreement for any reason, each Consenting Noteholder shall have the right to withdraw any vote in support of the Plan and revoke any acceptance of an offer to exchange its Notes in its sole and absolute discretion and the Company agrees that it shall not oppose such withdrawal or revocation.

(c)        Equity Holder Termination Event Procedures.  Upon the occurrence of an Equity Holder Termination Event under (i) subsections 2.2 (a), or (d) of this Support Agreement, this Support Agreement shall terminate automatically without further action, (ii) subsections 2.2 (b), (c) or (e) of this Support Agreement, this Support Agreement shall terminate, as to the Consenting Equity Holders only, five Business Days after counsel to the Consenting Equity Holders shall have given written notice to the Company of the intent to terminate this Support Agreement as to the Consenting Equity Holders and the breach or other matter giving rise to the right to so terminate this Support Agreement shall not have been cured during the five Business Day period after receipt of such notice (the date of termination under clause (i) hereof, together with the Company Terminate Date and the Noteholder Termination Date, the "Termination Date").  The automatic stay arising pursuant to section 362 of the Bankruptcy Code shall be deemed waived or modified for purposes of providing notice hereunder.

**2.6**     **Limitation on Termination.**

Except with respect to a Board Termination, no occurrence shall constitute a Termination Event if such occurrence is the result of the action or omission of the Party seeking to terminate this Support Agreement.

**Section 3.  The Company's Fiduciary Obligations.**

Notwithstanding anything to the contrary herein, (a) nothing herein requires the Company or the Board of Directors to breach any fiduciary obligations it has under applicable law; and (b) to the extent that such fiduciary obligations require the Company or the Board of Directors to terminate its obligations under this Support Agreement and the Term Sheet, it may do so without incurring any liability to any Plan Support Party under this Support Agreement or the Term Sheet.  In the event that the Company or the Board of Directors determines that its fiduciary duties require it to terminate this Support Agreement, the Company shall provide five (5) Business Days written notice to counsel to the Required Consenting Noteholders.

**Section 4.  Condition Precedent to Support Agreement.**

The obligations of the Parties and the effectiveness hereof are subject to the execution and delivery of signature pages for this Support Agreement by each of the Company, Consenting Equity Holders holding no less that 66% of the aggregate shares of Preferred Stock, and Consenting Noteholders holding no less than 66% of the principal amount of the Notes (the date upon which such condition is satisfied, the "Effective Date").

**Section 5.  Representations, Warranties and Covenants.**

**5.1  Power and Authority.**

Each Plan Support Party, severally and not jointly, represents, warrants and covenants to the Company, and the Company, jointly and severally, represents, warrants and covenants to each Plan Support Party, that, as of the date of this Support Agreement, (i) such Party has and shall maintain all requisite corporate, partnership, or limited liability company power and authority to enter into this Support Agreement and to carry out the transactions contemplated by, and perform its respective obligations under this Support Agreement and (ii) the execution and delivery of this Support Agreement and the performance of its obligations hereunder have been duly authorized by all necessary action on its part.

**5.2  Enforceability.**

Each Plan Support Party, severally and not jointly, represents, warrants and covenants to the Company, and the Company, jointly and severally, represents, warrants and covenants to each Plan Support Party, that this Support Agreement is the legally valid and binding obligation of it, enforceable in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization or other similar laws limiting creditors' rights generally or by equitable principles relating to enforceability or ruling of the Bankruptcy Court.

**5.3  Governmental Consents.**

Each Plan Support Party, severally and not jointly, represents, warrants and covenants to the Company, and the Company, jointly and severally, represents, warrants and covenants to each Plan Support Party that, as of the date of this Support Agreement, the execution, delivery, and performance by it of this Support Agreement does not and shall not require any registration or filing with, consent or approval of, or notice to, or other action to, with, or by, any Federal, state, or other governmental authority or regulatory body, except (i) any of the foregoing as may be necessary and/or required for disclosure by the Securities and Exchange Commission and applicable state securities or "blue sky" laws, (ii) any of the foregoing as may be necessary and/or required in connection with the Chapter 11 Cases, including the approval of the Disclosure Statement and confirmation of the Plan, (iii) filings of amended certificates of incorporation or articles of formation or other organizational documents with applicable state authorities, and other registrations, filings, consents, approvals, notices, or other actions that are reasonably necessary to maintain permits, licenses, qualifications, and governmental approvals to carry on the business of the Company, (iv) any of the foregoing as may be necessary and/or required pursuant to the rules, regulations and governing statutes for the Federal Communications Commission and any applicable state public utility commissions or similar federal, state, local or foreign regulatory entities, and (v) any other registrations, filings, consents, approvals, notices, or other actions, the failure of which to make, obtain or take, as applicable, would not be reasonably likely, individually

or in the aggregate, to materially delay or materially impair the ability of any Party hereto to consummate the transactions contemplated hereby.

**5.4** **Ownership.**

    (a)    Each Consenting Noteholder, severally and not jointly, represents, warrants and covenants to the Company that, without limiting the ability to sell, transfer or assign the Notes, subject to Section 8 below, (i) such Party is the legal owner of the Notes in the principal amounts indicated on such Consenting Noteholder's signature page hereto, and has and shall maintain the power and authority to bind the legal and beneficial owner(s) of such Notes to the terms of this Support Agreement, (ii) such Consenting Noteholder (a) has and shall maintain full power and authority to vote on and consent to or (b) has received direction from the party having full power and authority to vote on and consent to such matters concerning its pro rata share of the Notes and to exchange, assign and transfer such Notes, and (iii) other than pursuant to this Support Agreement, such Notes are and shall continue to be free and clear of any pledge, lien, security interest, charge, claim, equity, option, proxy, voting restriction, right of first refusal or other limitation on disposition, or encumbrances of any kind, that would materially and adversely affect in any way such Consenting Noteholder's performance of its obligations contained in this Support Agreement.

    (b)    Each Consenting Equity Holder, severally and not jointly, represents, warrants and covenants to the Company that (i) such Party is the legal owner of the Equity in the amount indicated on such Consenting Equity Holder's signature page hereto, and has and shall maintain the power and authority to bind the legal and beneficial owner(s) of such Equity to the terms of this Support Agreement, (ii) such Consenting Equity Holder (a) has and shall maintain full power and authority to vote on and consent to or (b) has received direction from the party having full power and authority to vote on and consent to such matters concerning its Equity, and (iii) other than pursuant to this Support Agreement and the terms of Third Amended and Restated Shareholders' Agreement, dated May 31, 2007, as amended, modified or supplemented from time to time, such Equity is and shall continue to be free and clear of any pledge, lien, security interest, charge, claim, equity, option, proxy, voting restriction, right of first refusal or other limitation on disposition, or encumbrances of any kind, that would adversely affect in any way such Consenting Equity Holder's performance of its obligations contained in this Support Agreement.

**5.5** **Other Support Agreements.**

Until the Termination Date, the Company shall not enter into any other restructuring support agreement related to a partial or total restructuring of the

13

Company's obligations unless such support agreement is not inconsistent with the Term Sheet.

### Section 6.  Remedies.

It is understood and agreed by each of the Parties that any breach of this Support Agreement would give rise to irreparable harm for which money damages would not be an adequate remedy and accordingly the Parties agree that, in addition to any other remedies, each non-breaching Party shall be entitled to specific performance and injunctive or other equitable relief for any such breach.  The Company and the Plan Support Parties agree that for so long as the Company and the Plan Support Parties have not taken any action to prejudice the enforceability of this Support Agreement (including without limitation, alleging in any pleading that this Support Agreement is unenforceable), and have taken such actions as are reasonably required or desirable for the enforcement hereof, then the Company and the Plan Support Parties shall have no liability for damages hereunder in the event a court determines that this Support Agreement is not enforceable.

### Section 7.  Acknowledgement.

This Support Agreement and the Term Sheet and transactions contemplated herein and therein are the product of negotiations among the Parties, together with their respective representatives.  Notwithstanding anything herein to the contrary, this Support Agreement is not, and shall not be deemed to be, a solicitation of votes for the acceptance of the Plan or any plan of reorganization for the purposes of sections 1125 and 1126 of the Bankruptcy Code or otherwise.  Notwithstanding anything herein to the contrary, the Company will not solicit acceptances of the Plan from any Plan Support Party until such Plan Support Party has been provided with a Disclosure Statement which complies with applicable nonbankruptcy law pursuant to the Solicitation.

### Section 8.  Miscellaneous Terms.

### 8.1    Assignment; Transfer Restrictions.

(a)    Each Plan Support Party hereby agrees, severally and not jointly, for so long as this Support Agreement shall remain in effect, not to sell, assign, transfer, hypothecate or otherwise dispose of any Equity or Notes unless, as a condition precedent to any such transaction, the transferee thereof executes and delivers a Joinder (as defined in Section 8.1(c) hereof) to the Company at least two (2) Business Days prior to the relevant transfer. Thereafter, such transferee shall be deemed to be a Consenting Noteholder or Consenting Equity Holder, as applicable, for purposes of this Support Agreement.

(b)    Any sale, assignment, transfer, hypothecation or other disposition of any Note or share of Equity that either (i) does not comply with the procedures set forth in subsection 8.1(a) hereof; or (ii) acts to delay or otherwise

14

materially effects the regulatory approvals required for the consummation of the Restructuring, shall be deemed void *ab initio*.

(c)     Any person that receives or acquires Notes or Equity pursuant to a sale, assignment, transfer, hypothecation or other disposition of such Notes or Equity by a Plan Support Party hereby agrees to be bound by all of the terms of this Support Agreement (as the same may be hereafter amended, restated or otherwise modified from time to time) (a "Joining Party") by executing and delivering a joinder in the form of Exhibit C hereto (the "Joinder"). The Joining Party shall thereafter be deemed to be a "Consenting Noteholder" or "Consenting Equity Holder," as applicable, and a Party for all purposes under this Support Agreement.

(d)     With respect to the Notes or Equity held by any Joining Party upon consummation of the sale, assignment, transfer, hypothecation or other disposition of such Notes or Equity, the Joining Party hereby makes the representations and warranties of the Consenting Noteholders or Consenting Equity Holders, as applicable, set forth in Section 5 of this Support Agreement to the Company.

(e)     This Support Agreement shall in no way be construed to preclude any Plan Support Party from acquiring additional Notes, Equity, or any other claim against or interest in the Company; provided that any such Notes, Equity or claim against or interest in the Company, shall automatically be deemed to be subject to the terms of this Support Agreement.

**8.2     No Third Party Beneficiaries.**

Unless expressly stated herein, this Support Agreement shall be solely for the benefit of the Company and each Plan Support Party. No other person or entity shall be a third party beneficiary.

**8.3     Entire Agreement.**

This Support Agreement, including exhibits and annexes hereto, constitutes the entire agreement of the Parties with respect to the subject matter of this Support Agreement, and supersedes all other prior negotiations, agreements, and understandings, whether written or oral, among the Parties with respect to the subject matter of this Support Agreement; provided, however, that any confidentiality agreement executed by any Party shall survive this Support Agreement and shall continue in full force and effect, subject to the terms thereof, irrespective of the terms hereof.

**8.4     Reporting Obligations.**

The Company shall provide to the counsel and financial advisors to the Required Consenting Noteholders the information and reports that are required pursuant to the DIP Facility to be provided to the lenders thereunder. Such information and reports shall be deemed to be "Advisors' Eyes Only" and shall only be disseminated to counsel or

15

financial advisors to the Required Consenting Noteholders, unless the Company otherwise consents.

**8.5     Counterparts.**

This Support Agreement may be executed in one or more counterparts, each of which shall be deemed an original and all of which shall constitute one and the same agreement.  Delivery of an executed signature page of this Support Agreement by email or facsimile transmission shall be as effective as delivery of a manually executed counterpart hereof.

**8.6     Settlement Discussions.**

This Support Agreement and the Term Sheet are part of a proposed settlement of disputes among the Parties hereto.  Nothing herein shall be deemed to be an admission of any kind.  Pursuant to Federal Rule of Evidence 408 and any applicable state rules of evidence, this Support Agreement and all negotiations relating thereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce the terms of this Support Agreement or in connection with the confirmation of the Plan.

**8.7     Reservation of Rights.**

(a)     Except as expressly provided in this Support Agreement or in any applicable confidentiality agreement, nothing herein is intended to, does or shall be deemed in any manner to limit (i) the ability of a Consenting Noteholder to consult with other Consenting Noteholders or the Company, (ii) the rights of a Plan Support Party to be heard as a party in interest in the Chapter 11 Cases, or (iii) the rights of a Consenting Noteholder to defend against any objection to, or estimation of, any of its Notes, or any other claims it may hold against the Company, in each case so long as such consultation, appearance or defense is consistent with the Plan Support Party's obligations under this Support Agreement.

(b)     If the transactions contemplated by this Support Agreement and in the Term Sheet are not consummated as provided herein, if a Termination Date occurs, or if this Support Agreement, or a Party's obligations under this Support Agreement, is otherwise terminated for any reason, each Party fully reserves any and all of its respective rights, remedies and interests (if any) under the Indenture, the Notes, the Company's organizational documents, applicable law and in equity.

(c)     For the purposes of this Support Agreement, "Consenting Noteholders" shall not include: (i) a holder of Notes that is a signatory hereto in its capacity as, or to the extent of its holdings as, a fiduciary or in a similar capacity, a broker or a dealer of (A) the Notes, or (B) any other interest in, claim against or other security in the Company; or (ii) any subsidiary or affiliate of a Consenting Noteholder (A) over which the Consenting Noteholder does not have corporate authority or control or (B) whose

16

credit decisions, including credit decisions to be bound by agreements such as this Support Agreement, under the internal policies or rules of such subsidiary or holder, are not subject to control by such Consenting Noteholder.

**8.8**  **Governing Law; Waiver of Jury Trial.**

(a)   The Parties waive all rights to trial by jury in any jurisdiction in any action, suit, or proceeding brought to resolve any dispute between the Parties arising out of this Support Agreement, whether sounding in contract, tort or otherwise.

(b)   This Support Agreement shall be governed by and construed in accordance with the laws of the State of New York and, in the event the Chapter 11 Cases are filed, the Bankruptcy Code, without regard to any conflicts of law provision which would require the application of the law of any other jurisdiction.  By its execution and delivery of this Support Agreement, each Party hereby irrevocably and unconditionally agrees for itself that, subject to Section 8.8(c) hereof, any legal action, suit or proceeding against it with respect to any matter under or arising out of or in connection with this Support Agreement or for recognition or enforcement of any judgment rendered in any such action, suit or proceeding, may be brought in any state or federal court of competent jurisdiction in New York County, State of New York, and by execution and delivery of this Support Agreement, each of the Parties hereby irrevocably accepts and submits itself to the nonexclusive jurisdiction of such court, generally and unconditionally, with respect to any such action, suit or proceedings.

(c)   Notwithstanding the foregoing, if the Chapter 11 Cases are commenced, nothing in subsections 8.8(a) or (b) hereof shall limit the authority of the Bankruptcy Court to hear any matter related to or arising out of this Support Agreement.

**8.9**  **Successors.**

This Support Agreement is intended to bind the Parties and inure to the benefit of the Plan Support Parties and the Company and each of their respective successors, assigns, heirs, executors, administrators and representatives; provided, however, that nothing contained in this Section 8.9 shall be deemed to permit any transfer, tender, vote or consent, of any claims other than in accordance with the terms of this Support Agreement.

**8.10**  **Nature of Obligations.**

Notwithstanding anything to the contrary herein, any obligations of the Plan Support Parties contained herein are several in nature and not joint obligations.

17

**8.11    Acknowledgment of Counsel.**

Each of the Parties acknowledges that it has been represented by counsel (or had the opportunity to and waived its right to do so) in connection with this Support Agreement and the transactions contemplated by this Support Agreement.  Accordingly, any rule of law or any legal decision that would provide any Party with a defense to the enforcement of the terms of this Support Agreement against such Party based upon lack of legal counsel shall have no application and is expressly waived.  The provisions of this Support Agreement shall be interpreted in a reasonable manner to effect the intent of the parties hereto. No Party shall have any term or provision construed against such Party solely by reason of such Party having drafted the same.

**8.12    Amendments, Modifications, Waivers.**

(a)    This Support Agreement (including, without limitation, the Term Sheet) may only be modified, amended or supplemented, and any of the terms thereof may only be waived, by an agreement in writing signed by each of the Company and the Required Consenting Noteholders; provided that if the modification, amendment, supplement or waiver at issue adversely impacts the treatment or rights of any Consenting Noteholder differently than other Consenting Noteholders, the agreement in writing of such Consenting Noteholder whose treatment or rights are adversely impacted in a different manner than other Consenting Noteholders shall also be required for such modification, amendment, supplement, or waiver to be effective.  Notwithstanding the foregoing, if this Support Agreement is modified in a manner materially adverse to the Consenting Equity Holders, any Consenting Equity Holder may terminate this Support Agreement as to itself only, pursuant to Section 2.2(c) hereof.

(b)    Notwithstanding Section 8.11(a) hereof, any of the dates set forth in Section 2.1 hereof may be extended by an agreement in writing by each of the Company and the Required Consenting Noteholders, which writing may be in the form of an e-mail by respective counsel to the Company and the Required Consenting Noteholders, representing that each of the Company and Required Consenting Noteholders, as applicable, agree to such extension.

**8.13    Severability of Provisions.**

If any provision of this Support Agreement for any reason is held to be invalid, illegal or unenforceable in any respect, that provision shall not affect the validity, legality or enforceability of any other provision of this Support Agreement.

**8.14    Notices.**

All notices and other communications required or permitted hereunder shall be in writing and shall be deemed given when: (a) delivered personally or by overnight courier

18

to the applicable addresses set forth below; or (b) sent by facsimile transmission or email to the parties listed below with a confirmatory copy delivered by overnight courier.

If to the Company, to:

Broadview Networks Holdings, Inc.
800 Westchester Avenue
Rye Brook, New York 10573
Attention:   Charles C. Hunter, Esq.

with a copy to (for informational purposes only):

Willkie Farr & Gallagher LLP
787 Seventh Avenue
New York, New York 10019
Attention:   Rachel C. Strickland, Esq.
                  Jennifer J. Hardy, Esq.
Telecopy:   (212) 728-8111
E-mail:       rstrickland@willkie.com
                  jhardy2@willkie.com

If to any Consenting Noteholder, to the email address set forth on its signature page, with a copy to (for informational purposes only):

Dechert LLP
1095 Avenue of the Americas
New York, New York 10036
Attention:   Michael J. Sage, Esq.
                  Michael H.M. Brown, Esq.
Telecopy:   (212) 698-3599
E-mail:       michael.sage@dechert.com
                  michael.brown@dechert.com

If to any Consenting Equity Holder to the address set forth on its signature page.

**8.15    Disclosure of Consenting Noteholder Information**

Unless required by applicable law or regulation, the Company shall not disclose the amount of Notes held by any Consenting Noteholder without the prior written consent of such Consenting Noteholder; and if such announcement or disclosure is so required by law or regulation, the Company shall afford each of the Consenting Noteholders a reasonable opportunity to (i) seek a protective order or other appropriate remedy or (ii) review and comment upon any such announcement or disclosure prior to the Company making such announcement or disclosure.  The foregoing shall not prohibit the Company from disclosing the aggregate claims of all Consenting Noteholders as a group.

IN WITNESS WHEREOF, the parties hereto have caused this Support Agreement to be executed and delivered by their respective duly authorized officers, solely in their respective capacity as officers of the undersigned and not in any other capacity, as of the date first set forth above.

BROADVIEW NETWORKS HOLDINGS, INC.,
 on behalf of itself and its subsidiaries

By:/s/ Michael K. Robinson
Name:  Michael K. Robinson
Title:  President and Chief Executive Officer

*SIGNATURE PAGE FOR RESTRUCTURING SUPPORT AGREEMENT*

[Plan Support Party Signature Pages Redacted]

*SIGNATURE PAGE FOR RESTRUCTURING SUPPORT AGREEMENT*

## SCHEDULE A

1. The name, address, citizenship and principal business of any person or entity that directly or indirectly owns at least ten percent of the equity of the applicant, and the percentage of equity owned by any such person or entity.

2. For any entity which will own ten percent or more of the carrier applicant, information regarding whether a foreign entity owns ten percent or more of such entity.

## **EXHIBIT A**

## TERM SHEET

**SUMMARY TERM SHEET FOR
PROPOSED RESTRUCTURING OF
<u>BROADVIEW NETWORKS HOLDINGS, INC.</u>**

This term sheet (this "**Term Sheet**") sets forth a brief summary of the principal terms of a proposed restructuring (the **"Restructuring"**) of the 11 3/8 % Senior Secured Notes due 2012 of Broadview Network Holdings, Inc., a Delaware Corporation (the "**Issuer**"), issued pursuant to that certain Indenture dated August 23, 2006 (as supplemented, the "**Existing Indenture**"), among the Issuer, the Guarantors named therein and The Bank of New York, as Trustee and Collateral Agent.

| PARTIES | |
|---|---|
| | |
| **Issuer (or "BNHI"):** | Broadview Networks Holdings, Inc. |
| **Guarantors:** | Substantially the same guarantors as under the Existing Indenture, other than immaterial or previously dissolved entities. |
| **Collateral Agent:** | The Bank of New York |
| | |
| **Holders:** | The legal or beneficial holders of, or fund manager or account manager with respect to, the $300,000,000 senior secured notes (collectively, the "**Existing Senior Notes**") issued pursuant to the Existing Indenture. |
| | |
| **Required Consenting Noteholders:** | Fidelity Management & Research Company<br>BlackRock Financial Management, Inc.<br>MSD Credit Opportunity Master Fund, L.P.<br>Watershed Asset Management, L.L.C.<br><br>Each as either a holder of the Existing Senior Notes or a fund manager or account manager with respect thereto. |
| | |
| **Existing Senior Notes:** | Principal Amount Outstanding: $300,000,000<br>Accrued Interest Outstanding: $17,062,500<br>Interest Rate:  11 3/8%<br>Maturity Date:  September 1, 2012 |
| | |
| **Existing Preferred Interests:** | Shares of Series A Preferred Stock, Series A-1 Preferred Stock, Series B Preferred Stock, Series B-1 Preferred Stock and Series C Preferred Stock of BNHI, issued and outstanding immediately prior to the Effective Date. |

| | |
|---|---|
| **TREATMENT OF SENIOR NOTE CLAIMS IN RESTRUCTURING** | On the effective date of the Restructuring (the "**Effective Date**"), the Existing Senior Notes shall be effectively converted, in the appropriate manner pursuant to applicable law, and in exchange therefore the Holders shall receive their pro rata share of the consideration set forth below.<br><br>New Senior Secured Notes:<br>*Issuer*: BNHI<br>*Guarantors*: Except as otherwise agreed, all direct and indirect subsidiaries of BNHI<br>*Principal Amount*: $150,000,000 senior secured notes (the "**New Senior Secured Notes**")<br>*Interest Rate*: 10.5%<br>*Default Interest Rate*: 2% in excess of the Interest Rate on any defaulted amount<br>*Maturity Date*: 5 years from issue date<br>*Optional Redemption:* The Issuer may, at its option, redeem all or any portion of the New Senior Secured Notes at the redemption prices set forth below, plus accrued and unpaid interest to the redemption date:<br><br>Within six months of issue date ................. 100%<br>Six months to 18 months following issue date 105%<br>18 months to 30 months following issue date 104%<br>30 months to 42 months following issue date 103%<br>42 months to 54 months following issue date 102%<br>54 months to 60 months following issue date 100%<br><br>*Collateral*: Not less than what is currently provided with respect to the Existing Notes.<br>*Covenants*: Substantially similar to those in the Existing Indenture, subject to the changes detailed below.<br>*Reporting Obligations*: Obligations to file financial reports with the Securities and Exchange Commission that are substantially similar to those under the Existing Indenture.<br><br>New Common Stock:<br>Of the new common stock issued by the restructured Issuer (the "**New Common Stock**"), 97.5% of the initial New Common Stock as of the Effective Date, subject to subsequent dilution by exercise of the Equity Holder Warrants (as defined below) and any equity issued under a management incentive plan (the "**MIP**").<br><br>With respect to the resolution of shareholder and regulatory |

| | |
|---|---|
| | issues relating to Holders with nominal amounts of Existing Senior Notes, including any payments proposed to be made in connection therewith, the Company and the Required Consenting Noteholders shall resolve such issues on terms satisfactory to the Required Consenting Noteholders. |
| | |
| **EXISTING INDENTURE AMENDMENTS** | The provisions of the Existing Indenture will be modified as set forth below.  Certain capitalized terms used in this "Covenants" section but not otherwise defined have the meanings set forth in the Existing Indenture.<br><br>*General*<br>• Eliminate provisions regarding ATX Acquisition and related escrow concept.<br>• Delete statement that holders of beneficial interest in voting stock of the Issuer greater than 10% are deemed to control the Issuer.<br>• Exclude votes of Affiliates under Section 2.09 only to the extent required by the Trust Indenture Act.<br>• Continuing Letter of Credit requirements to be agreed with the Required Consenting Noteholders.<br>• Eliminate offer/sale exemptions and temporary security concepts.<br>• Modify trustee provisions consistent with customary market practice.<br>• Revise such that all transactions contemplated by the pre-packaged Chapter 11 plan of reorganization in the United States Bankruptcy Court for the Southern District of New York (the "**Plan**") will be permitted.<br><br>*Limitation on Debt*<br>• Debt incurrence ratio to be 3.0:1.0 (excluding Senior Debt, as defined below).<br>• Revise definition of Consolidated Cash Flow to eliminate ability to add back equity offering costs and integration expenses.<br>• Revise definition of Consolidated Net Income to eliminate exceptions regarding extraordinary items, contingency reserves and losses on purchases of restricted subsidiaries.<br>Revise definition of Permitted Indebtedness to (i) limit intercompany indebtedness to unsecured and expressly subordinated debt and (ii) cap secured indebtedness under credit facility to $35 million (in |

|  |  |
|---|---|
|  | addition to existing basket for Capitalized Lease Obligations) with liens on the credit facility that are substantially similar to the liens securing the Revolving Credit Agreement (defined below) or as otherwise agreed among the Required Consenting Noteholders and the lenders under such credit facility ("**Senior Debt**").<br><br>• Revise definition of Pro Forma Consolidated Cash Flow to limit adjustments to those allowed under Regulation S-X and to tighten the reinvestment provision in clause (b).<br><br>*Limitation on Restricted Payments*<br>• Increase general basket to $25 million.<br>• Revise definition of Permitted Investments to add investments in licensing or contribution of intellectual property pursuant to joint marketing arrangements.<br>• Eliminate carve-outs for payment of dividends on disqualified capital stock and restricted payments made with Excluded Contributions.<br><br>*Limitation on Liens*<br>• Revise definition of Permitted Liens to add (i) liens in favor of Issuer or Restricted Subsidiaries, (ii) liens arising from precautionary UCC filings and (iii) liens to defease or discharge debt.<br>• Add general lien basket of $10 million.<br><br>*Transactions with Affiliates*<br>• Add carve-out for granting and performance of registration rights and obligations under the Shareholders' Agreement.<br>• Exclude pro rata distributions on Capital Stock from covenant.<br><br>*Issuance and Sales of Capital Stock*<br>• Add carve-out for joint ventures.<br><br>*Limitation on Asset Sales*<br>• Reduce period for reinvestment of net cash proceeds from Asset Sales to 270 days. |
|  |  |
| **TREATMENT OF PREFERRED EQUITY HOLDERS IN** | On the Effective Date, the common stock and the Existing Preferred Interests of BNHI will be cancelled and the holders of the Existing Preferred Interests (the "**Equity** |

| | |
|---|---|
| **RESTRUCTURING** | **Holders**") shall receive their pro rata share of: (A) 2.5% of the initial primary shares of the New Common Stock as of the Effective Date, subject to subsequent dilution by exercise of the Equity Holder Warrants and any equity issued under a MIP, and (B) two series of warrants (the "**Equity Holder Warrants**") to purchase, at any time prior to the 8th anniversary date of the Effective Date, up to (i) 11% of the fully diluted New Common Stock after giving pro forma effect to the issuance of primary shares underlying these warrants, but diluted for any primary shares issued pursuant to the MIP or the warrants described under (B)(ii) herein, at an exercise equity value, calculated prior to dilution for the issuance of the 11% warrants, equal to $171,346,154 which reflects a par plus accrued recovery on the Existing Senior Notes.  For example, prior to any possible dilution for the MIP, if there were 10,000,000 shares outstanding, prior to the issuance of the warrants, a cash exercise would result in the warrant holders purchasing approximately 1,235,955 additional shares at $17.135 per share; and (ii) 4% of the fully diluted New Common Stock after giving pro forma effect to the issuance of primary shares underlying all warrants (including those described under (B)(i) herein), but diluted for any primary shares issued pursuant to the MIP, at an equity exercise value, calculated prior to dilution for the 4% warrants, which together with the Company's $150,000,000 New Senior Secured Notes, plus amounts outstanding under any revolving credit facility and capitalized leases, less cash and cash equivalents on the Company's balance sheet as of the Effective Date, and giving pro forma effect for any cash and shares of New Common Stock relating to the exercise of the warrants contemplated under (B)(i) herein, would be equal to an enterprise value of $350,000,000.  For example, prior to dilution associated with any MIP, if there were 10,000,000 shares outstanding, if total debt was $170,000,000 and cash on the balance sheet was $50,000,000 (including $21,177,614 which might be associated with a cash exercise of the 11% warrants), the equity value would be $230,000,000, resulting in a share price of $20.470, at which the additional 4%, or 468,165 shares, would be exercised. |
| | |
| **TREATMENT OF UNSECURED CLAIMS** | All BNHI trade and subsidiary related obligations (excluding intercompany loan obligations, if any) will be unimpaired by the Restructuring. |

| | |
|---|---|
| **DIP FINANCING/EXIT FINANCING:** | To the extent necessary and applicable, BNHI will seek a post-petition credit facility (the "**DIP Facility**") and an exit facility (the material terms of any such DIP Facility (excluding the identity of the lender(s) and exit facility) to be in form and substance reasonably satisfactory to the Required Consenting Noteholders.<br><br>As used herein, the term "**Revolving Credit Agreement**" refers to that certain Credit Agreement, dated as of August 23, 2006, by and among BNHI and certain of its subsidiaries, the lenders thereto, and The CIT Group/Business Credit, Inc., as administrative agent, collateral agent and documentation agent, amended as of July 27, 2007, November 12, 2010, December 8, 2011 and May 31, 2012. |
| **CORPORATE GOVERNANCE:** | On the Effective Date, the new board of BNHI will be comprised of five to seven directors, designated as follows: one director will be the then current chief executive officer of BNHI and the remaining directors will be selected consensually by the Required Consenting Noteholders. |
| **MANAGEMENT INCENTIVE PLAN** | Securities exercisable for or convertible into 6 to 10% of the New Common Stock, subject to such terms and conditions to be determined by the board of restructured BNHI (any such shares to dilute all other New Common Stock granted in connection with the Restructuring). |
| **REGISTRATION RIGHTS AGREEMENT** | Registration rights for the New Senior Secured Notes will be granted pursuant to a registration rights agreement in form and substance satisfactory to the Required Consenting Noteholders. |
| **SHAREHOLDERS' AGREEMENT** | A Shareholders' Agreement shall be executed by the members of the Required Consenting Noteholders which will provide each member of the Required Consenting Noteholders with: (i) drag-along and tag-along rights with respect to its New Common Stock, (ii) rights of first refusal with respect to transfers of New Common Stock by other members of the Required Consenting Noteholders and (iii) preemptive rights with respect to the purchase of its pro rata share of any additional equity securities (other than New Common Stock issued pursuant to the Equity Holder Warrants or MIP) or issued or sold by BNHI (together with a pro rata portion of any securities that are unsubscribed for |

| | |
|---|---|
| | by any other member of the Required Consenting Noteholders). The Shareholders' Agreement shall terminate upon pricing of an initial public offering, as defined in the Shareholders' Agreement. |
| | |
| **IMPLEMENTATION:** | The Restructuring shall be effectuated through the Plan of BNHI, the Guarantors, and, only to the extent necessary, certain or all of BNHI's other domestic subsidiaries, which, in BNHI's sole discretion may be combined with an exchange offer for the Existing Senior Notes (provided that any such exchange offer shall result in 100% of the Existing Senior Notes being exchanged for the consideration described herein). The definitive documentation with respect to the Restructuring shall be in form and substance satisfactory to BNHI and the Required Consenting Noteholders and may not contain terms which vary materially from the terms described herein. |
| | |
| **FEES AND EXPENSES:** | In addition to paying the reasonable, actual and documented fees and expenses of its own legal and financial advisors, BNHI will pay the reasonable, actual and documented fees and expenses of Dechert LLP and FTI Consulting through the Effective Date and in accordance with the terms of the existing fee arrangements and without requiring such advisors to seek approval of such fees and expenses from the Bankruptcy Court. |
| | |
| **RELEASE:** | The Plan shall contain standard and customary third party releases and exculpations under section 1125(e) of the Bankruptcy Code, and the Confirmation Order will contain a "good faith" finding as contemplated by that section. |
| | |
| **REPORTING:** | From the date of execution of this Term Sheet and subject to applicable confidentiality agreements, BNHI shall maintain open and timely communication with the advisors to the Required Consenting Noteholders with respect to all aspects of the Restructuring process as well as any and all bankruptcy proceedings relating to BNHI, including, but not limited to, any potential sale of BNHI and any or all of its assets. In addition, BNHI will comply with its reporting obligations under the Existing Indenture. |

**EXHIBIT B**

**PLAN**

[See Exhibit 1 to the Disclosure Statement]

## EXHIBIT C

## JOINDER

This Joinder to the Restructuring Support Agreement, dated as of July 13, 2012 by and among each of Broadview Networks Holdings, Inc. and each of its direct and indirect subsidiaries (collectively, the "Company"), the Consenting Equity Holders and the Consenting Noteholders signatory thereto (as amended, supplemented or otherwise modified, the "Support Agreement), is executed and delivered by [    ] (the "Joining Party") as of _____ __, 2012. Capitalized terms used but not otherwise defined herein shall have the meaning set forth in the Support Agreement.

1. Agreement to be Bound. The Joining Party hereby agrees to be bound by all of the terms of the Support Agreement, attached to this Joinder as Annex I (as the same may be hereafter amended, restated or otherwise modified from time to time). The Joining Party shall hereafter be deemed to be a "Consenting Noteholder" or a "Consenting Equity Holder," as applicable, and a Party for all purposes under the Support Agreement.

2. Representations and Warranties. With respect to the aggregate principal amount of Notes and/or Equity held by the Joining Party upon consummation of the sale, assignment, transfer, hypothecation or other disposition of such Notes or Equity, listed on the signature page hereto, the Joining Party hereby makes the representations and warranties of the Consenting Noteholders or Consenting Equity Holders, as applicable, to the Company set forth in Section 5 of the Support Agreement.

3. Governing Law. This Joinder shall be governed by and construed in accordance with the internal laws of the State of New York, without regard to any conflicts of law provisions which would require the application of the law of any other jurisdiction.

* * * * *

[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, the Joining Party has caused this Joinder to be executed as of the date first written above.

Name of Institution: _____

By: _____

Name: _____

Title: _____

Telephone: _____

Facsimile: _____

E-mail: _____

**Aggregate Principal Amount of Notes Held**

$ _____

**Aggregate Amount of Equity Held**

Class A Preferred _____

Class A-1 Preferred _____

Class B Preferred _____

Class B-1 Preferred _____

Class A Common _____

Class B Common _____

[SIGNATURE PAGE TO JOINDER]

## ANNEX I

[Restructuring Support Agreement]